## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## MOBILE DIVISION

| | | |
|---|---|---|
| Akouvi Adjessom, individually, and on behalf of minor children J.Y.A. and J.S.A., Sokede Azogba, Christine Adjessom, and Jenice Adjessom, | : : : : : | JURY TRIAL DEMANDED |
| | : | No.: 1:25-cv-455 |
| Plaintiffs, | : : | |
| v. | : : | |
| City of Mobile, Nicholas Crepeau, Kenneth Gillespie, Blake Tillman, Steven Guidry, Christian Bryant, Jonathan Myers, Brian Rivers, Daryl Gipson, Philip Morris, Steven Laster, Oliver Simpson, Scott Hank, Brandy Battiste, and Alexandra Whitt, | : : : : : : | |
| Defendants. | | |

## <u>COMPLAINT</u>

Plaintiffs, Akouvi Adjessom, individually and on behalf of minor children J.Y.A and J.S.A., Sokede Azogna ("Ms. Azogna"), Christine Adjessom, and Jenice Adjessom (all together, "the Plaintiffs") by and through their attorneys, Grant & Eisenhofer, P.A., asserts the following Complaint against Defendants the City of Mobile ("the City"), Mobile Police Department Homicide Unit Officers, Lt. Nicholas Crepeau ("Crepeau") and Lt. Kenneth Gillespie ("Gillespie") (the "Homicide Unit Defendants"), Mobile Police Department Special Weapons and Tactics ("SWAT") Unit Officers, Blake Tillman ("Tillman"), Steven Guidry ("Guidry"), Christian Bryant ("Bryant"), Jonathan Myers ("Myers"), Brian Rivers ("Rivers"), Daryl Gipson ("Gipson"), Philip Morris ("Morris"), Steven Laster ("Laster"), Oliver Simpson ("Simpson"), and Scott Hank ("Hank") (the "SWAT Unit Defendants"), and Mobile Police Department Employees, Brandy Battiste ("Battiste") and Alexandria Whitt ("Whitt") ("Police Department Employee Defendants")

(the Homicide Unit Defendants, SWAT Unit Defendants, and Police Department Employee Defendants named herein will be collectively referred to as the "Police Department Defendants" and together with the City, the "Defendants"), and in support thereof, avers as follows:

## INTRODUCTION

1.      On November 13, 2023, members of the Mobile Police Department ("MPD"), including the SWAT Unit Defendants named above, descended upon 3408 Sheringham Drive, Mobile, Alabama ("the Sheringham Residence") to execute a search warrant. After surrounding the home, MPD's SWAT Unit approached the front door of residence with a battering ram and proceeded to break down the front door and at least one window in the living room of the home. At the time of the raid, Plaintiffs Akouvi Adjessom, her minor children J.Y.A. and J.S.A, Sokede Azogna, Christine Adjessom, and Jenice Adjessom were all residents of the home along with Akouvi's minor son, Randall Adjessom ("Randall"). MPD'S SWAT did not knock and announce its presence prior to entry.

2.      Meeting SWAT at the door was Plaintiff Azogna, who—upon seeing SWAT break down the front door of her home—panickily stated "what, what, what?" Instead of providing Ms. Azogna and the other residents of Sheringham Drive with a copy of the search warrant to review and an opportunity to peacefully comply with the same, MPD's SWAT Unit yelled "get on the ground," and gestured their weapons at Ms. Azogna repeatedly, using the barrel of a loaded gun to force her into a front bedroom. A SWAT member later admitted that "Grandmom met us at the front door." Despite "Grandmom's" meeting with the officers at the front door and her panic screams of "what, what, what," every member of SWAT stationed at the front door, including the SWAT Unit Defendants, continued on with the raid as if Ms. Azogna had never appeared. MPD's failure to knock and announce their presence prior to breaching the home and their subsequent

failure to provide a reasonable response time from the home's occupants, including all Plaintiffs, violated industry standards and federal law.

3.      Randall, asleep in his childhood bedroom, would have heard the home he shared with the Plaintiffs (his mom, sisters, aunt, and elderly grandmother) being breached from all sides by a seemingly large number of attackers. Awoken to the sound of the intruders breaking into his home, Randall came out of his bedroom and headed towards the front door. Within seconds of breaking into the Sheringham Residence, the SWAT Unit, including the SWAT Unit Defendants, reached an intersection at the end of the front hallway just a few feet from the front door when Randall appeared from around a corner coming from the direction of his bedroom. Justifiably believing that he and his family were under attack by a large number of individuals, Randall was holding a laser-guided weapon in his hand in defense of the Sheringham Residence and his family. Upon seeing that the intruders were actually a fully-armed battalion of MPD SWAT officers, Randall stopped in his tracks and started to retreat. Video confirms that he began taking steps backwards and raising his hands. SWAT disregarded the child's retreat and, within 11 seconds of breaking into the Sheringham Residence, shot Randall multiple times.

4.      While Randall lay dying from the multiple gun shot wounds inflicted by the MPD, MPD, including the SWAT and Homicide Unit Defendants, worked to cover up SWAT's unjustifiable killing. To conceal Randall's death while they avidly worked to find and/or trump up evidence justifying the gunning down of a minor, the SWAT Unit Defendants rounded up the surviving occupants (the Plaintiffs) of Sheringham Drive at gunpoint and held them all in the front room of the residence. MPD never told Randall's family that they had shot the child or that he was bleeding out in the hallway outside his bedroom door. As a result, none of the Plaintiffs had any

opportunity to render Randall aid, take him to a hospital, or call an ambulance; they also had no opportunity to say goodbye to their son, grandson, nephew, and brother.

5.      Plaintiffs were handcuffed by and/or at the direction of the SWAT Unit Defendants and detained on the floor of the front room of the Sheringham Residence for hours while MPD cleared Randall's dying body and worked to create a justification for his killing. In addition to the handcuffs, visibly armed members of MPD's SWAT Unit, including the SWAT Unit Defendants, guarded Plaintiffs in the front bedroom and informed Plaintiffs on numerous occasions that they were not free to leave. While they were handcuffed and detained, Plaintiffs asked to see the warrant, questioned the reason for their prolonged detention, and asked if someone was injured. MPD refused to answer any of these questions. Plaintiffs' aver that their detention at Sheringham Drive lasted far longer than was necessary to effectuate the search warrant and was not based on concerns related to officer safety or the destruction of evidence; rather, Plaintiffs prolonged detention at Sheringham Drive was a direct result of MPD's concealment efforts.

6.      After the Plaintiffs had already been detained for hours, Homicide Unit Defendant Crepeau, a lieutenant with the MPD, ordered that Plaintiffs be transported to the MPD police station for further questioning. At the time this order was given, Plaintiffs had already been detained for several hours. They had not committed any crimes, and Defendants did not suspect them of committing any crimes whatsoever. In other words, Defendants had no probable cause to continue to detain Plaintiffs. Nevertheless, Crepeau ordered that Plaintiffs, including the two minor children, be transported to the MPD for interrogation for the continued purpose of trying to conceal MPD's killing and create a plausible justification for the same.

7.      Plaintiffs were physically transported to station by Police Department Employee Defendants Battiste and Whitt in MPD vehicles at, upon information and belief, the instruction

and direction of Crepeau. Plaintiffs did not consent to their transport and did not believe that they were free to leave. Neither Battiste nor Whitt believed or suspected that Plaintiffs had committed any crimes. At all times during this transport, Plaintiffs remained under detention by the MPD. This compelled transport gave all the appearances of an arrest for each Plaintiff, including two minor children, yet no probable cause existed.

8.      At the station, Plaintiffs, including the minor children, were individually questioned for several additional hours by and/or at the direction of Crepeau and Homicide Unit Defendant Gillespie, another lieutenant with the MPD. Plaintiffs were not free to leave. During this questioning, no members of the MPD, including any of the Defendants, believed or suspected that Plaintiffs had committed any crimes, and Plaintiffs had not committed any crimes. Plaintiffs were finally released in the late afternoon. None of the Plaintiffs were charged with any crimes stemming from the day-long detention, interrogation, and pseudo-arrest.

9.      Defendants detention, transport, and interrogation of Plaintiffs violated the Fourth Amendment.

## **PARTIES**

10.     Plaintiff Akouvi Adjessom is the mother of Randall Adjessom and is and was at all material times a resident of Mobile, Alabama.

11.     Akouvi Adjessom is also the mother of minor children J.Y.A. and J.S.A. J.Y.A. is 16 years old at the time of this filing and was just 14 years old when she was detained at gun point, transported from her home, and interrogated at the MPD police station. J.S.A. is 10 years old at the time of this filing and was just 8 years old when she was detained at gun point, transported from her home, and interrogated at the MPD police station. Both J.Y.A. and J.S.A. are and were residents of Mobile, Alabama at all material times.

12.     Sokede Azogna is the grandmother of Randall Adjessom and is and was at all material times a resident of Mobile, Alabama.

13.     Christine Adjessom is the aunt of Randall Adjessom and is and was at all material times a resident of Mobile, Alabama.

14.     Jenice Adjessom is Randall's sister and is and was at all material times a resident of Mobile, Alabama.

15.     Defendant City of Mobile is a municipality of the State of Alabama and a governmental authority that owns, operates, manages, directs, and controls the Mobile Police Department, which employed the SWAT Unit, Homicide Unit, and Police Department Employee Defendants at all material times.

16.     Defendant Lt. Nicholas Crepeau was at all times relevant to this action a police lieutenant and/or supervisor of the Mobile Police Department, assigned to MPD's Homicide Unit, and participated in and/or directed Plaintiffs' unlawful detention, transport, and interrogation.

17.     Defendant Lt. Nicholas Crepeau is being sued in his individual capacity as a police officer for the City of Mobile.

18.     Defendant Lt. Kenneth Gillespie was at all times relevant to this action a police lieutenant and/or supervisor of the Mobile Police Department, assigned to MPD's Homicide Unit, and participated in and/or directed Plaintiffs' unlawful detention, transport, and interrogation.

19.     Defendant Lt. Kenneth Gillespie is being sued in his individual capacity as police officer for the City of Mobile.

20.     Defendant Brandy Battiste was at all times relevant to this action an employee and/or agent of the Mobile Police Department and participated in Plaintiffs' unlawful detention, transport, and interrogation.

21.    Defendant Brandy Battiste is being sued in her individual capacity as an employee/agent for the City of Mobile.

22.    Defendant Alexandria Whitt was at all times relevant to this action an employee and/or agent of the Mobile Police Department and participated in Plaintiffs' unlawful detention, transport, and interrogation.

23.    Defendant Alexandria Whitt is being sued in her individual capacity as an employee/agent for the City of Mobile.

24.    Defendant Scott Hank was at all times relevant to this action a police lieutenant and/or supervisor of the Mobile Police Department, assigned to its SWAT Unit, and participated in the training, policymaking, planning, supervision, and/or execution of and/or related to the predawn raid that caused the death of Randall and the subsequent detention of the Plaintiffs.

25.    Defendant Scott Hank is being sued in his individual capacity as police officer for the City of Mobile.

26.    Defendant Daryl Gipson was at all times relevant to this action a police corporal and/or supervisor of the Mobile Police Department, assigned to its SWAT Unit, and participated in the training, policymaking, planning, supervision, and/or execution of and/or related to the predawn raid that caused the death of Randall and the subsequent detention of the Plaintiffs.

27.    Defendant Daryl Gipson is being sued in his individual capacity as police officer for the City of Mobile.

28.    Defendant Philip Morris was at all times relevant to this action a police corporal and/or supervisor of the Mobile Police Department, assigned to its SWAT Unit, and participated in the training, policymaking, planning, supervision, and/or execution of and/or related to the predawn raid that caused the death of Randall and the subsequent detention of the Plaintiffs.

29.     Defendant Philip Morris is being sued in his individual capacity as police officer for the City of Mobile.

30.     Defendant Steven Laster was at all times relevant to this action a police officer and/or supervisor of the Mobile Police Department, assigned to its SWAT Unit, and participated in the training, policymaking, planning, supervision, and/or execution of and/or related to the predawn raid that caused the death of Randall and the subsequent detention of the Plaintiffs.

31.     Defendant Steven Laster is being sued in his individual capacity as police officer for the City of Mobile.

32.     Defendant Jonathan Myers was at all times relevant to this action a police officer and/or supervisor of the Mobile Police Department, assigned to its SWAT Unit, and participated in the training, policymaking, planning, supervision, and/or execution of and/or related to the predawn raid that caused the death of Randall and the subsequent detention of the Plaintiffs.

33.     Defendant Jonathan Myers is being sued in his individual capacity as police officer for the City of Mobile.

34.     Defendant Blake Tillman was at all times relevant to this action a police officer and/or supervisor of the Mobile Police Department, assigned to its SWAT Unit, and participated in the training, policymaking, planning, supervision, and/or execution of and/or related to the predawn raid that caused the death of Randall and the subsequent detention of the Plaintiffs.

35.     Defendant Blake Tillman is being sued in his individual capacity as police officer for the City of Mobile.

36.     Defendant Steven Guidry was at all times relevant to this action a police officer and/or supervisor of the Mobile Police Department, assigned to its SWAT Unit, and participated

in the training, policymaking, planning, supervision, and/or execution of and/or related to the predawn raid that caused the death of Randall and the subsequent detention of the Plaintiffs.

37.    Defendant Steven Guidry is being sued in his individual capacity as police officer for the City of Mobile.

38.    Defendant Brian Rivers was at all times relevant to this action a police officer and/or supervisor of the Mobile Police Department, assigned to its SWAT Unit, and participated in the training, policymaking, planning, supervision, and/or execution of and/or related to the predawn raid that caused the death of Randall and the subsequent detention of the Plaintiffs.

39.    Defendant Brian Rivers is being sued in his individual capacity as police officer for the City of Mobile.

40.    Defendant Christian Bryant was at all times relevant to this action a police officer and/or supervisor of the Mobile Police Department, assigned to its SWAT Unit, and participated in the training, policymaking, planning, supervision, and/or execution of and/or related to the predawn raid that caused the death of Randall and the subsequent detention of the Plaintiffs.

41.    Defendant Christian Bryant is being sued in his individual capacity as police officer for the City of Mobile.

42.    Defendant Oliver Simpson was at all times relevant to this action a police officer and/or supervisor of the Mobile Police Department, assigned to its SWAT Unit, and participated in the training, policymaking, planning, supervision, and/or execution of and/or related to the predawn raid that caused the death of Randall and the subsequent detention of the Plaintiffs.

43.    Defendant Oliver Simpson is being sued in his individual capacity as police officer for the City of Mobile.

## JURISDICTION AND VENUE

44.     This action is brought pursuant to 42 U.S.C. § 1983.  Jurisdiction is based upon 28 U.S.C. §§ 1331 and 1343.

45.     Venue is proper in this district under 28 U.S.C. § 1391(b) because the events giving rise to the claims asserted in this Complaint occurred in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL PLAINTIFFS

### THE MOBILE POLICE DEPARTMENT'S IMPROPER DECISION TO USE SWAT TO PERFORM A PREDAWN RAID AT THE SHERINGHAM RESIDENCE

46.     At all relevant times prior to and on November 13, 2023, Plaintiffs resided at the Sheringham Residence with Randall.

47.     The MPD first became interested in the Sheringham Residence in the weeks prior to November 13, 2023, when officers allegedly received a citizen's complaint concerning suspected drug activity at the location.

48.     The alleged citizen's complaint related to Randall's 18-year-old brother, Deangelo Adjessom ("Deangelo"), who thereafter became a suspect of an MPD Narcotics Unit investigation.

49.     Randall, a 16-year-old minor, was not a subject of the investigation and was not suspected of engaging in any criminal activity. Plaintiffs, including two minor children, were not the subject of the investigation and were not suspected of any criminal activity. At all relevant times, Deangelo, an adult and the target of the investigation, did not reside at the Sheringham Residence.

50.     On or about November 9, 2023, as a part of the then ongoing narcotics investigation, the MPD initiated a traffic stop on Deangelo and discovered a small amount of marijuana, a firearm, and what it considered to be evidence of intent to distribute marijuana.

51.     Deangelo cooperated during the traffic stop. He also waived his Miranda rights and agreed to be interviewed.

52.     Despite having evidence in hand that would have permitted MPD officers to effectuate the arrest of Deangelo, MPD released him.

53.     MPD then prepared a search warrant of the Sheringham Residence, even though Deangelo was not living at the Sheringham Residence at that time, which a judge executed on November 9, 2023, at approximately 8:17pm.

54.     The sworn Search Affidavit prepared by MPD officers for that warrant stated that that police received information from neighbors of drug activity at the Sheringham Residence. It also stated that police found marijuana, evidence of distribution, and a firearm on Deangelo during a recent traffic stop. The Search Affidavit does not mention Randall or any of the Plaintiffs as being suspected of committing criminal activity.

55.     The Search Affidavit did not state why Deangelo was not detained during the earlier traffic stop or why MPD did not obtain a warrant for the Sheringham Residence during that detainment.

56.     The Search Affidavit also did not articulate any facts evidencing the need for a nighttime pre-dawn raid.

57.     At the time the warrant was sought, MPD did not have reasonable grounds to believe that knocking and announcing its presence would create an imminent threat of physical violence to the officers or to another person.

58.     MPD likewise did not have reasonable grounds to believe that execution of the warrant during daylight hours would create an imminent threat of physical violence to officers or to another person.

59.     Consequently, MPD did not seek judicial authorization for a no-knock entry; MPD did not obtain supervisory approval for a no-knock entry; and MPD did not obtain felony-level prosecutor's office approval for the same.

60.     To be clear, the subsequent warrant executed by the Court did not authorize pre-dawn, no-knock execution of the warrant.

61.     Prior to executing the warrant on the home, an MPD Narcotics Unit police officer completed the MPD's Threat Assessment for Warrant Service form ("Threat Assessment"), which is used to measure the risk of violence the executing officers could potentially face.

62.     The Threat Assessment score was eight out of ten, which made the use of MPD SWAT "optional."

63.     Importantly, in cases where a SWAT detail is activated to participate in the execution of a search warrant, a parallel risk assessment evaluating the risk of injury or death to citizens and/or innocent bystanders is not required by the MPD.

64.     MPD's failure to evaluate the civilian risk is not an oversight on the part of the department, but is, in fact, intentional. There is one question on the Threat Assessment form that reads, "Are there children, elderly persons, or handicapped persons? [Inside the location to be searched]." However, although that question is contained on the form, the phrase "Informational purposes only" appears in parentheticals below this question and the columns next to the question where a response could be provided are permanently shaded out on the form.

65.     Although entry of the information is permanently shaded on the form, it is clear that MPD either knew or should have known that there were multiple children and elderly persons in the Sheringham Residence prior to execution of the warrant.

66.     Prior to the raid, MPD purportedly conducted surveillance over the course of "several weeks" on the home. Because MDP conducted surveillance over the course of "several weeks," it would have seen that multiple children lived there along with adult female family members. Yet, MPD did not indicate the number of children and elderly persons in the home in its Search Affidavit.

67.     During this "several weeks" of surveillance, MPD also did not observe any of the Plaintiffs engaging in any criminal activity or suspected criminal activity.

68.     Following MPD's inadequate and incorrect threat assessment and receipt of Court-executed search warrant, MPD's Narcotics Unit decided to engage the MPD's SWAT Unit to execute the search warrant apparently because of officer shortages in the MPD.

69.     MPD decided to effectuate a predawn raid for suspected marijuana sales despite the fact that MPD knew that the execution of a predawn raid posed a unique and heighted risk to citizens, as police will encounter individuals who are asleep at the time of the raid and who will wake up in a state of confusion and panic upon hearing banging, yelling, and the breaking down of doors at their home.

70.     Further, the MPD decided to effectuate the instant predawn raid knowing that individuals caught in the midst of a predawn raid were likely to believe that someone is breaking into their home, and consequently grab a weapon to protect themselves and their families. In fact, given Alabama's codification of the Castle Doctrine, citizens' protection of their home through the use of deadly force in response to a break-in would be justified, rendering it all the more foreseeable.

71.     Here, either (1) MPD did know, by virtue of its surveillance efforts, that minors and elderly persons lived at the Sheringham Residence and failed to consider the extreme risk to their

lives the predawn raid posed; or (2) as MPD Internal Affairs later concluded, had MPD conducted a more thorough investigation into the Sheringham Residence before completing the Threat Assessment and executing the search warrant, the officers would have known that there were children present in the household, including Randall, and could have formulated a safer approach, such as conducting the approach during school hours. Under either scenario, MPD failed to act reasonably and deviated from industry standard.

72.    MPD's failure to gather and/or disseminate information regarding the occupants of the Sheringham Residence resulted the omission of vital information from the Threat Assessment and the search warrant that would have precluded the use of SWAT and warranted an alternative form of search warrant execution.

## MPD'S KILLING OF 16-YEAR-OLD RANDALL ADJESSOM

73.    On November 13, 2023, at approximately at 5:37 a.m., MPD's SWAT, comprised of Officers Osviel Vigoa-Martinez, Scott Hank, Robert Davis, Daryl Gipson, Kyle Carag, Philip Morris, Josh Evans, Steven Laster, Jonathan Myers, Blake Tillman, Steven Guidry, Brian Rivers, Christian Bryant, Jordan Soto, and Oliver Simpson, as well as MPD Special Operations K9 handler Defendant Elizabeth Lowry, and supported on scene by MPD's Narcotics Unit, comprised of Defendants Charles DeGreer, Gerald Ripple, David Reyes, Jalon Robinson, Charles Hunter, Clinton Law, and Caitlyn Williams, began the predawn raid to execute the search warrant of the Sheringham Residence.

74.    Sunrise was not until 6:16 a.m. that day, meaning that the warrant was <u>not</u> executed during daylight hours despite the fact that MPD did not obtain authorization from the Court for a nighttime pre-dawn raid.

75.     At approximately 5:38:41 a.m., as seen on body worn camera (hereinafter referred to as "BWC") video footage, the SWAT Unit approached the Sheringham Residence from several different locations, while the Narcotics Unit team provided on scene support.

76.     After surrounding the home, at approximately 5:39:13, the SWAT Unit Defendants approached the front door of the residence with a battering ram and proceeded to break down the front door and at least one window in the living room of the home.

77.     At 5:39:51 a.m., the SWAT Unit Defendants tactically entered the front door of the premises in formation, yelling "police" for the first time, either as they entered or shortly thereafter.

78.     Plaintiff Sokede Azogba, an adult resident of the home, was located immediately inside the front door when SWAT battered down the door.

79.     The SWAT Unit Defendants did not provide Ms. Azogba with any information as to why they had just rammed down the door to the Sheringham Residence, nor did they provide her or any of the home's occupants with a chance at peaceful compliance.

80.     A still shot of that encounter is included below:



81. Instead, the SWAT Unit Defendants pointed their firearms at Ms. Azogba, yelled "get on the ground," and gestured their weapons at her repeatedly, using the barrel of a loaded gun to force her into a front bedroom. SWAT then moved down the hallway in formation.

82. The SWAT Unit Defendants later admitted that "Grandmom met us at the front door" and that SWAT "pushed" Ms. Azogba into the front room.

83. Despite "Grandmom's" meeting with the officers at the front door and her panic screams of "what, what, what," every member of SWAT stationed at the front door, which included Officers Vigoa-Martinez and SWAT Unit Defendants Hank, Gipson, Morris, Laster, Myers, Tillman, Guidry, Rivers, Bryant, and Simpson, continued on with the raid.

84. Specifically, SWAT continued to swarm the home and proceed down the hallway in a military-style assault.

85.    MPD's failure to knock and announce its presence <u>prior to breaching the home</u> (and its subsequent failure to provide a reasonable response time from the home's occupants), violated industry standards and federal law.

86.    Randall, asleep in his childhood bedroom, would have heard the home he shared with his mom, sisters, aunt, and elderly grandmother being breached from all sides by a seemingly large number of attackers.

87.    Within seconds of breaking into the Sheringham Residence, SWAT reached an intersection at the end of the front hallway just a few feet from the front door when Randall appeared from around a corner coming from the direction of his bedroom. Justifiably believing that he and his family were under attack by a large number of individuals, Randall was holding a laser-guided weapon in his hand, in defense of the Sheringham Residence and his family. Prior to realizing who was breaking in his home, Randall held the gun and sight pointed forward.

88.    BWC video footage shows the moment when Randall rounds the corner and sees that his attackers are actually police officers: SWAT shouts "hands up", and, in compliance with their directives, Randall immediately raised his right hand, which was holding the firearm, to the sky and placed his left bare hand in front of his face as if to shield himself from what was about to come. In addition to raising his right hand, as he was instructed to do, which necessarily caused the sight on the weapon to move upwards as well, Randall also tried to take several steps backwards in retreat.

89.    BWC footage shows SWAT's vantage point. From this footage, it is clear that MPD officers would have seen Randall putting his hands up and taking a step backwards in retreat.

90.    As Randall was starting to raise his hands and retreat, Officer Tillman, a member of the SWAT Unit, attempted to fire his weapon, but the weapon malfunctioned — a known issue

with MPD's firearms — and Defendant Tillman fell to the ground. Despite having the opportunity to do so, none of SWAT Unit called for their fellow officers to hold fire as Randall retreated.

91.     Instead, at 5:40:02, approximately 11 seconds after SWAT forced entry into the Sheringham Residence, Officer Osviel Vigoa-Martinez shot Randall four (4) times in the chest and torso.

92.     Officer Osviel Vigoa-Martinez shot Randall while Randall's hands were in the air and he was actively retreating from the officers, and thus while he posed no danger to MPD police officers or anyone else.

93.     After Officer Osviel Vigoa-Martinez shot Randall four (4) times, Randall fell to the ground with grave injuries; BWC reveals that his body writhed with the pain from his injuries, but the MPD officers on scene did not immediately render medical aid.

94.     Instead, at 5:40:30, a SWAT Team member can be heard on BWC stating, "What are we going to do with this?", apparently referring to the dying black child they had just shot as "this."

95.     More than four minutes after Randall was shot by Officer Osviel Vigoa-Martinez, at approximately 5:44:18 a.m., well after MPD had cleared the residence and knew the site was secure, Officer Christian Bryant, the SWAT Team medic, can be seen on a BWC beginning to place bandages on Randall. However, upon information and belief, Officer Bryant already knew that these efforts were insufficient to treat multiple gunshot wounds, which were causing profuse bleeding and systemic shock.

96.     Despite his grave condition, medical records confirm that Randall was not admitted to a local emergency room until 6:28 a.m.—50 minutes after Officer Osviel Vigoa-Martinez shot him, where he was pronounced dead.

97.     The local hospital is only 8 minutes from the Sheringham Residence.

**MPD'S COVER-UP AND DETENTION AND SEIZURE OF PLAINTIFFS**

98.     In the seconds, minutes, and hours after killing Randall, MPD officers and employees worked hard to conceal and coverup what they had just done.

99.     Aside from Ms. Azogba, who was pushed with a loaded firearm into the front room just seconds prior to the moment when MPD shot and killed her grandson, all of the other occupants of the Sheringham Residence, including the remaining Plaintiffs, were asleep when MPD broke into their home. After being awoken from the sounds of the raid, Plaintiffs immediately began appearing from their bedrooms.

100.    Meanwhile, in the front room, Defendant Rivers held Ms. Azogba at gunpoint on her hands and knees.

101.    Akouvi Adjessom appeared at the top of the steps within seconds of SWAT's entry. Like her son and mother, Akouvi Adjessom immediately complied with SWAT instructions, placing her hands in the air. Despite her compliance, SWAT Unit Defendants held her at gunpoint and then handcuffed and detained her in the front room of the Sheringham Residence.

102.    Akouvi Adjessom's three daughters, minor children J.Y.A. and J.S.A., and Jenice Adjessom appeared close behind their mother. The three girls also complied with commands. Despite their compliance, SWAT Unit Defendants handcuffed each of them and placed them under detention in the front room of the Sheringham Residence.

103.    Christine Adjessom, Akouvi Adjessom's sister, also appeared. She complied with demands, but was similarly taken at gun point to the front room of the residence where she was handcuffed and detained.

104.     At some point, the SWAT Unit Defendants took the handcuffs off of the minor children. Every other Plaintiff remained cuffed. The children were not free to leave the front room and remained detained with their mother, grandmother, aunt, and older sister.

105.     During the entire time that Plaintiffs were detained in the Sheringham Residence, a minimum of two SWAT Unit Defendants stood guard over the Plaintiffs, informing them that they were not free to leave.

106.     During this time period, Akouvi Adjessom repeatedly asked the SWAT Unit Defendants, what was going on. She informed the SWAT Unit Defendants that she was the owner of the house and requested the search warrant paperwork. The SWAT Unit Defendants repeatedly told her to be quiet and refused to answer her questions.

107.     SWAT Unit Defendants did not believe or suspect that any of the Plaintiffs had committed any crime and did not have probable cause to seize and detain them for this time period. SWAT Unit Defendants also detained Plaintiffs far longer than was necessary to effectuate the search of the Sheringham Residence. Thus, at the time of the continued detention, no exigent circumstances existed to justify the same.

108.     SWAT Unit Defendants were not detaining Plaintiffs for any legitimate law enforcement investigative purpose and, instead, detained the Plaintiffs for the specific purpose of concealing Randall's death and protecting the officers involved.

109.     During this hours-long detention at the Sheringham Residence, the Homicide Unit Defendants and Police Department Employee Defendants appeared on scene. Lt. Nicholas Crepeau directed that Plaintiffs should continue to be detained and instructed the Police Department Employee Defendants to transport Plaintiffs to MPD's station so that he and Lt. Gillespie could interrogate them.

110.    At the time Lt. Crepeau gave this instruction to his subordinates, he did not believe and did not suspect that any of the Plaintiffs had committed or been involved in any crime. He did not have probable cause to arrest the Plaintiffs. No exigent circumstances existed to justify any continued detention beyond what was necessary to effectuate the warrant. Despite lacking legal authority for the continued detention, he instructed the Police Department Employee Defendants to transport Plaintiffs against Plaintiffs' wills to the Mobile Police Department station house.

111.    Police Department Employee Defendants complied with Lt. Crepeau's commands and transported Plaintiffs, including the minor children, to the police department for interrogation. At the time the Police Department Employee Defendants seized, detained, and transported Plaintiffs from the Sheringham Residence to the police station, the Police Department Employee Defendants did not believe or suspect that any of the Plaintiffs had committed or been involved in any crime. They did not have probable cause to arrest the Plaintiffs and no exigent circumstances existed to justify the transport of Plaintiffs from their residence to a different location.

112.    Instead, Plaintiffs believe and therefore aver, that Defendants detained Plaintiffs in the front room and then transported Plaintiffs to the police station for interrogation to (1) continue to coverup the physical scene of MPD's killing; and (2) in a futile attempt to trump up charges against Randall and/or Deangelo to justify Randall's death and paint the child as a criminal.

113.    Despite lacking legal authority for the continued detention and the unlawfulness of the reasoning for the same, Police Department Employee Defendants put the Plaintiffs, including the minor children, in police-department vehicles and transported them from their home to the police station. Plaintiffs were not free to leave and did not believe they were free to leave. Plaintiffs did not voluntarily agree to the transport. At all times relevant hereto, Plaintiffs remained in the custody of the Mobile Police Department and its officers, supervisors, employees and agents.

114.    At the station, Plaintiffs were separated and individually questioned for hours, including the minor children, by the Homicide Unit Defendants. Plaintiffs did not voluntarily consent to this detention, seizure, transport, or interrogation. Plaintiffs were not free to leave the police station. Homicide Unit Defendants did not read Plaintiffs their Miranda warnings and did not inform them that they were <u>not</u> under arrest and were free to leave.

115.    At all times relevant to this questioning, the Homicide Unit Defendants did not believe or suspect that Plaintiffs had committed or been involved in any crime. The Homicide Unit Defendants did not have probable cause to detain and interrogate Plaintiffs.

116.    Plaintiffs unlawful detention and interrogation at the station stemmed not from safety concerns or exigency, but from a large-scale cover-up effectuated by the Defendants to conjure up evidence of a crime to pin on Deangelo or Randall.

117.    Defendants' efforts to paint Randall as a criminal in order to justify his unjustifiable killing also included searching Randall's cellular telephone absent consent or a search warrant enabling them to do so.

118.    Despite their best efforts, however, Defendants were unable to conjure up a crime on Randall or any of the Plaintiffs. When they finished their coverup attempt, the Homicide Unit Defendants finally admitted to Akouvi Adjessom that they had shot her son. At that point, Randall was already dead.

## THE AFTERMATH OF RANDALL'S DEATH

### A.    Community Outrage, a Temporary Ban on Predawn Raids, and the City's Failure to Enact Permanent Change

119.    Community outrage quickly followed in the aftermath of Randall's death, which was among four highly questionable and fatal uses of force by the MPD in an eight-month period.

22

120.    In response, the City placed Officer Osviel Vigoa-Martinez, who shot and killed Randall, on administrative leave.

121.    A statement from Mobile Mayor Sandy Stimpson, who was at all relevant times the Mayor of Mobile Alabama and a chief policy-maker of the MPD, expressed his condolences to Randall's family and further noted, "I have unanswered questions about the events leading up to this tragic outcome, and I am taking immediate steps to get those answers."

122.    Mayor Stimpson immediately instituted a temporary, 90-day ban, on all predawn warrants absent an immediate threat to life, and the Mayor requested that Kenyen Brown review the MPD's policy, procedures and training related to officers' use of force.

123.    Similarly, at a press conference with members of the media, Chief Prine, who was at all relevant times the Chief of Police for the MPD and a chief policy-maker of the MPD, acknowledged the danger predawn raids pose to the public, "[t]he question will always be and certainly understandable as to whether or not, you know, the individuals or the occupants of the home knew it was the police."

124.    Upon information and belief, Mayor Stimpson and Chief Prine's comments, as well as the Mayor's decision to institute the temporary ban on predawn raids absent exceptional circumstances, were due to the City's knowledge of and, up to that point, deliberate indifference to, similar past deadly incidents involving predawn raids and the use of excessive force by the MPD and its SWAT, as well as the continuing risk posed to the public absent immediate action to address deficient policies, practices, customs, training, supervision and/or discipline within the MPD.

125.    In fact, Mayor Stimpson and Chief Prine knew that just months prior, on March 7, 2023, MPD had shot and killed Kordell Jones, a 24-year old black man, in a pre-dawn raid on

Kordell's home, which occurred under strikingly similar circumstances to Randall's death, and that MPD had further detained, transported, and interrogated Kordell's family, including minor siblings, in violation of their constitutional rights after that killing as well.

126.    In that prior incident, MPD's SWAT broke into the Jones' family home using a battering ram and explosives to execute a warrant on Kordell's brother. Kordell was not suspected of committing any crime. But Kordell, awoken to the sounds of his family residence (which also included at least one child) being broken into, grabbed a firearm and then attempted to escape out of a window. Police shot Kordell approximately four times as he came out of the window, before he even hit the ground. He did not threaten the MPD with the firearm. He had not committed any criminal activity.

127.    After killing Kordell Jones, MPD detained Kordell's family members, including his minor siblings, and transported them to the Mobile Police Department station for interrogation. MPD did not have probable cause to detain any of Kordell's family members, nor were exigent circumstances present to justify the detention. Additionally, MPD did not read any of the family members their Miranda rights or tell any of those individuals that they were under no obligation to speak to MPD and were free to leave. By detaining, transporting, and interrogating Kordell's family members without probable cause or exigent circumstances, MPD violated their constitutional rights in the same manner that they violated Plaintiffs.

128.    Thus, at the time Plaintiffs were being unlawfully detained, transported, and interrogated, the City was on notice that MPD lacked sufficient training and supervision to conduct constitutional detentions and seizures. Yet, it failed to discipline or further train its officers to prevent similar unconstitutional searches and seizures from occurring in connection with future raids and investigations.

24

129.    The City's deliberate indifference to constitutional rights of Mobile's citizens who are not suspected to have committed any crime is exemplified through its statements and actions after Kordell's shooting. Chief Prine, consistent with his "fuck the public" mentality, placed blame on Kordell's brother for MPD's killing of Kordell, instead of his officers who had clearly violated Mobile's Use of Force policy, claiming that the shooting is an example of how criminal activity can impact the families of the criminal.

130.    The City and Mayor Stimpson took a different approach – placating the public with faux outrage at the situation while, simultaneously, likewise failing to retrain, supervise, or discipline the MPD officers who committed policy violations.

131.    After the shooting and unlawful detention of Kordell's family members, James Barber, Mayor Stimpson's Chief of Staff acknowledged that "no knock search warrants are a danger to people in the residences and officer safety," but said a ban could *not* be instituted because "it's a law that is through the state and not through the city counsel."

132.    Nevertheless, Mayor Stimpson's office stated that "it's our position that administratively, we will not execute no knock warrants. You have my assurance of that as long as I'm here, we will not do that," claimed Barber. Of course Barber's claims on behalf of the City were meaningless given that mere months later MPD broke into the Sheringham Residence yelling "police" only as they were entering the residence, conduct which amounts to the no-knock execution of a warrant without prior authorization to engage in same.

133.    After Randall's death, perhaps upon the realization that lawsuits on behalf of the multiple slain persons killed by MPD were impending, Mobile's City Council began to take steps, at least publicly, to formally codify and make permanent a restriction on predawn raids through a proposed City ordinance.

25

134.    But even though a child had now been killed, the City's efforts proved still to be a mere show to the public of proposed reform, which the City and MPD did not intend to actually enact.

135.    In fact, despite the recognition of the danger posed by predawn raids, the MPD, through its highest-ranking officer, Chief Prine, began to resist the call for permanent reform.

136.    According to Chief Prine, the proposed ordinance was unnecessary because the MPD had already reached a mutual understanding with the City's council about predawn raids. Obviously that mutual understanding, which had come—according to Stimpson's office after Kordell's death—failed to effectuate any meaningful change prior to Randall's killing.

137.    Upon information and belief, the MPD's opposition was, and remains, part of an ongoing custom or practice by the MPD to avoid oversight and accountability with respect to the improper predawn raids and unconstitutional searches and seizures, to avoid the reform of training, supervision, and discipline practices with respect to same, to conceal the extent of the MPD's staffing, equipment and tactical deficiencies, and to conceal the routine use of excessive force by MPD officers and employees.

138.    To date, due to MPD's opposition, efforts to impose a ban on predawn raids through City ordinance have been unsuccessful and their use by the MPD remains permissible even though the risk of death to innocent citizens, like 16-year-old Randall, clearly outweighs the benefit of these extremely dangerous raids.

**B.    Chief Prine's Derogatory Comments About the Public Expose the MPD's Deliberate Indifference to the Dangers Posed by Police Raids and the Public's Rights to be Free from Unlawful Searches and Seizures**

139.    Prior to November 13, 2023, the MPD's most senior officer, Chief Prine, exemplified the lack of concern MPD officers had for the public and, through actions taken during his tenure with the MPD, actively increased MPD officers' indifference to public safety.

140.    <u>Fuck the Public</u>: The Kenyen Brown Report cites an unidentified MPD police officer in a leadership position (Officer #1) who recalls Chief Prine, early in his tenure as chief of police, stating to MPD police officers, "I'm not concerned with what the media and public thinks about the police. Fuck the public." *See* Brown Report, at p. 80, Section VII, Subsection (a), (**Ex. A**)

141.    According to Officer #1, MPD officers would go on to echo and adopt Chief Prine's viewpoint, "<u>According to the chief, fuck the public!</u>" *Id.*

142.    Officer #1 thought that "Chief Prine's comments adversely impacted the way some officers may police in the future." *Id.*

143.    Upon information and belief, on or about April 9, 2024, Chief Prine was placed on administrative leave by the City of Mobile because of the systemic dysfunction that was allowed to go undressed during his tenure, which exposed the City to various individual and municipal claims related to the unconstitutional use of force by MPD police officers.

144.    Indeed, Chief Prine's comments at a press conference, occurring just hours after his placement on administrative leave, evidenced the MPD's disdain for oversight and accountability related to the appropriateness of predawn raids and the use of excessive force by MPD officers. Specifically, despite not having read the Brown Report, Chief Prine preemptively attempted to discredit its findings:

27

> "I would argue there's nothing in that report that's credible at all," he said "They certainly can't say anything about the leadership, or they open themselves up to a whole lot of liability with cases that are ongoing to being litigated today. So it really is about veiled threats and a power struggle,"

*See* Fox News 10, *Mobile's police chief says he's been forced out, calls himself 'whistleblower'* (available at https://www.fox10tv.com/2024/04/10/mobiles-police-chief-says-hes-been-forced-out-calls-himself-whistleblower/) (site last visited July 26, 2024).

145.    According to Fox News 10, that power struggle centered on MPD's refusal to restrict the use of no-knock warrants and predawn raids. *Id*

146.    Indeed, upon information and belief, despite knowing the danger posed by predawn raids, which include the increased risk of excessive or otherwise unnecessary force, as well as risks of avoidable the injury and death to uninvolved persons, MPD took no action to restrict the use of such raids or lessen the danger these raids posed to members of the public.

147.    Likewise, despite knowing that MPD had a pattern and practice of engaging in unconstitutional detention, seizures, and interrogations, MPD took no action to restrict the same or to train and supervise its officers with respect to constitutional investigative techniques.

148.    After placing Chief Prine on administrative leave, the City offered to allow him to retire with severance, which the Chief publicly declined, which ultimately led to the City voting to fire the Chief as of April 24, 2024.

149.    Apparently believing that the unconstitutional practices plaguing his department would never come to light given the potential for civil litigation, the Chief told broadcast media, "[a]nything they say that remotely attributes negligence on my leadership or the department's

negligence really opens them up to a lot of civil liability in these cases that some of them have already filed lawsuits on."[1]

150.    Upon information and belief, Chief Prine's statement following his firing was intended to serve as a final warning to the City — *i.e.*, that the systemic dysfunction and unconstitutional acts occurring within the MPD during Chief Prine's decades-long tenure could come to light if the City was not careful about what it chose to say about his tenure. The City, in an effort to evade liability, has heretofore chosen to heed that warning by continuing to coverup unconstitutional acts by its Chief Prine and its other police officers and employees.

**COUNT I**
**42 U.S.C. §1983 — MONELL LIABILITY**
**All Plaintiffs Against the City of Mobile**

151.    Plaintiffs incorporate the Facts Common to all Plaintiffs as if fully incorporated herein.

152.    Count I is alleged by Plaintiffs against the City.

153.    The SWAT Unit Defendants acted under the color of law, and under the authority of one or more interrelated *de facto* policies, practices, and/or customs of the City to violate Plaintiffs' rights as set forth herein.

154.    The Homicide Unit Defendants acted under the color of law, and under the authority of one or more interrelated *de facto* policies, practices, and/or customs of the City to violate Plaintiffs' rights as set forth herein.

155.    The Police Department Employee Defendants acted under the color of law, and under the authority of one or more interrelated *de facto* policies, practices, and/or customs of the City to violate Plaintiffs' rights as set forth herein.

---

[1] https://www.al.com/news/2024/04/mobile-mayor-says-police-chief-paul-prine-declined-severance-package-demanded-600000-payment.html (last accessed August 10, 2024).

156.    Prior to November 13, 2023, it was a *de facto* policy, practice, and/or custom of the City, through its police department, chief of police, mayor, city council, and final policymakers, including Chief Prine and/or Mayor Stimpson, to inadequately supervise and train police officers, including Police Department Defendants, concerning the need to:

a.  appropriately conduct stake outs to properly identify risks and dangers in executing search warrants;

b.  appropriately conduct arrests and/or investigations to reduce or eliminate the need for high-stakes search warrant execution;

c.  appropriately plan for search warrants to be executed in a manner that minimizes risk of injury or death to the public;

d.  appropriately identify the dangers posed by predawn raids to members of the public;

e.  appropriately identify the dangers posed by no-knock warrant execution to members of the public;

f.  complete required threat assessments in a way that accurately accounts for those conditions that officers are likely to encounter when executing a search warrant;

g.  consider alternatives to predawn raids when minors, elderly, disabled, and/or uninvolved persons are likely to be present at the property to be searched;

h.  effectively determine the appropriateness of predawn raids in light of case-specific circumstances;

i.  effectively identify safer alternatives to predawn raids, including, but not limited to, the "surround and call-out" method of search warrant execution;

j.  appropriately identify the risks associated with the execution of search warrants and act reasonably to limit those risks;

k.  appropriately plan for the safe execution of search warrants;

l.  ensure that no-knock warrants were not used absent exigent circumstances;

m.  require supervisory approval for no-knock warrants;

n.  require supervisor approval for predawn raids;

o.  appropriately identify whether someone in a home posed a risk while in the midst of executing a search warrant;

p.  appropriately identify themselves before executing a search warrant;

q.  appropriately knock and allow citizens a reasonable amount of time to answer the door before breaking into a home;

r.  communicate effectively during the execution of search warrants;

s.  ensure that a clear chain of command was in place during search warrant execution;

t.  ensure that police officers were aware of their independent duty to intervene in any case whether they suspect that another police officer may use of excessive force;

u.  consider, prioritize, and protect the sanctity of human life during the execution of search warrants and, generally, during police officers' encounters with the public;

v.  appropriately identify situations warranting and weighing against use of the MPD's SWAT;

w.  ensure that units within the MPD were appropriately staffed so that SWAT was not unnecessarily called upon to execute non-exigent search warrants;

x.  detain occupants of a home only for the length of time necessary to effectuate a search warrant;

y.  transport occupants of a home away from the premises only when necessitated by a finding of a probable cause;

z.  appropriately identifying what qualifies as probable cause;

aa. appropriately identifying what qualifies as exigent circumstances;

bb. read Miranda rights before conducting any interview;

cc. inform individuals who are not subject to an arrest that they are free to leave if they choose to do so;

dd. discipline officers who violate an individual's constitutional rights to be free from unlawful search, seizure, and or detention; and

ee. discipline officers who violate an individual's constitutional right to be free from excessive force.

157.    By failing to adequately supervise and train police officers and employees, including the Homicide Unit Defendants, SWAT Unit Defendants, and Police Department Employee Defendants concerning the aforementioned issues, the City thereby failed to adequately discourage constitutional violations on the part of MPD police officers and staff.

158.    Upon information and belief, the City did not require appropriate in-service training or re-training of police officers who were known to engage in constitutional violations related to improper detentions, seizures, transports, interrogations, and excessive uses of force.

159.    Upon information and belief, the City did not require appropriate in-service training or re-training of police officers and/or staff who were known to engage in improper, intentional, willful, reckless, and/or negligent unconstitutional conduct with respect to improper detentions, seizures, transports, interrogations, and excessive uses of force.

160.    Upon information and belief, the City did not require appropriate in-service training or re-training of police officers and/or staff who were known to engage in improper, intentional, willful, reckless, negligent, and/or excessive uses of force on members of the public.

161.    Moreover, it was the *de facto* policy, practice, and/or custom of the City, through its police department, chief of police, mayor, and council, to inadequately supervise and train MPD police officers, including the Police Department Defendants, to intervene and/or report constitutional violations and misconduct committed by their fellow police officers.

162.    The City, acting through its police department, chief of police, mayor, and council, has adopted and continues to maintain a recognized and accepted policy, custom, and/or practice of systematically violating the rights of its citizens from being unreasonably searched, seized, detained, and interrogated.

163.    Before MPD killed Randall Adjessom, the City, acting through its police department, chief of police, mayor, and council, was fully aware that MPD officers and staff were seizing the family members present during deadly raids and transporting to and questioning them at MPD's station without their consent and without probable cause to do so and the resultant need for proper training and supervision of their police officers and staff, but the City was deliberately indifferent to those prior failures and failed to properly train and supervise their police officers and staff regarding those failures.

164.    As a result of the above-described practices, policies, and/or customs, as well as Chief Prine's derogatory comments and overall sentiment about the citizens he swore to serve, the City's police officers and staff, including the Police Department Defendants, believed that their actions would not be properly monitored by supervisory police officers and/or other employees of the City, that this improper conduct would not be investigated or sanctioned, and would be tolerated and condoned by the City.

165.    The above actions by the City were the moving force behind the Police Department Defendants' unconstitutional actions and thus caused Plaintiffs to be deprived of their freedom violating their 4th (excessive force) Amendment rights under the United States Constitution.

### COUNT II

**42 U.S.C. §1983 — 4th AMENDMENT EXCESSIVE FORCE AND UNLAWFUL DETENTION**

**Plaintiffs J.Y.A. and J.S.A., Sokede Azogna, Christine Adjessom, and Jenice Adjessom Against the SWAT Unit Defendants**

166.    The aforementioned Plaintiffs incorporate the Facts Common to all Plaintiffs as if fully set forth herein.

167.    Count II is alleged by Plaintiffs J.Y.A. and J.S.A, Sokede Azogna, Christine Adjessom, and Jenice Adjessom against the SWAT Unit Defendants: Tillman, Guidry, Bryant, Myers, Rivers, Gipson, Morris, Laster, Simpson, and Hank.

168.    The SWAT Unit Defendants unlawfully detained and seized the afore-named Plaintiffs, and thus deprived them of her constitutionally protected right to be free from the use of excessive force, by forcing Plaintiffs to remain in the front room of the Sheringham Residence for multiple hours after MPD had shot and killed Randall.

169.    During the time in which Plaintiffs were unlawfully detained at the Sheringham Residence, at least one or more visibly armed SWAT Unit Defendants guarded the door to the room in which Plaintiffs were detained, which constituted an unnecessary, unreasonable, and excessive use of force under the circumstances. Plaintiffs, and Akouvi Adjessom on their behalf, asked on numerous occasions why they were being detained and received no response from SWAT Unit Defendants, who continued, at all times, to use excessive force through their armed presence, verbal commands, and physical blocking of the door to the front room of the Sheringham Residence along with keeping the adult Plaintiffs in handcuffs for the entire ordeal.

170.    During that time in which Plaintiffs were unlawfully detained, Plaintiffs did not pose any threat to the SWAT Unit Defendants or any other MPD officers or employees, and Plaintiffs' detention was unnecessary for the integrity of the any ongoing criminal investigation.

171.    Plaintiffs were unlawfully detained by the SWAT Unit Defendants in the Sheringham Residence for far longer than was necessary to effectuate the search warrant on the home.

172.    Plaintiffs were unlawfully detained by the SWAT Unit Defendants when no exigent circumstances, like the potential destruction of evidence, existed.

173.    At no point during the SWAT Unit Defendants' continued detention of Plaintiffs did the SWAT Unit Defendants believe or suspect that Plaintiffs had committed any crimes or were about to commit any crimes. No probable cause existed for Plaintiffs' continued detention past when the execution of the warrant was complete.

174.    SWAT Unit Defendants knew or should have known that no reasonable police officer would believe the seizure and detention of Plaintiffs for a period of hours at the Sheringham Residence past when the execution of the warrant was complete was reasonable or somehow authorized by law.

175.    For forty minutes of this unlawful seizure and detention, Randall lay riddled with bullet wounds dying a few feet away from the detained Plaintiffs.

176.    SWAT Unit Defendants did not permit Plaintiffs to comfort Randall as he took his last breaths.

177.    SWAT Unit Defendants did not permit Plaintiffs to call for emergent medical care for Randall.

178.    SWAT Unit Defendants refusal to permit Plaintiffs to leave the room was not because they feared the destruction of evidence or because they had safety concerns. Rather, SWAT Unit Defendants kept Plaintiffs confined in the front room in order to effectuate a large-scale coverup of their killing.

179.    By detaining Plaintiffs in the Sheringham Residence while their brother, grandson, and nephew lay dying feet from where they were kept, SWAT Unit Defendants either intended to inflict emotional distress, or knew or should have known that emotional distress was likely to result from their conduct. SWAT Unit Defendants detention of Plaintiffs was extreme and outrageous

and caused Plaintiffs emotional distress so severe that no reasonable person could be expected to endure it.

180.    SWAT Unit Defendants conduct went beyond all possible bounds of decency and is utterly intolerable in a civilized society.

181.    Plaintiffs sustained and continue to suffer from severe emotional stress as a result of SWAT Unit Defendants' unconstitutional use of excessive force.

182.    As a result of SWAT Unit Defendants' actions, Plaintiffs were deprived of their constitutional right under the 4th Amendment to be free from the use of excessive force and suffered damages as aforesaid.

## COUNT III

### 42 U.S.C. §1983 — 4th AMENDMENT EXCESSIVE FORCE AND UNLAWFUL DETENTION

**All Plaintiffs Against Nicholas Crepeau, Brandy Battiste, and Alexandra Whitt**

183.    Plaintiffs incorporate the Facts Common to all Plaintiffs as if fully set forth herein.

184.    Count III is brought by all Plaintiffs against Nicholas Crepeau, Brandy Battiste, and Alexandra Whitt.

185.    Crepeau, Battiste, and Whitt unlawfully detained and seized Plaintiffs, and thus deprived them of their constitutionally protected right to be free from the use of excessive force, by seizing Plaintiffs from their home and transporting Plaintiffs against their will to the MPD police station for questioning when they did not have any probable cause or exigent circumstances to do so.

186.    Specifically, Crepeau ordered Battiste and Whitt to seize the Plaintiffs and transport them from their residence to the MPD station house for questioning. Battiste and Whitt complied with the directive and, upon information and belief, conducted the physical transport.

187.    During that time in which Plaintiffs were unlawfully detained in transport and prior to when Crepeau ordered that they be transported, Plaintiffs had not committed any crime, and Crepeau, Battiste, and Whitt did not have any reason to suspect that Plaintiffs had committed any crime or were about to commit any crime.

188.    During that time in which Plaintiffs were unlawfully transported, Plaintiffs did not pose any threat to Crepeau, Battiste, and Whitt or any other MPD officers or employees and their forced detention and transport was unnecessary for the integrity of the any ongoing criminal investigation.

189.    Yet, Crepeau's, Battiste's, and Whitt's transport of Plaintiffs to the MPD police station was akin to an arrest.

190.    Crepeau, Battiste, and Whitt knew or should have known that no reasonable police officer or staff member would believe that seizing Plaintiffs, including minor children, against their will and transporting them to the MPD police station was reasonable or somehow authorized by law.

191.    By removing Plaintiffs from their home and transporting them to the police station when Plaintiffs had not committed any crimes and were not suspected of committing any crimes, Crepeau, Battiste, and Whitt either intended to inflict emotional distress, or knew or should have known that emotional distress was likely to result from their conduct. Crepeau's, Battiste's, and Whitt's continued detention and transport of Plaintiffs was extreme and outrageous and caused Plaintiffs emotional distress so severe that no reasonable person could be expected to endure it.

192.    Crepeau's, Battiste's, and Whitt's conduct went beyond all possible bounds of decency and is utterly intolerable in a civilized society.

193.    Plaintiffs sustained and continue to suffer from severe emotional stress as a result of Crepeau's, Battiste's, and Whitt's unconstitutional use of excessive force.

194.    As a result of Crepeau's, Battiste's, and Whitt actions's, Plaintiffs were deprived of their constitutional right under the 4th Amendment to be free from the use of excessive force and suffered damages as aforesaid.

**COUNT IV**

**42 U.S.C. §1983 — 4th AMENDMENT EXCESSIVE FORCE AND UNLAWFUL DETENTION**

**All Plaintiffs Against the Homicide Unit Defendants**

195.    Plaintiffs incorporate the Facts Common to all Plaintiffs as if stated fully herein.

196.    Count IV is brought by all Plaintiffs against Homicide Unit Defendants, Lt. Nicholas Crepeau and Lt. Kenneth Gillespie.

197.    The Homicide Unit Defendants unlawfully detained and seized Plaintiffs, and thus deprived them of their constitutionally protected right to be free from the use of excessive force, by keeping them detained at the MPD police station and questioning them for hours against their will.

198.    The Homicide Unit Defendants did not inform Plaintiffs of their Miranda rights and did not inform Plaintiffs that they were free to leave or that they had the option of not providing any statement at all to MPD.

199.    During the time in which Plaintiffs were unlawfully detained at the MPD police station, the Homicide Unit Defendants guarded Plaintiffs, which constituted an unnecessary, unreasonable, and excessive use of force under the circumstances.

200.    During that time in which Plaintiffs were unlawfully detained, Plaintiffs had not committed any crimes, and the Homicide Unit Defendants did not have any reason whatsoever to

38

suspect that Plaintiffs had committed any crimes or were about to commit any crimes. Thus, the Homicide Unit Defendants lacked the probable cause necessary to keep Plaintiffs detained.

201.    During that time in which Plaintiffs were being interrogated against their will, as was or should have been known to Homicide Unit Defendants and any reasonable police officer, and/or staff member, Plaintiffs did not pose any threat to the Homicide Unit Defendants and their detention was unnecessary for the integrity of the any ongoing criminal investigation.

202.    During the time in which Plaintiffs were unlawfully detained at the MPD police station, at least one or more visibly armed MPD police officer guarded Plaintiffs, which constituted an unnecessary, unreasonable, and excessive use of force under the circumstances. Plaintiffs asked on numerous occasions why they were being detained and received no response from Homicide Unit Defendants, who continued, at all times, to use excessive force through their armed presence, verbal commands, and continued interrogation.

203.    The Homicide Unit Detectives' detention and interrogation at the MPD police station was akin to an arrest.

204.    Homicide Unit Defendants knew or should have known that no reasonable police officer would believe that seizing Plaintiffs against their will and interrogating them at the MPD police station was reasonable or somehow authorized by law.

205.    Homicide Unit Defendants knew or should have known that no reasonable police officer would believe that detaining Plaintiffs at the MPD police station and questioning them against their will was reasonable or somehow authorized by law.

206.    By detaining and questioning Plaintiffs at the MPD police station against their will, absent probable cause, and without informing them of their right not to speak to police, Homicide

Unit Defendants either intended to inflict emotional distress, or knew or should have known that emotional distress was likely to result from their conduct.

207.    Homicide Unit Defendants' detention of Plaintiffs was extreme and outrageous and caused Plaintiffs emotional distress so severe that no reasonable person could be expected to endure it.

208.    Homicide Unit Defendants' conduct went beyond all possible bounds of decency and is utterly intolerable in a civilized society.

209.    Plaintiffs sustained and continue to suffer from severe emotional stress as a result of Homicide Unit Defendants' unconstitutional use of excessive force.

210.    As a result of the Homicide Unit Defendants' actions, Plaintiffs were deprived of their constitutional right under the 4th Amendment to be free from the use of excessive force and suffered damages as aforesaid.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs Akouvi Adjessom, individually and on behalf of minor children J.Y.A. and J.S.A., Sokede Azogba, Christine Adjessom, and Jenice Adjessom respectfully request that the Court enter judgment in their favor and against Defendants on all counts of the complaint, and award relief as follows:

A. Compensatory damages against the Defendants, jointly and severally, in an amount to be determined at trial;

B. Punitive damages against the individual Police Department Defendants for their conduct in an amount to be determined at trial, in order that such award will deter similar prohibited behavior by defendants and other law enforcement officers in the future;

C. Pre-judgment and post-judgment interest and recovery of Plaintiffs' costs, including reasonable attorneys' fees pursuant to 42 U.S.C. §1988 and 42 U.S.C. §1920, against Defendants, jointly and severally;

D. All damages recoverable pursuant to Alabama Code §6-5-410, and

E.  Any and all other relief to which Plaintiffs may be entitled.

Respectfully submitted this 11th day of November, 2025.

GRANT & EISENHOFER P.A.

*/s/ Cynthia B. Morgan*
Elizabeth A. Bailey (*PHV Forthcoming*)
Steven A. Medina (*PHV Forthcoming*)
Cynthia B. Morgan (*PHV Forthcoming*)
123 Justison Street
Wilmington, DE 19801
302-622-7086
ebailey@gelaw.com
smedina@gelaw.com
cmorgan@gelaw.com

*Attorneys for Plaintiffs Akouvi Adjessom,*
*minor children J.Y.A., J.S.A., Sodeke Azogba,*
*Christine Adjessom, and Jenice Adjessom*

41