# EXHIBIT A

# Use of Force Review and Report of City of Mobile Police Department

**Prepared by:**

**Kenyen Brown of Thompson Coburn, L.L.C.**

**Tyrone Powers of Powers Consulting Group, L.L.C.**

**Elise Gonzalez of Thompson Coburn, L.L.C.**

**April 2024**

54048437 v1

# TABLE OF CONTENTS

Page

I.   ACKNOWLEDGEMENT ................................................................. 1

II.  PREAMBLE ............................................................................ 1

     The History of Policing in Mobile ............................................... 2

III. BASIS FOR INVESTIGATION .................................................... 4

     A.   Use of Force Incidents ..................................................... 4

     B.   Independent Investigative Team ....................................... 4

     C.   The Investigation .......................................................... 5

IV.  USE OF FORCE STANDARDS ................................................... 6

     A.   General Use of Force Standards ....................................... 6

     B.   MPD's Use of Force Policy .............................................. 12

V.   ANALYSIS OF POLICE INVOLVED SHOOTINGS/USE OF FORCE
     INCIDENTS ........................................................................ 13

     A.   16-year-old male juvenile (Juvenile #1) – Case No. M223-11-01400.................. 13

          SUMMARY ................................................................. 13

          ANALYSIS ................................................................. 15

     B.   16-year-old Female Juvenile (Juvenile #2) - Case No. M223-10-01921.............. 20

          SUMMARY ................................................................. 20

          ANALYSIS ................................................................. 21

          RECOMMENDATIONS ..................................................... 22

     C.   Jawan Dallas – Case No. M223-07-00202 ........................... 23

          SUMMARY ................................................................. 23

          ANALYSIS ................................................................. 35

          RECOMMENDATIONS ..................................................... 38

     D.   Beezer DuBose, Jr. - Case No. M223-10-01384................... 40

          SUMMARY ................................................................. 41

          ANALYSIS ................................................................. 43

     E.   Christopher Jones ......................................................... 49

          SUMMARY ................................................................. 49

          ANALYSIS ................................................................. 52

          RECOMMENDATIONS ..................................................... 53

     F.   Kordell Jones .............................................................. 56

54048437 v1

        SUMMARY ................................................................................... 56

        ANALYSIS .................................................................................... 59

        RECOMMENDATIONS ............................................................... 65

VI.     MPD COMMAND/LEADERSHIP CULTURE ..................................... 65

   A.   Paul Prine, Chief of Mobile Police Department ............................. 65

        a.    Policies and Training.......................................................... 65

        b.    Pre-Dawn Raids ................................................................. 66

        c.    MPD Morale ....................................................................... 67

        d.    Community Perception ........................................................ 67

        e.    Internal Conflicts ............................................................... 67

   B.   MPD Executive Leader #1 ............................................................. 67

   C.   MPD Executive Leader #2 ............................................................. 68

   D.   MPD Executive Leader #3 ............................................................. 69

   E.   MPD Executive Leader #4 ............................................................. 70

   F.   MPD Executive Leader #5 ............................................................. 71

        a.    Policies and Training.......................................................... 71

        b.    Officer-Involved Shooting ................................................. 72

        c.    Community Relations and MPD Morale .............................. 72

   G.   MPD Leader  #1 ............................................................................. 73

        a.    Use of Profanity ................................................................ 73

        b.    Chief Prine's Tenure ......................................................... 73

        c.    Chief Prine's Derogatory Comment About the Community.................... 73

   H.   ███████████████████████████████████

              ..................................................................................... 74

        a.    ███████████████████ ................................................ 74

        b.    ███████████ ............................................................... 74

        c.    ███████████ ............................................................... 75

   I.   MPD Trainer .................................................................................. 76

        a.    Taser Training .................................................................... 76

        b.    Officer Use of Profanity .................................................... 76

        c.    Beezer DuBose, Jr./Officer #1 .......................................... 76

        d.    Reasonable Use of Force/Juvenile #2 ................................ 77

        e.    Mentally Ill Suspects.......................................................... 77

VII.    VIEW OF FORMER MPD COMMAND/LEADERSHIP ............................... 77

54048437 v1

|  | a. | Chief Prine's Early Tenure As Chief and MPD Culture | 77 |
|  | b. | Rift Between Chief Prine and Intelligence Unit | 78 |
|  | c. | Gang Intelligence | 79 |
|  | d. | Early Morning Raids | 79 |
|  | e. | Strategic initiatives | 79 |
|  | f. | Improving the Community | 80 |

**VIII.** CHIEF PRINE'S DEROGATORY COMMENTS ABOUT THE COMMUNITY .......... 80

|  | a. | Officer #1 | 80 |
|  | b. | ███████████ | 80 |
|  | c. | Officer #2 | 80 |
|  | d. | ███████████ | 81 |
|  | e. | Officer #3 | 81 |
|  | f. | ███████████ | 81 |
|  | g. | ████████ | 81 |

**IX.** VIEWS OF MOBILE LEADERSHIP ....................................................... 81

| A. | Mayor Sandy Stimpson | 81 |
| B. | Councilor # 1 | 82 |
| C. | Councilor # 2 | 83 |
| D. | Councilor # 3 | 84 |
| E. | Councilor # 4 | 85 |

**X.** VIEWS OF COMMUNITY STAKEHOLDERS ....................................... 86

| A. | NAACP Chapter 5044 | 86 |
| B. | Pastor # 1 | 87 |
| C. | Police Benevolent Association representative # 1 | 88 |

**XI.** VIEWS FROM THE COMMUNITY .................................................... 89

| A. | Community Listening Forum | 89 |

**XII.** ADDITIONAL INDEPENDENT INVESTIGATIVE TEAM OBSERVATIONS AND RECOMMENDATIONS ............................................................ 94

## I. ACKNOWLEDGEMENT

The Independent Investigative Team would like to thank the City of Mobile, Mayor Sandy Stimpson, the Mayor's Chief of Staff James Barber, City Attorney Ricardo Woods, Public Safety Director Robert Lasky, Chief Paul Prine, and all members of the Mobile City Council for assigning us such a meaningful and important task. This work impacts the lives of both Mobile residents and countless visitors that flock to Mobile to experience the nation's first Mardi Gras or for the numerous other cultural heritage, historical or natural attractions the city has to offer. The Independent Investigative Team also thanks members of the Mobile Police Department, the Police Benevolent Association, and numerous local African-American pastors and community leaders, as well as the general public for generously sharing their time, experiences, and insight with the Independent Investigative Team in order to produce this report.

## II. PREAMBLE

Throughout United States history, the relationship between policing and the Black community has been marked by systemic racism, discrimination, and violence. Addressing these issues requires an understanding of this history that allows us to see the community through the eyes of those impacted on a daily basis. It requires real, tangible and comprehensive reforms aimed at addressing systemic inequalities, promoting community engagement and trust, and holding law enforcement accountable for their actions, while working diligently to dramatically reduce crime and hold offenders accountable for real unlawful actions. Constitutional policing and unbiased effective policing are not mutually exclusive. In fact, the identified founder of modern Western policing – Sir Robert Peel - indicated as much with his nine principles of policing. In 1829, Peel noted:

1. The basic mission for which the police exist is to prevent crime and disorder.
2. The ability of the police to perform their duties depends on public approval of police actions.
3. Police must secure the willing cooperation of the public in voluntary observance of the law to be able to secure and maintain the respect of the public.
4. The degree of cooperation of the public that can be secured diminishes proportionately to the necessity to use physical force.
5. Police seek and preserve public favor not by catering to public opinion but by constantly demonstrating absolute impartial service to the law.
6. Police use of physical force to the extent necessary to secure observance of the law or to restore order only when the exercise of persuasion, advise and warning is found to be insufficient.
7. Police, at all times, should maintain a relationship with the public that gives reality to the historic tradition that *the police are the public and the public are the police*, the police being only members of the public who are paid to give full-time attention to duties which are incumbent on every citizen in the interests of community welfare and existence. (Italics added)
8. Police should always direct their attention strictly towards their functions and never appear to usurp the powers of the judiciary.

54048437 v1

9. The test of police efficiency is the absence of crime and disorder, not the visible evidence of police action in dealing with it.

The nine principles that Sir Robert Peel penned almost 200 years ago are just as important and significant to appropriate and effective police operations today as they were when he first wrote them. They should be taught in all entrance level police training programs and they should be posted in every police prescient.

Comprehensive reforms and an understanding of the role, mission, operations and history of policing will impact how city leaders and police leaders address the community after use of force incidents – how they explain and discuss incidents; and how they resolve conflict and all interactions with the police and the community.

**The History of Policing in Mobile**

Policing in Mobile, Alabama, dates back to the city's early establishment and has evolved significantly over the years. Mobile was founded in 1702 by the French and is one of the oldest cities in Alabama. Policing in Mobile's early days was informal, with community members tasked with maintaining order. Thus, there has always been a connection between policing and community in Mobile and a "philosophy" that police are the community, and the community are the police. During the late 18th century Mobile came under Spanish control and policing was likely organized under Spanish colonial authorities. After the United States acquired Mobile and the surrounding region in the early 19th century, American-style policing began to take shape. Throughout the antebellum period, the city of Mobile grew as a major port city, which brought about the need for more formalized policing to manage the population and commerce. During this period policing in Mobile was rudimentary compared to today. Significantly, during Reconstruction and through-out the Civil Rights Era and associated movements, the city of Mobile experienced significant social and political changes. This period saw challenges and changes in policing practices, particularly regarding race relations and civil rights protection.

Throughout the 20th century, Mobile's police department underwent significant modernization and professionalization efforts. This included the establishment of formal training programs, the adoption of modern policing techniques, and the expansion of the department's responsibilities.

Throughout its history, Mobile's policing has been shaped by the city's unique social, economic, and political circumstances. In recent decades, Mobile's police department, has shifted towards community policing strategies aimed at building trust and collaboration between police and the communities they serve. The Mobile Police Department faces modern challenges such as addressing crime, drug abuse, and issues related to poverty and inequality.

Recent events in Mobile, Alabama have highlighted that there are still challenges to overcome. Indeed, several members of the African-American community randomly and angrily shouted, "Slave Patrols!" during the Independent Investigative Team's March 21, 2023 town hall style Community Listening Forum. Events have also indicated the importance of ethical, focused and effective police leadership and a need for trust and transparency between the police and the

54048437 v1

community. Logically there is a concern for loss of life. Police are the only entity in the United States of America that have the legal authority to restrict freedom and or seize an induvial based on law, discretion and training. With such power, there is a higher expectation of professionalism and accountability. Police officers and police leadership in Mobile and throughout the nation must be above reproach.  Police must police for and with the people and not against the people.  Police officers are public servants whose job it is to protect and serve the people. As Sir Robert Peel noted in his Principles, "The people are the police and the police are the people."

While this report will make a number of findings, observations and recommendations, the Independent Investigative Team acknowledges the tremendous sacrifices and risks MPD officers burden on behalf of a community they love and serve on a daily basis.  Nonetheless, our review, findings, observations and recommendations are intended to make the job of individual MPD officers easier while they simultaneously enhance community trust by demonstrating a priority for the sanctity of life.

The Mayor and City Council must also have a clear understanding of the role and importance of leadership. They must ensure that police leaders and officers are appointed approved and act consistent with the Peelian Principles. They must articulate, underscore and ensure the necessity of fostering public cooperation and maintaining legitimacy. When this is coupled with a coordinated effort to resolve problems, prevent crime and disorder, and solve crime, the outcomes will allow a department to act lawfully and fulfill its mission.

## References

Alpert, Geoffrey P. (Author), Roger G. Dunham. Policing Multi-Ethnic Neighborhoods: The Miami Study and Findings for Law Enforcement in the United States. Praeger, 1988.

Alpert, Geoffrey P. and Roger G. Dunham. Understanding Police Use of Force: Officers, Suspects, and Reciprocity. Cambridge University Press, 2004.

Balto, Simon. Occupied Territory: Policing Black Chicago from Red Summer to Black Power (Justice, Power, and Politics) The University of North Carolina Press; Illustrated edition, 2019.

Fassin, Didier and Frédéric Debomy. Policing the City: An Ethno-graphic.  Other Press, 2022.

Guariglia, Matthew. Police and the Empire City: Race and the Origins of Modern Policing in New York. Duke University Press, 2023.

Haberfeld, Maria.  Police Leadership: Organizational and Managerial Decision-Making Process. Pearson Education, 2012.

Jett, Brandon T. Race, Crime, and Policing in the Jim Crow South. Louisiana State University Press, 2021.

Morris, Rebecca and Duchess Harris. The History of Law Enforcement. Essential Library: 2019.

54048437 v1

Nolan, Thomas. Perilous Policing: Criminal Justice in Marginalized Communities. Routledge, 2019.

Richard Meure. The Art of Policing: 2,500 Years of Sun Tzu's Combat Wisdom That Can Revolutionize Law Enforcement. Looseleaf Law Publications, Inc. 2019.

Wadman, Robert C.  and William Thomas Allison. To Protect and to Serve: A History of Police in America. Pearson; 2003.

Walsh, William F. and Gennaro F. Vito.  Police Leadership and Administration: A 21st-Century Strategic Approach. Taylor & Francis, 2018.

Pillars of Truth in Law Enforcement's Past, accessible at: https: ://leb.fbi.gov/articles/featured-articles/pillars-of-truth-in-law-enforcements-past.

## III.     BASIS FOR INVESTIGATION

### A.     Use of Force Incidents

Over a span a little over eight months, the Mobile Police Department (MPD) was involved in a series of high-profile instances of "use of force," several of which resulted in the death of citizens, others of which gained significant negative notoriety after bystander videos of the incidents were posted to social media, and subsequently reported on by the local mainstream media.  Exacerbating public scrutiny of these events was the fact that all six of the aforementioned incidents involved the police use of force against members of Mobile's African-American community.  Members of the community voiced concerns to the City of Mobile Administration (Administration) that these troubling events were not isolated occurrences but rather the result of shifting MPD tactics and practices as directed by MPD leadership or overlooked by MPD leadership.  Without proper scrutiny, and consistent reviews of MPD's policies and practices, members of the community were certain that these occurrences would continue.

As a result of the concerns expressed from the community, the Administration, after consulting with the City Council President, reached out to former United States Attorney for the Southern District of Alabama, Kenyen Brown, to perform a review of MPD's use of force in these six recent incidents.  However, the Administration and Mr. Brown thereafter recognized that the six recent use of force incidents could not be properly examined in a vacuum, but would require a more expanded examination of MPD policies, procedures, practices, trainings and culture.

### B.     Independent Investigative Team

1. **Kenyen Brown, Thompson Coburn, L.L.C.:** Former United States Attorney for the Southern District of Alabama, Kenyen Brown, leads the Independent Investigative Team and is currently a partner of the law firm of Thompson Coburn, L.L.C. based out of Washington, D.C. Mr. Brown was nominated to his prior position of United States Attorney by former President Barack Obama, and confirmed by the United States Senate in November of 2009.  Mr. Brown served in that capacity from November 2009 to March 2017.  Mr. Brown was the first African-American to hold the position of United States Attorney in the history of the State of Alabama. For several years while holding this position Mr. Brown also served as Chair of the United States

Attorney General's Advisory Committee, Subcommittee for Law Enforcement Coordinating Committee (LECC)/Victim Witness/Community Engagement and set model standards. As a result, he is well-versed in best policing practices and effective police/community engagement tools.

Prior to his tenure as United States Attorney, Mr. Brown served for eight years on staff for the United States Senate Ethics Committee, which included conducting high-profile Congressional ethics investigations and leading training and compliance efforts for the committee. He was also the Acting Chief Counsel and Staff Director for the U.S. House Ethics Committee, where he handled similar high-profile work.

2. **Dr. Tyrone Powers/Powers Consulting Group, L.L.C.:**  The Powers Consulting Group, L.L.C. (hereafter referred to as PCG) is comprised of experts in the fields of Criminal Justice, Homeland Security, law, legal and social policy research, writing and analysis, security operations, criminal and civil investigations, training development and facilitation and expert witness testimony. The company offers consultation, tailor-made services, and technical support - following a thorough examination of a client's mission, legal obligations, regulatory controls, and operational structure. Recognizing that each client is unique, PCG works diligently to provide appropriate support and services that address the specific nuances, problems, and goals of its clients.

Dr. Tyrone Powers, C.E.O. of PCG served as a Maryland State Trooper and a Special Agent with the Federal Bureau of Investigation. He is a skilled investigator – specifically in criminal investigations, law enforcement administration, use of force assessments, evidence collection, constitutional policing, community policing, police training, policies and practices, security management and organizational development.  Dr. Powers is a nationally renowned expert in police use of force cases, contracted to offer case analysis and courtroom testimony in both civil and criminal cases. Dr. Powers is also a contracted consultant with the Prince George's County States Attorney's Office.  Dr. Powers frequently provides commentary to local and national media outlets in order to provide in depth analysis regarding high-profile use of force cases.

3. **Elise Gonzalez, Thompson Coburn, L.L.C.:**  Ms. Gonzalez is an associate in the business litigation group of Thompson Coburn, L.L.C. where she represents a broad array of clients in all phases of litigation at the state and federal level.  Ms. Gonzalez earned her J.D. magna cum laude from SMU Dedman School of Law and her Bachelor's degree in Anthropology from the University of Texas at Austin.

### C.    The Investigation

As part of its investigation, the Independent Investigative Team reviewed: MPD's General Orders; MPD's Memorandum Orders; MPD and State of Alabama law enforcement officer training materials as it relates to the use of force; selected officer disciplinary files and training records; all forms and documents, Body Worn Camera videos, bystander videos, surveillance videos, dispatch audio recordings relating to the deaths and/or use of force against two juveniles; Jawan Dallas, Beezer DuBose, Jr., Chris Jones and Kordell Jones.

The Independent Investigative Team conducted the following interviews: Mayor Sandy Stimpson; several member of the Mobile City Council; the local head of the NAACP; a local

representative of the Police Benevolent Association; MPD's command staff, including Chief Paul Prine; several of MPD's second line of supervisors; a MPD training officer; select rank and file MPD officers; Mobile's Public Safety Director; the Mayor's Chief of Staff; Mobile-area pastors from the African-American community; MPD Internal Affairs/Office of Professional Responsibility Office investigators; a former Mobile Police Chief/Mobile Public Safety Director; and a former longtime member of MPD's command staff.

## IV.   USE OF FORCE STANDARDS

### A.   General Use of Force Standards

One of the greatest, most critical and politicized powers of policing is use-of-force: *the lawful execution of force against a person's physical movement in order to accomplish a lawful arrest.* It also involves ensuring the safety of people against physical threat; and to establish and maintain social order and peace.

Founded in 1976 as a nonprofit organization, the Police Executive Research Forum (PERF) is a police research and policy organization and a provider of management services, technical assistance, and executive-level education to support law enforcement agencies. PERF helps to improve the delivery of police services through the exercise of strong national leadership; public debate of police and criminal justice issues; and research and policy development. Ultimately, use of force is about the ***sanctity of all human life***—the lives of police officers and the lives of the people they serve and protect. The preservation of life has always been at the heart of American policing. PERF notes that, "Refocusing on that core ideal has never been more important than it is right now." Police Executive Research Forum Home Page, https://www.policeforum.org (last visited Apr. 16, 2024).

The International Association of Chiefs of Police (IACP) notes:

> Managing uses of force by officers is one of the most difficult challenges facing law enforcement agencies. The ability of law enforcement officers to enforce the law, protect the public, and guard their own safety and that of innocent bystanders is very challenging. Interactions with uncooperative subjects who are physically resistant present extraordinary situations that may quickly escalate. Ideally, an officer is able to gain cooperation in such situations through the use of verbal persuasion and other de-escalation skills. However, if physical force is necessary, an officer's use of force to gain control of subjects in these and other circumstances must be objectively reasonable.

International Association of Chiefs of Police Home Page, https://www.theiacp.org/ (last visited Apr. 16, 2024).  Two historic and foundational Supreme Court decisions have defined clear parameters around police "use-of-force." In 1985, the Supreme Court ruled in *Tennessee v. Garner*, that "[u]nder the Fourth Amendment of the U.S. Constitution, a police officer may use deadly force to prevent the escape of a fleeing suspect only if the officer has a good-faith belief that the suspect poses a significant threat of death or serious physical injury to the officer or others" (Justia U.S. Supreme Court, *Tennessee v. Garner* 1985; https://supreme.justia.com/cases/federal/us/471/1/) (accessed March 27, 2024).

<u>Tennessee v. Garner 471 U.S. 1 (1985)</u>

<u>Facts:</u>

In Garner, a Memphis police officer, acting in conformance with state law, shot and killed an unarmed youth fleeing over a fence at night in the backyard of a house he was suspected of burglarizing.

<u>Holding</u>:

The officer's action was unconstitutional. "Such force may not be used unless it is necessary to prevent the escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others."

There is "no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment."

"The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable."

"Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so."

"A police officer may not seize an unarmed, non dangerous suspect by shooting him dead."

In 1989, the Supreme Court announced the "objectively reasonable standard" in *Graham v. Connor,* and established that "the facts and circumstances related to the use of force should drive the analysis, rather than any improper intent or motivation by the officer who used force." (Justia U.S. Supreme Court, *Graham v. Conor* 1989; https://supreme.justia.com/cases/federal/us/490/386/) (accessed March 27, 2024). *Graham v. Connor* also serves as foundational reasoning for proportional response by an officer against the threat of harm by an assailant. More and more, both federal and local jurisdictions are including the measure of "necessary" to their legislative conditions on use-of-force - backing the trifecta of objective measures: reasonable, proportional, and necessary.

<u>Graham v. Conner 490 U.S. 386 (1989)</u>

Analyzed under the Fourth Amendment

Objective Reasonableness

54048437 v1

<u>Holding</u>:

"The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."

"Calculus must embody allowance for the fact that police officers are often forced to make split second judgments – in circumstances that are tense, uncertain and rapidly evolving – about the amount of force that is necessary in a particular situation."

The question is whether the officer's actions were "objectively reasonable" in the light of the existing facts and circumstances, without regard to their underlying intent or motivation.

The Government's interest is evaluated by using the Graham factors.

1. The severity of the crime at issue
2. Whether the suspect posed an immediate threat to the safety of the officers or others; and
3. Whether the suspect was actively resisting arrest or attempting to evade arrest by flight.

While these are the most common factors courts consider, they are not exclusive. Rather, courts examine the totality of the circumstances and consider whatever specific factors may be appropriate in a particular case, whether or not listed in Graham." *Bryan v. MacPherson*, 630 F.3d 805 (9th Cir. 2010). *See also Charles v. Johnson, 18 F.4th 686,699 (11th Cir. 2021).*

Other relevant factors include:

- Availability of less intrusive alternatives to the force employed.
- If feasible, whether proper warnings were given
- Whether it would have been apparent to officers that the person they used force against was emotionally disturbed
- Prior law enforcement contacts with the subject or location
- The number of officers versus the number of subjects
- Characteristics of the subject (e.g., age, gender, disability)
- Injury or level of exhaustion of the officer
- Whether the subject appears to be affected by mental illness or under the influence of drugs or alcohol
- Environmental factors (lighting, terrain)
- Crowd-related issues
- Subject's proximity to potential weapons
- Whether the officer had time to reassess the situation and consider whether continued/additional force was necessary.

The United States Supreme Court has stated that use of excessive force is an area of the law "in which the result depends very much on the facts of each case." *Mullenix v. Luna*, 577 U.S. 7, 13 (2015) (internal quotations omitted).

54048437 v1

As copied below, in the U.S. Department of Justice, Justice Manual: Title 1: Organization and Functions; 1-16.000 - Department of Justice Policy On Use Of Force (July 2022), deadly force is restricted to "only when necessary:"

> It is the policy of the Department of Justice to value and preserve human life. Officers may use only the force that is objectively reasonable to effectively gain control of an incident, while protecting the safety of the officer and others, in keeping with the standards set forth in *Graham v. Connor*, 490 U.S. 386 (1989). Officers may use force only when no reasonably effective, safe, and feasible alternative appears to exist and may use only the level of force that a reasonable officer on the scene would use under the same or similar circumstances.

Courts have also noted that police department policies may be stricter than the Constitution:

> A city can certainly choose to hold its officers to a higher standard than that required by the Constitution without being subjected to increased liability under Section 1983. *Smith v. Freland*, 954 F.2d 343 (6th Cir. 1992).

Otherwise, there would be an incentive for government to adopt the least restrictive policies possible,

> The Constitution establishes certain minimum thresholds for official conduct. It is to be expected—and hoped—that states, school boards, police departments, and other agencies will go beyond constitutional minima in determining the standards and policies to which their employees must conform." *Couture v. Bd. of Educ. of Albuquerque Pub. Sch.*, 535 F.3d 1243, 1255 (10th Cir. 2008).

> A State is free to prefer one search-and-seizure policy among the range of constitutionally permissible options, but its choice of a more restrictive option does not render the less restrictive ones unreasonable, and hence unconstitutional." *Virginia v. Moore*, 553 U.S. 164 (2008).

## 1-16.200 - DEADLY FORCE- U.S. Department of Justice, Justice Manual:

I.    Law enforcement officers and correctional officers of the Department of Justice may use deadly force only, when necessary, that is, when the officer has a reasonable belief that the subject of such force poses an imminent danger of death or serious physical injury to the officer or to another person.

A.    Deadly force may not be used solely to prevent the escape of a fleeing suspect.

B.    Firearms may not be discharged solely to disable moving vehicles. Specifically, firearms may not be discharged at a moving vehicle unless: (1) a person in the vehicle is threatening the officer or another person with deadly force by means other than the vehicle; or (2) the vehicle is operated in a manner that threatens to cause death or serious physical injury to the officer or others, and no other objectively reasonable means of defense appear to exist, which includes moving out of the path of

9

the vehicle. Firearms may not be discharged from a moving vehicle except in exigent circumstances. In these situations, an officer must have an articulable reason for this use of deadly force.

C.      If feasible and if to do so would not increase the danger to the officer or others, a verbal warning to submit to the authority of the officer shall be given prior to the use of deadly force.

D.      Warning shots are not permitted outside of the prison context.

E.      Officers will be trained in alternative methods and tactics for handling resisting subjects, which must be used when the use of deadly force is not authorized by this policy.

F.      Deadly force should not be used against persons whose actions are a threat solely to themselves or property unless an individual poses an imminent danger of death or serious physical injury to the officer or others in close proximity.

Alabama Code § 13A-3-27, *Use of force in making an arrest or preventing an escape*, establishes:

(a) A peace officer is justified in using that degree of physical force which he **reasonably** believes to be **necessary**, upon a person in order:

(1) To make an arrest for a misdemeanor, violation or violation of a criminal ordinance, or to prevent the escape from custody of a person arrested for a misdemeanor, violation or violation of a criminal ordinance, unless the peace officer knows that the arrest is unauthorized; or

(2) To defend himself or a third person from what he reasonably believes to be the use or imminent use of physical force while making or attempting to make an arrest for a misdemeanor violation or violation of a criminal ordinance, or while preventing or attempting to prevent an escape from custody of a person who has been legally arrested for a misdemeanor violation or violation of a criminal ordinance.

(b) A peace officer is justified in using deadly physical force upon another person when and to the extent that he reasonably believes it necessary in order:

(1) To make an arrest for a felony or to prevent the escape from custody of a person arrested for a felony, unless the officer knows that the arrest is unauthorized; or

(2) To defend himself or a third person from what he reasonably believes to be the use or imminent use of deadly physical force.

(c) Nothing in subdivision (a)(1), or (b)(1), or (f)(2) constitutes justification for reckless or criminally negligent conduct by a peace officer amounting to an offense against or with respect to persons being arrested or to innocent persons whom he is not seeking to arrest or retain in custody.

(d) A peace officer who is effecting an arrest pursuant to a warrant is justified in using the physical force prescribed in subsections (a) and (b) unless the warrant is invalid and is known by the officer to be invalid.

(Ala. Code § 13A-3-27, Casetext, https://casetext.com/statute/code-of-alabama/title-13a-criminal-code/chapter-3-defenses/article-2-justification-and-excuse/section-13a-3-27-use-of-force-in-making-an-arrest-or-preventing-an-escape#:~:text=March%20%2C%202024.-,Section%2013A%2D3%2D27%20%2D%20Use%20of%20force%20in%20making,criminal%20ordinance%2C%20or%20to%20prevent (last visited Apr. 16, 2024).

Still, a significant number of jurisdictions have ignored the provisions of these landmark decisions and additional state provisions that hold police accountable to constitutional use of force decisions. From Eric Garner to George Floyd, agencies and local governments have found themselves at the center of public criticism and federal inquiry (especially those not conforming to police reform) – assessing patterns and practices of excessive force; and other forms of unconstitutional policing.

Another measure that can and should be considered by jurisdictions - is "Justified but Avoidable." While a use of force may meet the legal threshold for being objectively reasonable, necessary, and proportional, there are certain circumstances in which, had alternative measures been taken, including effective de-escalation techniques or proper tactical planning, the excessive force (albeit legal) may have been preventable or circumvented, resulting in an effective arrest and the preservation of life.

Most law enforcement agencies in the United States adopt a "use of force continuum" or some variation of it. A continuum illustrates the proportional relationship between a subject's levels from compliance to combative; and an officer's legal use-of-force response to it. The use-of force continuum serves as a visual representation of this dynamic to help officers make better, more effective use-of-force decisions. In formal, thorough training, officers learn that a totality of circumstances must also be used to make valid use-of-force decisions.



54048437 v1

### B. MPD's Use of Force Policy

MPD has two main internal policies regulating the use of force, General Order Sections 1.3.1. and 1.3.2, which are recited below.

**General Order No. 1**

## 1.3.1 USE OF FORCE:

Many decisions and actions of law enforcement officers have serious consequences, but none are as irrevocable as the decision to use force. Officers are expected to achieve control, and to the extent possible, exhaust other reasonable means before resorting to the use of deadly force.

Control is achieved through:

    1. Officer presence on the scene.
    2. Verbal commands.
    3. Control and restraint.
    4. Conducted Electrical Weapons.
    5. Chemical irritants.
    6. Hand-held impact weapons.
    7. Deadly force.

Employees may use reasonable force to effect a legal arrest or detention, and also to overcome any resistance or threatened resistance of the person being legally arrested or detained.
Only the amount of force necessary to effect the arrest may be used *and employees should use de-escalation tactics when possible.*

**General Order No. 1**

## 1.3.2 AUTHORIZED USE OF A DEADLY FORCE:

### Definitions

Deadly Force – That level of force which a reasonable and prudent person would consider likely to cause death or great bodily harm.

Probable Cause – A state of facts as would lead a man of ordinary care and prudence to believe and consciententiy entertain honest and strong suspicions that a person sought to be arrested is guilty of a crime.

Reasonable Probability – The facts or circumstances the officer knows, or should know, are such as to cause an ordinary and prudent person to act or think in a similar way under similar circumstances.

Serious Physical Injury – A bodily injury that creates a substantial risk of death, causes serious permanent disfigurement, or results in long-term loss or impairment of the functioning of any bodily member or organ.

The following **conditions** must be met to justify the use of deadly force:

A. The officer has probable cause to believe any of the following:

    1. The subject possesses a weapon or is attempting to gain access to a weapon under circumstances indicating an intention to use it against the officer or someone else; or

    2. There exists a reasonable probability of further death or injury if a violent felon is not apprehended and the officer has exhausted all other reasonable means of apprehension; or

    3. A subject with the capability of inflicting death or serious injury – or otherwise incapacitating the officer – without a deadly weapon is demonstrating an intention to do so; or

    4. The subject is attempting to escape from the vicinity of a violent confrontation in which he inflicted or attempted the infliction of death or serious physical injury.

B. Application of Deadly Force:

    1. When circumstances permit, a verbal warning of the intent to use deadly force shall be given.

    2. When the decision is made to use deadly force, officers may continue its application until the subject surrenders or no longer poses an imminent danger.

    3. When deadly force is permissible under this policy, attempts to shoot to cause minor injury are unrealistic and can prove dangerous to officers and others because they are unlikely to achieve the intended purpose of bringing an imminent danger to a timely halt.

    4. Even when deadly force is permissible, officers should assess whether its use creates a danger to third parties that outweighs the benefit of its use.

    5. When deadly force is used, appropriate medical aid shall be rendered, as is deemed safely possible, while awaiting the arrival of Emergency Medical Technicians.

## V.     ANALYSIS OF POLICE INVOLVED SHOOTINGS/USE OF FORCE INCIDENTS

### A.     16-year-old male juvenile (Juvenile #1) – Case No. M223-11-01400

**SUMMARY**

    At 5:37 AM on November 13, 2023, MPD's Special Operations, Special Weapons and Tactics Unit (herein after referred to as "<u>SWAT</u>") assisted the MPD Narcotics Unit in executing a search warrant at 3408 Sheringham Drive ("<u>Sheringham</u>").  The search warrant was issued after MPD received citizen complaints about drug activity on the premises.  After receiving these complaints, MPD also found marijuana, a firearm, and evidence of drug distribution on the 18-year-old male who was the target of the search, during a traffic stop.

    Before completing the search warrant, a narcotics officer completed the MPD Threat Assessment for Warrant Service form ("<u>Threat Assessment</u>") (measuring the risk of violence the executing officers could potentially face).  The Threat Assessment score was eight, which made the use of a SWAT team "optional."  A parallel risk assessment evaluating the risk of injury or death to citizens and/or innocent bystanders if the SWAT Detail is activated to participate in the execution of a search warrant was not required.  There is one question on the Threat Assessment

For Warrant Service form that reads, "Are there children, elderly persons, or handicapped persons? [Inside the location to be searched]." However, "Informational purposes only" appears in parentheticals below this question and the columns next to the question where a response can be provided are permanently shaded out on the form. Due to officer shortages and the large size of the home, the narcotics team engaged SWAT to execute the search warrant. MPD conducted surveillance of the home prior to the search, but according to the MPD Office of Professional Responsibility's ("OPR", or alternatively "Internal Affairs") internal investigation, the surveillance team did not ask the neighbors whether juveniles occupied the premises.

As seen on body worn camera (hereinafter referred to as "BWC") video footage, SWAT officers approached the residence on Sheringham at 5:37 AM. SWAT announced their presence by collectively banging on the front door and windows, yelling "Police, Search Warrant." SWAT then breached and tactically entered the premises in formation. When SWAT officers reached an intersection at the end of the front hallway, a young man appeared from around the corner. As shown by a participating SWAT officer's BWC video footage, a red laser dot was seen pointed at Officer # 1 and Officer #2. No MPD rifle was equipped with a visible laser during this particular search warrant.

After seeing this red laser, SWAT Officer #1 attempted to fire his weapon, but his weapon malfunctioned and he fell to the ground. Consequently, Officer #2 fired four shots at the Juvenile #1, the brother of the 18 years old that was the subject of the search warrant. Officers waited until the area was secured before rendering medical aid. Juvenile #1 died as a result of his injuries.

In total, four adult females, one juvenile male, and two juvenile females occupied the Sheringham premises at the time of the search. These individuals were detained in the front room of the home during the duration of the search. During the search, police seized a HK P30 .40 caliber handgun equipped with a red laser located with the deceased.

After this incident, OPR conducted an internal investigation analyzing the officer's use of force and compliance with MPD policies. The investigator found that the officers reasonably perceived Juvenile #1's actions as "threatened resistance, with the potential of death or great bodily harm to [the officers] and others." Memorandum to Chief Paul O. Prine from Internal Affairs Investigator ("16-Year-Old Investigative Summary"), p. 6. Officer #2's perceived risk of death or great bodily harm was due to the red laser sweeping over "at least one officer and at one point directly pointing at another officer." *Id.* at 7. The OPR investigation concluded that Officer #2's application of deadly force was justified.





## ANALYSIS

1.      It is the opinion of the Independent Investigative Team that under the totality of the circumstances, a court would likely find that the officer's use of deadly force against Juvenile #1 qualifies as a reasonable use of deadly force. When analyzing claims of excessive force, courts must decide whether the officer's actions were objectively reasonable in light of the totality of the circumstances. *Graham v. Connor*, 490 U.S. 386, 397 (1989); *Tennessee v. Garner*, 471 U.S. 1, 9 (1985). Further, the reasonableness of the use of force must be judged from the perspective of a

reasonable officer on the scene, rather than with hindsight. *Graham*, 490 U.S. at 396. In its analysis, courts will consider several factors, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect is actively resisting or evading arrest. *Id.* However, the Eleventh Circuit has held that the presence of the second factor alone may justify the use of excessive force. *Shaw v. City of Selma*, 241 F. Supp. 3d 1253, 1271 (S.D. Ala. 2017).

In this scenario, Juvenile #1 posed an immediate threat to the safety of the officers at the scene when he rounded the hallway in his home carrying a laser-sighted gun, aiming the red laser dot on multiple MPD officers' bodies.

2.      It is the opinion of the Independent Investigative Team that that Officer #2 complied with MPD General Order No. 1.3.1 USE OF FORCE, in that, as per the above discussion, he "use[d] reasonable force to effect a legal arrest or detention, and also to overcome any resistance or threatened resistance of the person being legally arrested or detained."

3.      It is the opinion of the Independent Investigative Team that Officer #2 complied with MPD General Order 1.3.5 when they immediately attempted to render medical aid to Juvenile #1 once MPD officers confirmed that the scene was secure.

4.      It is the opinion of the Independent Investigative Team that the sanctity of life was not prioritized in MPD's decision to execute the search warrant for Juvenile #1's home pre-dawn because its Threat Assessment For Warrant Service form to determine if a SWAT Detail should be activated fails to genuinely evaluate risks to citizens if a SWAT Detail is activated. Moreover, executing this search warrant at 5:40 AM escalated the intensity and severity of this incident. As many citizens noted in the Community Listening Forum, pre-dawn search warrants often increase the danger of a search warrant and police encounters because individuals are asleep at the time of the breach and wake up in a state of confusion and panic upon hearing banging, yelling, and breaking down the doors of their home. When individuals wake up, they may think that somebody is breaking into their home, and consequently grab a weapon to protect themselves, their home, and their families. ███████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

███████████████████████████

If MPD had conducted a more thorough investigation before completing the Threat Assessment and executing the search warrant, the officers would have known that there were juveniles present in the household, including the deceased, and could have formulated a safer approach, such as conducting the approach during school hours. *See* MPD Internal Affairs Investigative Summary, p. 10 ("He nor his team asked the neighbors if they knew of or had seen any kids of juvenile age at the location." The lack of attention to exhaust all resources for information did not allow the SWAT team commander vital information to have to consider if an alternative execution could have been used on a home that was occupied by four adult females, one juvenile male and two juvenile females."); *see also* General Orders 46.1.7 ("The Special Operations Division Commander shall be responsible for gathering and disseminating information on current and alternative strategies along with identifying needs for special resources."). Thus, Juvenile #1's death may have been avoided.

16

5.      It is the opinion of the Independent Investigative Team that the sanctity of life was not prioritized in MPD's decision to activate SWAT Detail due to a manpower shortage.  The MPD Threat Assessment resulted in a threat score of 8, which made the use of SWAT Detail optional.  Of note, the Threat Assessment highlighted that the suspect on the premises was known or believed to possess a handgun, which resulted in 2 points.  Further, the Threat Assessment noted that the suspect was known to abuse marijuana and had a felony conviction for marijuana.  However, the decision to use SWAT was based on a "manpower shortage in his unit to execute search warrants on large houses."  MPD Internal Affairs Investigative Summary, p. 3.  As one local Mobile pastor remarked to the Independent Investigative Team, was a case involving marijuana really "that serious" to justify the use of the SWAT team?

There is no other indication that the suspect or any other individual in the home had a history of violent crime or weas mentally unstable. Thus, Juvenile #1's death could have been avoided.

6.      It is the opinion of the Independent Investigative Team that a failure of SWAT Detail officers to maintain their weapons in good and working order may have contributed to the officers' deadly use of force against Juvenile #1.

The BWC video footage captured by one of the SWAT officers leading entry into the home after breaching the front door reveals that his weapon malfunctioned during the execution of the search warrant.  *See*  BWC of lead officer (Officer frantically stating that his gun is jammed).  This malfunction appears to have contributed panic to the overall situation.  This was not the first instance of SWAT rifle malfunctions—the OPR investigation noted that there were two other incidents.  *See* MPD Internal Affairs Investigative Summary, p. 12.

During Internal Affairs' interview with the SWAT Detail Commander, he stated that each officer is responsible for the maintenance of their rifle, and that there is not a written standard operating procedure on firearm maintenance.  Internal Affairs Statement Summary of Interview SWAT Commander, p. 1.  MPD General Orders reads: "It is the supervisors' responsibility to check the condition of department issued property, their personnel and their shift as part of the routine duties to be conducted weekly."  General Orders 84-13; *see also* General Order 11-6 (stating that responsibilities of the Joint Operations Center Command including "routine and periodic maintenance of all equipment to ensure a readiness state").

Despite the order regarding routine equipment checks, the rifle inspection conducted by a later inspector of the weapon found that the weapon was "completely dry (not properly lubricated)" and had "significant carbon build up."  Report of officer that inspected the malfunctioning gun, p. 1.  The investigation also revealed that the "detent has significant wear due to friction, a lack of lubrication and corrosion are contributing factors to this amount of wear."  *Id.*  Therefore, it appears that there was a possible recurring oversight in the examination and maintenance of MPD weapons, which contributed to the intensity of the search and could have put officer lives at risk.

7.      It is the opinion of the Independent Investigative Team that MPD officers appear to have a preconceived notion regarding its citizens, which negatively impacts community relations and trust.  In Internal Affairs' interview of ███████████████████ he pointedly stated: "He can assume everybody they are going to deal with has a gun.  There are going to be convicted felons.  They are going to have a history of violence."  Internal Affairs Statement Summary, Interview of ████████████████ p. 2.  Although MPD was aware of the possibility that

guns were located on the Sheringham premises, there was no indication that any of the occupants had violent histories, and the target's only felony was for marijuana.

At the Community Listening Forum, African-American citizens shared the feeling that MPD officers perceived them as guilty or being criminals before the police even talked to them. Further, ████████████████████████████████████████████████ This above statement by the ████████████ validates this community feeling. Although MPD must approach each warrant and citizen encounter with caution, this statement is directly contradicted by the information noted but then neglected in the Threat Assessment. MPD must carefully analyze the facts in each scenario before jumping to generalized conclusions.

8.     The Fourth Amendment safeguards "the privacy and security of individuals against arbitrary invasions by governmental officials." *Carpenter v. United States*, 585 U.S. 296, 303 (2018) (quoting *Camara v. Mun. Ct. of City and Cnty. of S.F.*, 387 U.S. 523, 528 (1967)). When governmental officials pursue a search in an attempt to uncover evidence of criminal wrongdoing, the Fourth Amendment requires those officials to obtain a judicial warrant. *Riley v. California*, 573 U.S. 373, 382 (2014).

The Supreme Court has recognized that cell phones "place vast quantities of personal information literally in the hands of individuals." *Id.* at 386. Because of the power of cell phones, officers must generally secure a warrant before searching the contents of a cell phone. *Id.*; see also *United States v. Butler*, No. 3:18-CR-179-J-32MCR, 2020 WL 1429827, at *1 (M.D. Fl. Mar. 24, 2020) ("Unlike other objects seized, a cell phone requires separate authorization to search its contents."). A search warrant must be supported by probable cause under the United States and Alabama Constitutions. Probable cause for a search exists when under the totality of the circumstances, there is a "fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Franklin*, 649 F.3d 1, 7 (11th Cir. 2012).

The police obtained a search warrant prior to executing the search at Sheringham. The search warrant listed "cell phones" as an item to be "searched **for** and seized, if found," during the search (emphasis added). The search warrant merely permitted officers to "search for" a physical cell phone device, not "search the contents" of a cell phone. To the Independent Investigative Team's knowledge, a separate search warrant to search the contents of cell phones seized at the Sheringham residence was neither sought nor received.

The target of the search warrant was the 16-year-old's older brother. The sworn affidavit by officers established probable cause for the search at the Sheringham premises. The affidavit stated that police received information from neighbors of drug activity at the Sheringham premises. Further, the police found marijuana, evidence of distribution, and a firearm on the older brother during a recent traffic stop. However, at no point in the affidavit is the 16-year-old mentioned as being suspected of criminal activity. The police could not assume that the 16-year-old's mere association with his older brother by living in the same house indicated he was participating in criminal or drug activity. See *Ybarra v. Illinois*, 444 U.S. 85, 91 ("But, a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person."). It does not appear to the Independent Investigative Team that the police made this assumption for any of the other occupants. See OPR Investigative Summary, p. 10 (stating that the home was occupied by four adult females, one juvenile male, and two juvenile females). Due to the officer-involved shooting, the 16-year-old was the subject of a shooting

18

investigation—not a drug investigation. *United States v. Pendergrass*, No. 1:17-CR-315-LMM-JKL, 2018 WL 7283631, at *9 (N.D. Ga. Sept. 11, 2018) (stating that although cell phones can be an instrument to accomplish certain crimes, such as drug distribution, cell phones are not "intrinsically associated" with shooting investigations).

Moreover, it appears that the police did not believe the Sheringham search warrant justified a search of the 16-year-old's cell phone. The police had the option to present the search warrant to GCTC, but declined to do so. *See id*. at *9 n.8 ("The government suggests that [the detective] delayed obtaining a search warrant for the phone after seizing it because he might not have been successful in obtaining one, as he did not know to whom the phone belonged or whether there would be evidence of wrongdoing on the phone. . . . Although the probable cause standard is an objective one and does not depend on an officer's subjective beliefs, it is worth noting that the government has doubts about whether [the detective] had probable cause to search the phone at the time he seized it."). Thus, the police did not have a valid search warrant to search the 16-year-old's cell phone.

In the absence of a valid search warrant, the search must fall within a specific exception to the warrant requirement to be constitutional. *Riley*, 573 U.S. at 382. A recognized exception to the warrant requirement is express and implied consent. *United States v. Lisbon*, 835 F. Supp. 2d 1329, 1364 (N.D. Ga. 2011). Implied consent can be inferred from an individual's actions and behaviors. *Id.*

Juvenile #1 could not give the police implied consent to search his cell phone because he was deceased at the time police seized the cell phone. The fatal shooting occurred within a minute of police first announcing their presence. No action or behavior seen on the body camera footage can be interpreted as indicating assent to a search of his cell phone. Moreover, the police did not obtain consent from the 16-year-old's parent or any other family member. *United States v. Edouard*, No. 8:23-cr-158-KKM-CPT, 2023 WL 9321090, at *6 (M.D. Fl. Dec. 21, 2023) (finding that a search of deceased's cell phone was constitutionally permissible because the deceased's mother consented to the search). Therefore, the police did not have express or implied consent to constitutionally search the 16-year-old's cell phone.

There are other exceptions to the warrant requirement in addition to consent. For example, warrants are not required in "exigent circumstances." *Riley*, 573 U.S. at 402. The exigent circumstances exception permits a warrantless search "when there is a compelling need for official action and no time to secure a warrant." *United States v. Holloway*, 290 F.3d 1331, 1334 (11th Cir. 2002) (citing *Michigan v. Tyler*, 436 U.S. 499, 509 (1978)). This exception encompasses situations including danger of flight or escape, loss or destruction of evidence, risk of harm to the police or public, and hot pursuit. *Id*.

MPD cannot cite any exigent circumstances that would have potentially allowed the police to search the 16-year-old's cell phone without a warrant. There was no risk of flight or escape because the 16-year-old died and police detained the remaining occupants of the Sheringham home. There was no potential for the phone to be destroyed, as it had been seized and placed in police custody. There was no risk to the safety of the officers or the public that would warrant a search of the cell phone. Finally, there is no indication that a hot pursuit was occurring at the time the police requested that a forensic exam be performed on the cell phone.

Simply because the Sheringham premises was the site of a homicide investigation did not extinguish the need for a search warrant. *Flippo v. West Virginia*, 528 U.S. 11, 14 (1999) (rejecting any "murder scene exception" to the Fourth Amendment and holding that the search was "not constitutionally permissible simply because a homicide had recently occurred there"); *Ex parte Usrey*, 527 So. 2d 732 (Ala. 1987) (same). Thus, no other exception to the search warrant requirement applied, and the attempted search was unjustified and unconstitutional. ███

███

## RECOMMENDATIONS

1. In order to prioritize the sanctity of life MPD should adopt protocols which limit the execution of search warrants prior to 6:30 AM in most instances except for in the most exceptional circumstances with the direct approval of the Chief of Police.

2. In order to prioritize the sanctity of life, and to avoid possible lifetime trauma, if children or juveniles are known to occupy the premises to be searched, the search should be conducted during school hours, if possible.

3. MPD should mandate identification of children, elderly, and handicapped who may be present on the premises before every SWAT operation. Moreover, MPD should prioritize the sanctity of life by formally and genuinely incorporating factors into their evaluation of whether a SWAT Detail should be activated as part of executing a search warrant by including factors that evaluate and/or gauge citizen risk if a SWAT Detail is activated.

4. MPD should increase the regularity of weapon equipment checks to prevent equipment malfunctions. To this end, MPD must create a policy setting forth a schedule and logging system that tracks the maintenance of MPD weapons.

5. In order to heal police/community relations and help build trust, the Independent Investigative Team recommends that MPD focus their tactics and responses to the specific set of facts before them and not base their tactics on preconceived notions. This recommendation can be achieved by increasing anti-bias training and increasing MPD's community involvement and engagement.

### B. 16-year-old Female Juvenile (Juvenile #2) - Case No. M223-10-01921

## SUMMARY

On October 17, 2023, Officer #1 used force against and did arrest a female student, Juvenile #2, for "disorderly conduct." The incident occurred in front of the Accel Academy building where Juvenile #2 was officially enrolled, and was captured through a cell phone video by an observer inside of the school. The 17-second video clearly reveals Juvenile #2 positioned between the parked patrol car and Officer #1 in a wide-leg stance behind her. The Assistant Principal stood behind and slightly to the right of Officer #1 and had an unobstructed view of the incident. The video also shows Officer #1 employing firm grips in order to physically constrain the non-compliant Juvenile #2. Officer #1 also appears to have placed his left hand on the back of Juvenile

54048437 v1

#2's neck. As Juvenile #2 continues to struggle, Officer #1 repositions his hands to Juvenile #2's waist. Officer #1, with considerable force, twists Juvenile #2 to his right side, over his hip, lifts then throws her to the sidewalk face down. The maneuver was so swift and severe that the Assistant Principal jumped out of the way to avoid coming in contact with Juvenile #2' body as she was slung by Officer #1. The video records the sound of Juvenile #2 hitting the ground.

Alleged precipitating conduct by Juvenile #2, including arguments, belligerence, non-compliance or the use of profanity did not appear on the observer's cell phone video. Officer #1 failed to activate his body worn camera prior to and during this incident. Additionally, a review of Accel Academy's internal surveillance camera videos revealed that the Assistant Principal appears to yank Juvenile #2's hair (which is in a long braided style) hard enough to turn her body's direction around 180° when she attempts to walk away from him.

**ANALYSIS**

1. Officer #1 failed to employ effective de-escalation techniques to persuade Juvenile #2 to vacate the premises.

    (a)    Officer #1 did not exhaust de-escalation techniques and therefore violated MPD policy 1.3.1. Use of Force, "...*Officers are expected to achieve control, and to the extent possible, exhaust other reasonable means before resorting to the use of deadly force*" (June 5, 2020).

    (b)    Officer #1 failed to effectively use time to allow Juvenile #2 to self-regulate, grow calmer, ease her frustration, and reduce the agitation that Officer #1 and the Assistant Principal claimed to have witnessed earlier from Juvenile #2. It was incumbent upon Officer #1 to look beyond the "belligerence," and to allow time for her family to pick her up from school.

2. Officer #1 used excessive force in attempting to control and arrest Juvenile #2. Officer #1 should have known that the force employed could have led to serious bodily harm.

3. Conditions which justify the use of force that could lead to serious bodily harm or death by an officer in accordance with MPD policy did not exist prior to or during the incident involving Officer #1 and Juvenile #2.

4. Officer #1 used excessive force against Juvenile #2, who struggled against him to get away – Active Resistance - but was clearly not combative. Juvenile #2 did not attempt to strike or physically retaliate against Officer #1 or the Assistant Principal and did not possess a weapon; nor did she attempt to use an everyday instrument such as her cell phone, as a weapon against Officer #1 or the Assistant Principal. There are no statements describing Juvenile #2 attempting to gain entry back into the building. Testimonies from Officer #1, and the Assistant Principal, and Juvenile #2 did not describe Juvenile #2 as combative or physically threatening to anyone.

5. The force used against Juvenile #2 by the Assistant Principal (pulling-yanking her hair to stop her forward progress while she was moving away from him) may have constituted a criminal assault and required some police action. After a brief verbal exchange, Assistant

Principal appears to pull Juvenile #2's hair hard enough to turn her body's direction around 180°.

The act of hair pulling constitutes third degree assault, and possibly second degree assault, under Alabama state law. A person commits third degree assault under the following circumstances: (1) with intent to cause physical injury to another person, the person causes physical injury to any person or (2) the person recklessly causes physical injury to another person. Ala. Code § 13A-6-22(a)(1)–(2). Third degree assault is considered a Class A misdemeanor. *Id.* § 13A-6-22(b). In contrast, a person commits second degree assault if "with intent to cause *serious* physical injury to another person, he or she causes serious physical injury to any person." ALA. CODE § 13A-6-21(a)(1) (emphasis added). If found guilty, second degree assault is a Class C felony. *Id.* § 13A-6-21(b).

In the case of *Gaddis v. Ala. Inst. For Deaf and Blind*, a teacher was disciplined by her employer after an incident in which the teacher pulled a student's hair. No. 1:16-CV-01881-SGC, 2019 WL 4393025, at *3 (N.D. Ala. Sept. 13, 2019). Although the assault was not at issue in the case, the court noted that, as a result of the hair pulling incident, the teacher was "arrested and tried for third-degree assault" in an Alabama state court. *Id; see also Romans v. J.P. Mills, Inc.*, 844 So. 2d 1239, 1241 (Ala. Civ. App. 2002) (noting that a defendant was charged with third-degree assault for pulling hair). The cases cited above confirm that hair pulling constitutes third degree assault, but based on the statutory language, there could be an argument for second degree assault as well. Officer #1 made no inquiry into this action and it was not otherwise identified by MPD Internal Affairs after reviewing said videos. Moreover, the Assistant Principal's actions may have also escalated Juvenile #1's belligerent non-compliant behavior.

## RECOMMENDATIONS

1. The Mobile Police Department should provide <u>routine</u> training for interacting with children and youth, to include de-escalation techniques specifically designed to:

   (a) understand and respond to child, puberty and adolescent behaviors
   (b) recognize signs and symptoms of children and youth in behavioral health crisis.
   (c) coordinate de-escalation responses with school administrators, teachers and SROs.
   (d) productively, responsibly interview and interrogate children and youth.

3. MPD should design and facilitate <u>routine</u> training on interacting with children and youth <u>in coordination with</u> child psychologists, Alabama Department of Youth Services, and other child and youth service specialists.

4. MPD should restrict the nature of secondary employment for its officers with K-12 educational institutions.

5. MPD must establish a clear, comprehensive, and <u>separate</u> policy establishing mandatory BWC activation and recording; archiving recordings; specific circumstances that prohibit the use of BWC activation (i.e., informant interviews); mandatory activation for in-progress calls; interacting with the public, etc.

6.  MPD should establish and weekly convene a "Performance Review Board" – comprised of commanders, training administrators, medical specialists, legal representatives, etc. This board analyzes camera footage to assess use of force cases. The assessment includes the extent to which policies were followed or violated; opportunities to write or revise agency policies; recommendations for training and any other pertinent topics.

7.  MPD must prohibit contact of any kind with the neck, neck holds, touching of the neck, and or choke holds unless in extreme or exigent circumstances.

### C.   Jawan Dallas – Case No. M223-07-00202

**SUMMARY**

According to the stated facts contained in officer statements and other documents associated with the in-custody death of Mr. Jawan Dallas, on Sunday July 2, 2023, at 9:35 PM, John Doss called 911, reporting there was an unknown black male trying to get in his trailer located at 5413 Carol Plantation Road Lot 33. Mr. Doss reported the black male suspect was a homeless guy that hangs out in the trailer park. Mr. Doss described the suspect as wearing a hat and a red shirt or red pants. Mr. Doss told the 911 operator the suspect was "headed up the road." The 911 operator then transferred the call to the MPD operator. When the call was transferred, Mr. Doss reported that the suspect walked up toward trailer 27.

At 9:46 PM, the Mobile Police Department operator dispatched the call to Officer #1 and Officer #2. The officers were working as a two-person unit due to vehicle issues with Officer #2's assigned patrol vehicle. Shortly after the officers arrived, they encountered a white male, subsequently identified as Suspect #1, standing in the yard of Lot 28A and a black male, later identified as Jawan Dallas sitting in a vehicle parked in front of Lot 27.

After obtaining identifying information from Suspect #1, the officers attempted to obtain identifying information from Mr. Dallas, who was seated in a vehicle. After repeated attempts failed, Officer #2 opened the vehicle door, at which time, Mr. Dallas exited the vehicle. Almost immediately, Mr. Dallas tried to run from the officers. A brief foot pursuit ensued with the officers tackling Mr. Dallas to the ground. Mr. Dallas began actively resisting the officers' attempt at placing him in custody. Officer #2 deployed his Taser, which had little effect on bringing Mr. Dallas to compliance. However, after the Taser deployment, the officers were able to handcuff Mr. Dallas.

Once in custody and at approximately 9:58 PM, Officer #1 requested medical personnel to the scene. At approximately 10:03 PM, the Taser probes were removed from Mr. Dallas's skin by Corporal #1. Corporal #1 arrived at the scene after Mr. Dallas was in custody. Officer #3 also arrived on scene after custody was achieved. While medical personnel were responding to the scene, Mr. Dallas began complaining that he was unable to breathe. He was placed in a patrol vehicle and the door was shut - while waiting for medical personnel.

At approximately 10:08 PM, Mobile County EMS Unit 13 arrived on scene. Personnel from Mobile County EMS Unit 13 did not immediately administer medical assistance to Jawan Dallas. At approximately 10:17, as Dallas was being checked by paramedics, it was determined that he was in medical distress. Cardiopulmonary Resuscitation (CPR) was performed by paramedics and Mr. Dallas was subsequently transported to Providence Hospital located at 6801 Airport Boulevard where he was pronounced dead in the emergency room at 11:12 PM.

Officer #3 indicated that he responded to the call as additional back up and arrived at the scene after Mr. Dallas was placed in custody. According to Officer #3 when he arrived on scene, Mr. Dallas was on the ground in the prone position. Mr. Dallas was saying he was unable to breathe and was complaining of pain, at which time, he was moved to a seated position so that the Taser prongs could be removed by Officer #4. Officer #3 indicated that Mr. Dallas was then moved to the patrol vehicle and he appeared to be able to walk on his own accord to the vehicle. Officer #3 indicated that Mr. Dallas sat up in the rear seat of the patrol vehicle and appeared to be alert. Officer #3 indicated that Mr. Dallas was still saying that he couldn't breathe but did not appear to be in distress. Officer #3 observed the paramedics checking Mr. Dallas's vital signs. Officer #3 explained that he observed Mr. Dallas fall backwards in the seat and appear to go unresponsive. Mr. Dallas was then pulled out of the patrol vehicle and the handcuffs were removed. Officer #3 stood by while the emergency personnel, Officer #2 and Officer #1 administered CPR on Mr. Dallas until he was transported to the hospital.

Mr. John Doss indicated that on said date he was inside his mobile home, when his dogs started barking. He opened the front door and observed an unknown black male standing on the outside of his chain-link fence. The fence marks off Doss's property from the neighboring mobile home lot. Mr. Doss indicated to homicide detective Sergeant #1 that he began telling the black male to leave his property, at which point, the black male began talking incoherently. The black male then began walking toward Unit 27 or 28. Mr. Doss went inside his residence and called 911 to report the incident. Mr. Doss indicated that he felt like he had seen the black male on the property before but was unsure of his name. Mr. Doss described the black male as wearing red shorts and possibly a black/white shirt and wearing a dark color fishing style hat.

Officer #2 indicated that he has been a police officer with MPD for approximately 14 months. At the time of the incident, Officer #2 was assigned as a uniformed officer at the Second Precinct with specific assignment to Third Squad. Officer #2's work shift was 6:45 PM to 6:45 AM. Officer #2 and Officer #1 were riding as a two-man unit because his patrol vehicle was having engine problems. Officer #2 recalled that the police operator dispatched them to the call-in reference to a possible burglary in progress. Officer #2 indicated that when they arrived on scene, they parked their patrol vehicle near Unit 27 and approached Unit 28A on foot.

Officer #2 indicated that he first noticed a white male (Suspect #1) standing on the front porch of Unit 28A. Officer #2 indicated that Officer #1 began engaging Suspect #1, at which time, Officer #2 observed a black male (Jawan Dallas) sitting in a car that was parked in front of Unit 28A. Officer #2 indicated that he began asking Mr. Dallas for his identification, but Mr. Dallas did not provide one to him. Officer #2 indicated that Mr.  Dallas appeared to be reaching underneath the driver seat and around other areas inside the vehicle, so he (Officer #2) attempted to open the vehicle driver door. He indicated that the driver's door wouldn't open. Officer #2 indicated that he reached into the open window and opened the door by using the inside handle. Officer #2 indicated that he grabbed Mr. Dallas's arm, as he began exiting the vehicle.

Officer #2 indicated that when Mr. Dallas exited the vehicle, he almost immediately tried to run off. Officer #2 explained that Mr. Dallas did so by pushing past him and then began to run around the rear of the vehicle. According to Officer #2 as Mr. Dallas ran off, Officer #2 and Officer #1 caught up to him. According to Officer #2, Officer #1 wrestled Mr. Dallas to the ground, at which time, both officers began trying to place Dallas's arms behind his back to handcuff him. Officer #2 indicated that Mr. Dallas began actively resisting by kicking and flailing his arms about.

Officer #2 indicated that at this point he, Officer #2, deployed his Taser and believed that he applied 5 drive-stuns to Mr. Dallas's legs. Officer #2 indicated that it appeared that the drive-stun applications did not have an effect on Mr. Dallas.

According to Officer #2, Mr. Dallas grabbed for the Taser and was able to pull it from his (Officer #2's) hands. Officer #2 indicated that he became engaged in a brief struggle for the Taser with Mr. Dallas and eventually he, Officer #2, regained control over the Taser. Officer #2 indicated that after regaining control he redeployed his Taser, by shooting both sets of Taser prongs at Mr. Dallas. Officer #2 believed that three of the four Taser prongs successfully lodged into the skin of Mr. Dallas's back. Officer #2 indicated that he believed that he administered three trigger cycles to Mr. Dallas - with little effect. After the third cycle, Officer #2 indicated that he threw the Taser to the ground and began helping Officer #1 with placing Mr. Dallas's hands behind his back.

Officer #2 indicated that after Mr. Dallas was handcuffed, Officer #3 and Officer #4 arrived on the scene. Officer #2 indicated that Officer #4 removed the Taser prongs from Mr. Dallas, and Mr. Dallas was placed into a patrol vehicle. Officer #2 indicated that medical personnel were then summoned to check on Mr. Dallas. Officer #2 indicated that when medical personnel arrived, Mr. Dallas was allowed to have his feet outside the vehicle, as his vital signs were being checked. During this time, Officer #2 indicated that he had to reach into the patrol vehicle and hold Dallas still by grabbing the handcuffs.

Officer #2 indicated that while medical personnel were checking Mr. Dallas' vital signs, Mr. Dallas fell backwards onto the seat. The medical personnel then asked MPD officers to pull Mr. Dallas from the patrol vehicle because he was in distress. Officer #2 indicated that he observed Officer #1 pull Mr. Dallas from the patrol vehicle and remove the handcuffs. Officer #2 indicated that medical personnel began CPR on Mr. Dallas. Officer #2 indicated that he assisted by administering chest compressions.

Officer #2 was unable to recall anything Mr. Dallas was saying during the incident, but he did remember him complaining that one of his arms was hurting. Officer #2 indicated that he had no interaction with Dallas prior to the night of the incident.

Officer #1 has been a police officer with MPD for approximately 14 months. At the time of the incident, Officer #1 was assigned as a uniformed officer at the Second Precinct with specific assignment to Third Squad. Officer #1's work shift was 6:45 PM to 6:45 AM. During an interview with Sergeant #1, Officer #1 indicated that the radio traffic for the call for this incident was a possible burglary in progress. Officer #1 indicated that when he and Officer #2 arrived at the scene, they parked near Unit 27. Officer #1 and Officer #2 then approached Unit 28A on foot. While approaching Unit 28A, Officer #1 observed a black male (Jawan Dallas) sitting in a vehicle and then observed a white male (Suspect #1) standing on the front porch of Unit 28A. Officer #1 indicated that he first engaged Suspect #1 by asking him why he was standing on the front porch. Suspect #1 began indicated that he had just walked from behind the trailer. Officer #1 requested and obtained Suspect #1's driver's license and then turned his attention to Officer #2.

Officer #1 indicated that Officer #2 was attempting to obtain identification from Mr. Dallas. Officer #1 indicated that he observed Officer #2 open the vehicle door and he observed Mr. Dallas exit the vehicle. Officer #1 indicated that upon existing the vehicle, Mr. Dallas immediately try to run away, at which time, he (Officer #1) and Officer #2 ran behind Mr. Dallas. Officer #1 indicated that he and Officer #2 both tackled Mr. Dallas to the ground. Officer #1 indicated that he began

trying to get Mr. Dallas's hands behind his back, but Mr. Dallas was resisting by kicking with his legs and flailing his elbows about. Officer # indicated that as a result of Mr. Dallas's resistance, he (Officer #1) was having a hard time getting Mr. Dallas's hands behind his back. Officer #1 indicated that on at least two separate times he was struck to his head by Mr. Dallas's flailing elbows.

Officer #1 indicated during the altercation, he shouted for Officer #2 to deploy his Taser. Officer #1 observed Officer #2 drive-stun Mr. Dallas multiple times, "but it had little to no effect on him." Officer #1 indicated that he heard Officer #2 say, "Let go of my Taser." Officer #2 indicated that a short time later, Officer #2 was able to Tase Mr. Dallas with at least two trigger cycles. Officer #1 indicated that eventually that he and Officer #2 were then able to handcuff Mr. Dallas's wrists behind his back.

Officer #1 indicated that Mr. Dallas continued to kick with his feet while handcuffed so they decided to move him to the patrol vehicle. Officer #1 indicated that before being placed in the patrol vehicle, the Taser Prongs were removed from Mr. Dallas by Officer #4. Officer #1 indicated that he checked Mr. Dallas's pockets and found two baggies of what appeared to be crystal meth and spice. Officer #1 remained at the patrol vehicle while waiting for medical personnel to arrive. Officer #1 described Mr. Dallas's demeanor while in the patrol vehicle as alert. He indicated that Mr. Dallas complained that his arm was hurting. Officer #1 indicated that when medical assistance arrived, the medical personnel began checking Mr. Dallas' vital signs. He indicated that Mr. Dallas fell back in the patrol vehicle. Officer #1 indicated that he then removed Mr. Dallas from the vehicle, per the medical personnel's request, and he also removed the handcuffs from Mr. Dallas. Officer #1 assisted with CPR until Mr. Dallas was transported to the hospital.

Officer #1 had no interaction with Dallas prior to the night of the incident.

On Wednesday July 5, 2023, at approximately 2:45 PM Suspect #1 was interviewed at Mobile Police Headquarters. The interview was audio recorded. Suspect #1 indicated on the night of the incident he was at his residence when a friend, Suspect #2, stopped by. Suspect #2 was driving a silver vehicle and there was an unknown female passenger. Suspect #1 asked Suspect #2 if he had any marijuana for sale and Suspect #2 told him that he only had enough that they both could smoke together. Suspect #1 indicated that he followed Suspect #2 to an address on Carol Plantation Road with intentions of smoking the marijuana because he didn't want to smoke around his residence. When they arrived at the location, they both stopped their vehicles near Lot 28A and Suspect #2 exited his own vehicle, then got into Suspect #1's vehicle.

Suspect #1 indicated that they weren't at the location long when they observed a police car pulling onto the property. According to Suspect #1, he and Suspect #2 got out of the vehicle and ran through the trailer park. Suspect #1 indicated that he had the marijuana on him, and hid it behind trailer 28A before walking through the yard of 28A. As Suspect #1 was in the fenced yard of Lot 28A, he was stopped by a police officer. The officer told Suspect #1 to hop the fence and he complied. Suspect #1 then gave his Arkansas identification card to the officer.

Suspect #1 indicated that it was at this point, he noticed that Mr. Jawan Dallas (known to him by the nickname Jay) was seated in the driver's seat of a vehicle that was parked in front of 28A. Suspect #1 indicated that this was the first sighting of Mr. Dallas during the entire incident. Suspect #1 indicated that he stood beside a police officer as another police officer was asking Mr.

Dallas for his identification. Suspect #1 indicated that Mr. Dallas refused to give the other officer his identification. Suspect #1 indicated that the officer opened the driver door of Mr. Dallas's vehicle, at which time, Mr. Dallas exited the vehicle. Suspect #1 indicated Mr. Dallas attempted to run away from the officers. Suspect #1 indicated that he observed the officers and Mr. Dallas fall to the ground. Suspect #1 indicated that that Mr. Dallas was actively resisting both police officers and the officers were attempting to gain physical control of Mr. Dallas. Suspect #1 indicated that while the officers and Mr. Dallas were struggling on the ground, he (Suspect #1) returned to his vehicle and drove away. Suspect #1 indicated on the day after the incident he began hearing that Mr. Dallas had been tased and later died.

On Wednesday July 5, 2023, at approximately 10:56 PM, a news story about the in-custody death of Mr. Dallas was published on Fox 10 News. During the news segment, Mr. John Doss and Ms. Michelle Champagne were interviewed by reporter Areil Mallory. Mr. Doss and Ms. Champagne both indicated that they witnessed the incident and they both alleged that the officers used excessive force during the encounter with Mr. Dallas.

According to statements and other documents associated with the in-custody death of Mr. Jawan Dallas, on Thursday July 6, 2023, during an area canvass of 5413 Carol Planation Road, Witness #1 was identified as a potential eyewitness. Witness #1 was interviewed at approximately 4:00 PM.

Witness #1 reported that he was present when the incident occurred and noted that on the night of the incident, he was inside lot 27 and had looked out a window to see a police car coming down the driveway. Witness #1 indicated that he stepped outside and observed police officers standing near a vehicle that was parked in front of lot 28A. Witness #1 indicated that he observed that there was a black male seated in a vehicle and that the black male exited the vehicle. Witness #1 recognized the black male as a man he knows by the name "Jay."

Witness #1, indicated that when Jay got out the vehicle, he began talking with the officers. Witness #1 indicated that Jay appeared to be agitated and then threw his hands up. Witness #1 claimed that Jay began to walk away from the officers, at which time, one of the officers tased Jay as he was walking away from them. Witness #1 indicated that he observed the officers tussling with Jay on the ground. Witness #1 indicated that Jay wasn't resisting but instead he had his hands clenched to his chest the whole time. Witness #1 indicated that he could hear Jay yelling, "it hurts, it hurts." Witness #1 indicated that after Mr. Dallas was in custody, officers moved him to the police vehicle. Witness #1 also suggested that another Tasing incident occurred by the police vehicle.

On Thursday July 6, 2023, at approximately 6:41 PM, Michelle Champagne was interviewed. Ms. Champagne explained that after Mr. Doss called 911, she then got on the telephone with the trailer park manager (Witness #2). According to Ms. Champagne while on the phone, the trailer park manager told her that police officers had pulled up to the trailer park. Ms. Champagne then got off the phone and she and Mr. Doss began walking toward where the incident was occurring.

Ms. Champagne indicated that she and Mr. Doss were standing at a distance from the incident and she was unable to clearly see anyone's face. Ms. Champagne indicated that she observed two people "wrestling" on the ground, and that one of them was a police officer. Ms. Champagne indicated that she heard Mr. Doss yell out to the officer, asking him if he needed

assistance. The officer didn't acknowledge him, leading Mr. Doss to yell out to the officer two additional times. Ms. Champagne indicated that she also yelled out to the officer, asking if he needed assistance.

Ms. Champagne "described the situation as a struggle with the natural instinct to want to help the officer because it appeared that he needed assistance." Ms. Champagne indicated that she went back to her trailer and called 911 from her cellular telephone. She indicated that she only observed one officer involved in the struggle with Mr. Dallas. Ms. Champagne indicated that she called 911 because she was concerned for the officer's safety.

Witness #2 indicated that on the night of the incident, she was sitting outside her residence and observed a police car approaching the area of Lot 28A. Witness #2 indicated that she observed a black male and two white females running from the area of Lot 28A. She indicated that the three individuals ran through the trailer park and appeared to be hiding from the police officers. Witness #2 indicated that she then heard a police officer yelling, "stop resisting, stop resisting." She then heard a male voice yelling for help.

On Tuesday July 11, 2023, an additional area canvass at 5413 Carol Plantation Road was conducted. At approximately 9:25 AM an interview was conducted of Witness #3. Witness #3 indicated that he arrived home from the store after the incident occurred and while Mr. Dallas was seated in the patrol vehicle. Witness #3 indicated that as he got out of his vehicle in front of his trailer, he could hear a man saying, "help me, I can't breathe." Witness #3 indicated that he understood the man to be in the backseat of a patrol vehicle that was parked on the opposite side of the trailer park from his trailer. Witness #3 indicated that he did not personally witness the incident but only heard what the man was saying. Witness #3 also claimed that he heard a Taser being deployed while the man was in the patrol vehicle.

On Wednesday July 5, 2023, at approximately 9:00 AM, an autopsy was performed on Mr. Jawan Dallas by a physician at the Alabama Department of Forensic Sciences (ADFS) Mobile facility. According to the autopsy report, Mr. Dallas had four (4) Taser probe punctures to the rear torso, above the midline. There were two additional skin punctures to the upper back. There were also two (2) two possible Drive-Stun marks to the back. One on the left side back and the other to the left shoulder blade. There were no other external injuries noted. The cause of death is noted as "cardiorespiratory failure, due to acute myocardial ischemia, due to methamphetamine, ABD-BUTINACA and MDMD-4en-PINACA toxicity."

The Taser device that was deployed by Officer #2 was the Taser 7 model serial number X4000KPAX. The Taser 7 model device is equipped with internal software capable of recording every Taser application. A Taser 7 report was compiled and added to the case file.

Review of the Taser 7 report showed the following:

- The date and time of the Taser 7 deployment was July 2, 2023, starting at 21:54:41 hours. The duration of the Taser deployment was 44.346 seconds.
- During the deployment there were twenty (20) right arc button presses at 21:54:48 hours to 21:55:21 hours. This Taser activity is from Drive-Stun applications during the incident and/or unintentional activations during the struggle between Dallas and the officers.

- The report reflects there were two (2) trigger pulls that deployed at 21:56:09 hours and again at 21:56:11. These two trigger pulls deployed two separate sets of Taser probes.
- There were then five (5) right arc presses after the Taser probes were deployed.

*Taser Regulations (in italics):*

*Memorandum Orders.  MO – 20 17–09 relates to the use of taser or axon weapons.*

*SUBJECT: CONDUCTED ELECTRICAL WEAPON (CEW) POLICY AND USE REPORT*

*TO: All Personnel*

*PURPOSE: To establish policy and procedure regarding deployment of the CEW*

*I. Information*

*The \*Axon Conducted Electrical Weapon (CEW) manufactured by \*Axon International, Inc. has been approved for use by officers of the Mobile Police Department. The CEW is deployed as an additional police tool and is not intended to replace firearms or self-defense techniques. {Italics added}*

*The CEW may be used to control dangerous or violent subjects when deadly physical force does not appear to be justified and/or necessary; or attempts to subdue the subject by other conventional tactics have been or will likely be ineffective in the situation, or there is reasonable expectation that it will be unsafe for officers to approach within contact range of the subject.*

*The \*Axon CEW has a data port that stores the date and time of each firing of the weapon \*in the firing log. The data protects the officer from claims of excessive force by providing complete and accurate documentation of each firing.*

*The CEW falls into the category of Less Lethal Force technology and equipment, defined as:*

> *1. Those items, when used properly, which are less likely to result in death or serious physical injury than force commonly referred to as "deadly."*

> *2. Less Lethal Force is defined \*as force used to subdue or render a subject non-threatening, with a lower probability of effecting fatal consequences.*

*II. Procedure*

> *A. The CEW shall be issued to and used only by officers who have completed the Mobile Police Department's User or Instructor CEW training program.*
> *B. Only properly functioning and charged CEW's shall be carried on or off duty.*
> *C. Each discharge, including accidental discharges, of a CEW shall be investigated and documented. A Less Lethal Munitions Report (PD-27) shall be completed after each use*

54048437 v1

*of the CEW. Discharges of the CEW during an approved training session will not require routine completion of these forms or further investigation unless an injury occurs during the training session.*

***D****. The CEW is programmed to deliver a 5-second "electrical discharge." The officer using the weapon can shorten the automatic 5-second cycle by turning the CEW off. It is recommended that during field deployment and use of the weapon, the full 5-secondcycle be delivered to gain maximum effectiveness and compliance of the subject.*

***E.*** *NEVER aim the CEW at the eyes or face. It is laser sighted. The top probe will follow the front and rear sights and the laser sight. The bottom probe will travel at \*either a 12 degree or a 3.5-degree downward angle depending on which cartridge is being used. The Taser 7 also has a bottom laser that gives the officer a visual indicator as to where the bottom probe will impact the subject.*

***F****. Keep hands away from the front of the weapon at all times even if the safety is forward and the CEW is deactivated.*

***G****. DO NOT fire the CEW near flammable liquids or fumes. The approved CEW can ignite gasoline and other flammables. Some self-defense sprays are flammable and should not be used in conjunction with the CEW unless a reasonable period of time has elapsed to allow the evaporation of flammable fumes. Do not deploy the CEW in highly flammable meth labs.*

***H****. Replace the cartridges by the expiration date. All expired cartridges will be turned into the Property Unit and replaced with new cartridges. Expired cartridges will be sent to the Training Academy for use during training exercises.*

## III. Section Commander Responsibilities

    ***A.*** *Review each use of a CEW by officers within their division.*
    ***B****. Ensure training on less lethal devices is provided as needed.*
        *1. A certified CEW instructor will conduct the Basic User Certification for the CEW training. All training should be coordinated through the Training Unit, although a supervisor may request one of his trained instructors to conduct the training.*

## IV. Shift Commander/Lieutenant Responsibilities

    ***A****. Ensure that incidents involving any discharge of the CEW is investigated and appropriately documented.*
    ***B.*** *Ensure only trained officers are issued and use the CEW.*

## V. Sergeants Responsibilities

    ***A.*** *Respond to scenes where the CEW has been or is expected to be deployed.*
    ***B****. Evaluate scene and ensure appropriate investigative units respond when necessary.*
    ***C.*** *Ensure that officers who discharge the CEW complete a Less Lethal Munitions Report (PD-27).*
    ***D.*** *Ensure the reports are forwarded through the chain of command to the Chief of Police. A copy of the Less Lethal Munitions Report (PD-27) shall be forwarded to the Training Unit.*

*E. Investigate each incident where the CEW is used on a subject (with actual firing of probes or touch stunning). Review the officer's incident report and Less Lethal*

*Munitions Report (PD-27). If the incident involved the use of force other than the deployment of the CEW, a Use of Force Report will be submitted also.*
*F. Ensure EMS is requested at a deployment scene and appropriate emergency care is administered.*
*G. Each supervisor with officers assigned a CEW shall be supplied with gloves, alcohol swabs, adhesive bandages, evidence envelopes and biohazard stickers. These supplies shall be provided to the officer on the scene responsible for securing the CEW evidence and removing the probes from the subject.*

*VI. Taser Equipped Officers*

*A. Carry the CEW on duty unless specifically exempted by higher authority.*

*B. The CEW shall be carried in the issued holster or other APPROVED holster. If the officer desires to carry a holster other than the issued holster he/she must first assure the holster is recommended by Taser International, Inc. for use. The officer will be required to purchase any additional holsters if they are approved to carry the CEW in another holster.*
*C. \*The Taser shall be carried on the officer's support side. Either cross draw or support side direct draw shall be allowed but must be from the officer's support side.*
*D. \*Before each shift or extra job, the officer will conduct a function check on their issued CEW. This function check will consist of placing the device into the function mode, checking the battery capacity, utilizing the ARC switch to allow for the 5-second function test and ensure that the device is functioning as intended. The battery shall be charged every 30 days or as needed to maintain a sufficient charge to complete the shift. An officer should not begin their shift with less than 20% charge on the battery.*
*E. Officers may carry the CEW during off duty or extra jobs. However, the CEW is not to be carried off duty out of uniform.*
*F. When not in use the Taser shall be secured properly in a carrying case and treated as a weapon.*
*G. Before discharging the CEW, the officer shall state" Taser, Taser, Taser" so that other officers on the scene are aware that the use is imminent.*
*H. After discharging a CEW, the officer shall broadcast a "Code Zebra" by radio and request a supervisor to the scene if one is not present.*
*I. The broadcast of a "Code Zebra" will be interpreted by Communications personnel as notification that a CEW has been discharged. Communications shall notify Fire Dispatch and have a medical unit respond to the scene.*
*J. After CEW deployment, officers should remove the probes. They should first stabilize the area by placing their gloved support hand 6-8 inches away from the probe, then using the \*cartridge safety clip of the gloved strong hand, use significant force and pull directly up from the arrested subject's affected area. The officer should then check the probe ensuring that everything is intact, including the barb. After the probes are removed, the arrested individual's affected area should be treated with an antiseptic wipe by pressing down onto the affected area (DO NOT WIPE OR RUB). Then, place*

31

*a bandage over the affected area.*

**K.** *The \*smart CEW cartridge probes should be secured in the \*probe bay on each side of the respective probes. While holding the CEW expended cartridge in the gloved support hand, the officer should pull the glove over the cartridge and wires (DO NOT ROLL THE WIRES AROUND THE CARTRIDGE). The officer should then place the gloved cartridge into the palm of the gloved strong hand and pull that glove over the cartridge and glove.*

**L.** *Since CEW probes penetrate the arrested individual's skin, there is a possibility that skin, flesh, or clothing may be attached to the barbs. Therefore, the probes should be treated as evidence. The probes should be stored in a prescribed manner so trace evidence on the probes will not be lost or cross contaminated. All items should be stored in compliance with the Mobile Police Department evidence protocol.*

## VII. Treatment of Persons subjected to Tasering

**A.** *After securing the subject in handcuffs and other appropriate restraints, the CEW officer shall remove the probes using prescribed methods. However, if the probes embed in soft tissue areas, the officer shall require the subject to be treated at a hospital and the probes removed only by medical personnel. The cartridge shall be removed from the CEW prior to removal of probes.*

**B.** *Once in custody, the arresting officer shall advise the paramedic or emergency room staff that the person has been subjected to the CEW and relate the time of the incident. If the probes penetrate the skin; the puncture sites shall be brought to the attention of the emergency room staff, paramedic and officer's supervisor. Only emergency room staff may remove probes that embed in soft tissue areas such as the neck, face, groin or eyes.*

**C.** *After examining the affected person, the paramedics will make the determination if the person should be transported to the hospital for additional treatment.*

**D.** *If the treatment, including removal of probes is administered at a medical facility, officers should follow department procedures for evidence retention at a medical facility.*

**E.** *In no case shall the suspect be transported to jail or other detention facilities until they have been cleared by the on-scene paramedics or emergency room personnel.*

**F.** *Officers must be aware that one easily overlooked aspect of injury in shooting a subject with the Taser is that of falling from a standing position. Paramedics should perform a thorough physical examination with particular emphasis on secondary injuries.*

## VIII. Tactical Deployment

**A.** *Use common sense.*

**B.** *Use verbal commands and point laser sight at subject prior to firing.*

**C.** *Have additional cartridges available or a second CEW ready to fire in case probes miss the target or there is a malfunction.*

**D.** *Have back up present to prepare to arrest or use other force options as appropriate and necessitated by the situation.*

**E.** *Aim at lower center mass and back shots remain the preferred area when practical (See Appendix A).*

**F.** *Avoid hitting the face, neck, and chest/breast areas (See Appendix A).*

**G.** *Use cover and distance to ensure officer safety.*
**H.** *If the suspect runs, the officer must run also to prevent wires from breaking.*

**I.** *Avoid use on slanted roofs or on the edge of buildings to eliminate the possibility of the subject falling.*
**J.** *Avoid use on subjects in swimming pools or deep bodies of water due to the chance of drowning.*
**K**. *NEVER deploy the CEW from a seated position in a patrol vehicle.*
**L.** *NEVER deploy the CEW at anyone on a two wheeled mode of transportation.*
> *NOTE: Please note that the recommendation for intentionally targeting the preferred target zone is qualified by "when possible" and "unless legally justified." These qualifiers address the reality that an arrest situation is fast moving and dynamic, and that exact shot placement in a preferred target zone is not always going to be possible. It may not even be possible to intentionally aim the CEW, but rather just point and shoot. This recommendation also recognizes the reality that sometimes it is legally justified to aim for areas outside the preferred target zone. The preferred target zone does not mean that other areas are prohibited. However, when the situation allows for sufficient time to intentionally aim the CEW, it is recommended to try, when possible, to aim for the preferred target areas shown in Appendix A. This may require some slight modification to traditional target attainment by lowering the point of aim several inches to lower center mass.*

**X.** *Use of Force Issues*
> **A.** *The use of the \*CEW constitutes use of force.*
> **B.** *The CEW is placed on the force continuum between control and restraint and chemical irritants.*
> **C.** *The CEW may be used from up to 21 feet away when:*
>> *1. The suspect is punching or kicking, or*
>> *2. Threatening to punch or kick, or*
>> *3. Lesser force options are ineffective, or*
>> *4. Likely to be ineffective, or*
>> *5. The officer reasonably believes the suspect is a credible threat, or*
>> *6. The suspect is a threat from a distance and the officer is at risk of injury if he/she attempts to close the gap.*
>> *7. Other deployment considerations include:*
>>> *a. Imminent threat to officers or others.*
>>> *b. Suspect actively resisting arrest.*
>>> *c. Circumstances are tense, uncertain and rapidly evolving.*
>>> *d. Severity of the crime.*
>>> *e. Attempting to evade by fighting.*
>> *8. Officer/Subject factors that may be considered:*
>>> *a. Age*
>>> *b. Sex*
>>> *c. Pregnancy (avoid use, if possible, on late term women as the CEW could cause complications from a secondary injury or fall.)*
>>> *d. Skill level*

e. Multiple subjects/officers
f. Relative Strength
9. Special Circumstances
a. Closeness of weapon
b. Injury or exhaustion of officer
c. Officer on ground
d. Distance between officer and subject
e. Special knowledge
f. Availability of other options

## XI. Communications Responsibilities

**A**. Upon notification of a "Code Zebra," the Communications Officer shall dispatch the officer's supervisor to the scene.
**B.** Shall notify Fire Communications and request a paramedic unit to respond to the scene.
**C.** Shall make other notifications of the deployment of the CEW as dictated by the incident and department policy.

## VII. Training Unit Responsibilities

**A.** Provide annual retraining to certified users and instructors.
**B.** Coordinate training for certification as requested by need of field services or other divisions within the department.
**C.** Train all new officers during the basic Police Academy.
**D.** Review copies of the Less Lethal Munitions Report (PD-27) for completeness, and retain one copy in the deploying officers training file.
**E.** Maintain training updates from Taser International, Inc. and distribute updates to all department members who are CEW Instructors.

## General Order 1.3.1 USE OF FORCE:

Many decisions and actions of law enforcement officers have serious consequences, but none are as irrevocable as the decision to use force. Officers are expected to achieve control, and to the extent possible, exhaust other reasonable means before resorting to the use of deadly force.

Control is achieved through:

1. Officer presence on the scene.
2. Verbal commands.
3. Control and restraint.
4. Conducted Electrical Weapons.
5. Chemical irritants.
6. Hand-held impact weapons.
7. Deadly force.

Employees may use reasonable force to affect a legal arrest or detention, and also to overcome any resistance or threatened resistance of the person being legally arrested or detained.

34

*Only the amount of force necessary to affect the arrest may be used and employees should use de-escalation tactics when possible.*

*(end of Taser regulations)*

## ANALYSIS

1.      Consistent with the investigation of the in-custody death of Mr. Dallas, the two arresting officers progressed through steps 1 – 4 of the order procedure to gain control of Mr. Dallas. They displayed Officer Presence when they arrived at the location in a marked police vehicle, and their department uniforms clearly displayed police insignia. Officers gave Verbal Commands to Mr. Dallas and Suspect #1 to provide identification.

Officer #2's request for Mr. Dallas to retrieve his license required some movement/searching/retrieving on his part. Officer #2 did not request that Mr. Dallas remain still or place his hands on the dashboard, steering wheel, or out of the window for officer safety. Mr. Dallas did not fully comply with providing his license, but did reach around in his vehicle, partially responding to the Officer's request to retrieve his identification.

Consistent with the investigation, the involved officers attempted to gain control of Mr. Dallas as Officer #2 removed him from the vehicle. Mr. Dallas began to physically resist by pulling away from Officer #2, and attempted to run from the scene. The officers tackled him to the ground. While on the ground, he ignored the officers' commands and physically resisted their attempts to gain control of him. During this encounter, Mr. Dallas was peppered with profanity and called a "motherfucker," as he was being tased and crying out that he couldn't breathe. He was told "quit fighting motherfucker." Mr. Dallas was told to let go of the Taser. The struggle for the Taser may explain Taser Timeline above. Internal Affairs' narration indicates that "Officer #2 made multiple attempts to deploy his Conducted Electrical Weapon (Taser) to achieve compliance and control over Mr. Dallas."

According to Mobile Police Department Policy:

The CEW may be used to control dangerous or violent subjects when deadly physical force does not appear to be justified and/or necessary; or attempts to subdue the subject by other conventional tactics have been or will likely be ineffective in the situation, or there is reasonable expectation that it will be unsafe for officers to approach within contact range of the subject.

The CEW falls into the category of Less Lethal Force technology and equipment, defined as:

1. Those items, when used properly, which are less likely to result in death or serious physical injury than force commonly referred to as "deadly."

2. Less Lethal Force is defined as force used to subdue or render a subject non-threatening, with a lower probability of effecting fatal consequences.

Mobile Police Department Policy notes:

Use of Force Issues

A. The use of the *CEW constitutes use of force.

B. The CEW is placed on the force continuum between control and restraint and chemical irritants.

C. The CEW may be used from up to 21 feet away when:

    1. The suspect is punching or kicking, or

    2. Threatening to punch or kick, or

    3. Lesser force options are ineffective, or

    4. Likely to be ineffective, or

    5. The officer reasonably believes the suspect is a credible threat, or

    6. The suspect is a threat from a distance and the officer is at risk of injury if he/she attempts to close the gap.

    7. Other deployment considerations include:

        a. Imminent threat to officers or others.

        b. Suspect actively resisting arrest.

        c. Circumstances are tense, uncertain and rapidly evolving.

        d. Severity of the crime.

        e. Attempting to evade by fighting.

    8. Officer/Subject factors that may be considered:

    a. Age

    b. Sex

    c. Pregnancy (avoid use, if possible, on late term women as the CEW could cause complications from a secondary injury or fall.)

    d. Skill level

    e. Multiple subjects/officers

Mr. Dallas did not appear to be an imminent threat to officers or others. Mr. Dallas was attempting to evade by resisting – he did not appear combative but was non-compliant and actively resisting. As a result of the physical confrontation with Mr. Dallas circumstances were tense, uncertain and rapidly evolving. According to involved officers Mr. Dallas was punching or kicking, or threatening to punch or kick. However, while active resistance and attempting evade/flee are viewable on the BWC video, other actions (i.e. kicking) are not captured on the BWC video.

Consistent with MPD "use of force" policy, the use of the Taser was justifiable and consistent with policy at the time.

Other actions taken during the arrest and in-custody death of Mr. Dallas – the profanity ("move your fuckin' legs"), kicking towards Mr. Dallas's legs or moving them apart with the officer's foot as Mr. Dallas is on his back in handcuffs and in medical distress articulating that he can't breathe are also "force" issues as they are taken under the color of law after Mr. Dallas is no longer a threat to officers or others and no longer in a position to evade, fight, resist.

Notably one of the Officers did sit Mr. Dallas up indicating "I am trying to get him where he can breathe." The officer continued to hold him in the seated position to facilitate Mr. Dallas' breathing ability. Mr. Dallas continued to complain about breathing and pain in his arm and to request water. He said that he did not want to cause the officers any problems.

36

2.      Subsequent to Mr. Dallas being under complete control, handcuffed no and longer an obvious threat to officers, the public or himself, Officer #2 used unnecessary, unprofessional, demeaning, disrespectful, denigrating, inhumane and escalating language to Mr. Dallas who was suffering a medical emergency. As indicated in the investigation, Officer #2 and evidenced in the BWC video Officer #2 told Mr. Dallas, "Shut the fuck up!" five (5) times. Subsequent to Mr. Dallas being under complete control, handcuffed and no longer an obvious threat to officers, the public or himself, and when he was "on his back, rocking back and forth, Officer #2 threatened to punch Mr. Dallas in the stomach if he moved again." Consistent with BWC video and the Memorandum Report to Chief Prine, Mr. Dallas complained to officers that he thought his arm was injured.  To this appropriate compliant and notification, Officer #2 replied, "Yeah, no shit."  Mr. Dallas lay on the ground for a period of time indicating that he was in medical distress and couldn't breathe. Officers continued to use profanity towards him. As appropriately noted in the investigation – "Although Mr. Dallas was belligerent, attempted to flee, and physically resisted, he never used derogatory language toward the officers. Even when he was in custody, he addressed officers as 'Sir.'"

Consistent with the BWC video and as appropriately noted in the investigation:

> Officer #4 spoke with Witness #3 at the scene after Mr. Dallas was taken into custody. Witness #3 made a statement to the effect, 'The guy in the police car is a friend of mine, and I'll protect him from the police if I need to'. Officer #4 replied, 'If you think you're hard, bring your ass around here.' It should be noted that Officer #4 also made a statement to involved officers of 'Y'all just stepped up your game, now get ready for litigation,' while Officer #1's body worn camera was still active. Officer #4 spoke from a personal/professional experience he encountered similar to what had just transpired on scene two years ago prior to this incident, while serving in his official police capacity. While the comment is not a violation of this order, it served no purpose on an active scene of this magnitude with young officers involved.

Certainly, Officer #4's conduct is indicative of behavior that could be reported/referred to the Employee Intervention Program:

> As part of the Department's ongoing evaluation of its employees, supervisors shall continually monitor the actions and behaviors of all employees under their direction. Supervisors are responsible for monitoring and reporting on all aspects of their subordinate's conduct and behavior. These reports shall include conduct that is both commendatory and *problematic*. {Italics added} All conduct and behavior reports shall be submitted to the Watch Commander or Unit Supervisor of the employee whose actions are being reported.

3.      Upon arrival at the scene, EMT/paramedic response to Mr. Dallas was slow considering Mr. Dallas had complained and was complaining of breathing issues and pain.  Officers explained to the EMT that Mr. Dallas was combative, but did not immediately notify medical personnel of his breathing issues, his request for water, etc. For several minutes EMT personnel stood outside of the vehicle without looking in on Mr. Dallas – who was calling out. One officer indicated "check him out because he is beating his head and kicking in the vehicle." The officer then had to ask

54048437 v1

another officer for keys. When officers opened the door Mr. Dallas complained of pain in his right arm and continued to indicate that he couldn't breathe. The paramedic used profanity toward Mr. Dallas – "Don't mess my shit up" – even as Mr. Dallas was clearly in medical distress.

## RECOMMENDATIONS

1.   MPD must focus on the related facts of the incident – an objective analysis of the Use of Force Incident – without demonizing or denigrating any involved citizen in the case. During an interview with a member of MPD ████████████ during this investigation by Attorney Kenyen Brown and Dr. Tyrone Powers ████████████ ████████ of MPD sated directly to Attorney Kenyen Brown and Dr. Powers that Mr. Jawan Dallas was "a piece of shit." This is indicative of a serious problem with MPD leadership and culture.  In-person and in public press conferences/briefings MPD must focus on the facts of the case and not on any judgment of "value" or "worth" of the alleged perpetrator or arrestee. Judging a citizen's value is not the job of professional police agencies/departments/officers. Officers are there to serve and protect. An arrest is designed to take a perpetrator or alleged perpetrator into custody for the purpose of charging them with a crime. Officers are not to act as judge, jury and executioner. Their actions and probable cause for such actions are to be based on the facts, and not on their perception of the individual being arrested, for factors that may contribute to danger at the time of the arrest.

2.   MPD should immediately implement enhanced de-escalation and ethics training, as the documented unnecessary, unprofessional, demeaning, disrespectful, denigrating, inhumane and escalating language used towards Mr. Dallas who was suffering a medical emergency is a clear and present indication that current training is insufficient. Further, there seems to be a culture, as indicated by comments in interviews conducted of ████████████████ specifically comments made to the effect that Mr. Dallas was "a piece of shit," and that "we didn't kill those people, they killed themselves," condones the demonization of alleged perpetrators (and citizens), and thus have allowed for – if not encouraged - its mitigation and marginalization by officers of MPD. Unless addressed immediately, this language and culture could lead to a severe, devastating and longstanding divide between the police and the community they have taken an oath to serve and protect. Leadership or officers that indicate this type of disrespect to citizens should be severely disciplined – after all appropriate hearings (if the conduct is confirmed) via suspension without pay. Transgressions of this sort will do long-term harm between the police and the community and financial harm to the city of Mobile and its citizens. It will negatively impact the ability to the city of Mobile to gain the public cooperation necessary to effectively reduce crime permanently. MPD publicly indicates the adoption of "The Six Pillars of the national 21st Century Policing initiative reaffirms the best practices the Mobile Police Department currently implements. We focus on criminals, not communities. Our best practices promote effective crime reduction while building public trust. And, through collaborative relationships with faith leaders, school officials, and community action groups, we ensure that citizens are aware and educated on key tactics to be safe." Some of the actions demonstrated in this case, as verified in Internal Affairs' Memorandum to the

Chief are inconsistent and counter to this statement on Mobile Police Department's website.

3.   MPD should review/revisit and reevaluate its Taser Policy and training to ensure that all Taser use is justified, necessary, consistent with the use of force continuum. Additionally, the policy should be appropriate, proportional and administered consistent with best practices.  There is no indication that the impending use if the Taser was announced before being deployed by Officer #2.

By 2011, according to Department of Justice National Institute of Justice in a report entitled "Police Use of Force, Tasers and Other Less-Lethal Weapons," Taser use had increased. The report indicated that more than 15,000 law enforcement and military agencies used Tasers at that time. It noted that Tasers had caused controversy (as did pepper spray) and had been associated with in-custody deaths and allegations of overuse and intentional abuse. The report noted that organizations such as Amnesty International and the American Civil Liberties Union had questioned whether Tasers can be used safely, and what role their use plays in injuries and in-custody deaths. (https://www.ojp.gov/pdffiles1/nij/232215.pdf)

The report noted that CEDs such as Tasers produce 50,000 volts of electricity. The electricity stuns and temporarily disables people by causing involuntary muscle contractions. This makes people easier to arrest or subdue. When CEDs cause involuntary muscle contractions, the contractions cause people to fall. Some people have experienced serious head injuries or bone breaks from the falls, and at least six deaths have occurred because of head injuries suffered during falls following CED exposure. By 2011, more than 200 Americans had died after being shocked by Tasers. Some were normal, healthy adults; others were chemically dependent or had heart disease or mental illness. The report noted that despite the dangers, most CED shocks produce no serious injuries. A study by Wake Forest University researchers found that 99.7 percent of people who were shocked as part of this NIJ-sponsored study included six police departments and evaluated the results of 962 "real world" CED uses. Skin punctures from CED probes were common, accounting for 83 percent of mild injuries. (https://www.ojp.gov/pdffiles1/nij/232215.pdf)

According to research and a study conducted by USA Today and the Arnolt Center:

- Most decisions about Taser use and training are left to individual agencies. Some departments have adopted strict Taser policies and use of force reports, others give officers the tool without training
- Compared with firearms training, Taser instruction is treated as an afterthought in many departments and training academies.
- Taser-like devices are marketed as a less-lethal option for emergency self-defense and preventing harm. But police have been accused of using them as punishment, repeatedly firing 50,000 volts of electricity into people when there is no apparent imminent threat of harm, temporarily paralyzing the nervous system and muscles.

- Four of five cases that ended in death began as calls for nonviolent incidents, and 84% were unarmed. In cases where race could be determined, Black people accounted for nearly 40% of those killed, about three times their share of the U.S. population.

Also:

- In Arlington, Texas, the police department banned use of the Tasers on people who may be resisting arrest but show no signs they intend to harm officers or others.
- New Jersey requires a "robust" investigation of police Taser deployments, including a review by the county prosecutor's office, and, if the deployment is problematic, the attorney general's office.

Axon noted that "Where an allegation of a 'Taser-related' death occurs, the most common causes are drug intoxication and heart disease." Axon indicated that training should include "both Axon Academy training, where users gain the knowledge necessary for the appropriate use of Taser energy weapons, as well as practical and scenario-based training, which helps develop important skills for a successful deployment in the field." Lethal Force? Tasers are meant to save lives, yet hundreds die after their use by police, USA Today, (www.usatoday.com/in-depth/news/investigations/2021/04/23/police-use-tasers-ends-hundreds-deaths-like-daunte-wright/7221153002 (last visited Apr. 17, 2024)).

According to Lon Bartel, a Taser master trainer and director of training and curriculum for VirTra, an Arizona-based company that uses virtual reality to replicate real-life scenarios for law enforcement officers, "Taser training primarily focuses on how to operate the weapon, which is not good enough." Bartel noted, "You don't just draw your Taser and fire…. Sometimes it's the right tool, and sometimes it's not." *Lethal Force? Tasers are meant to save lives, yet hundreds die after their use by police*, USA Today, www.usatoday.com/in-depth/news/investigations/2021/04/23/police-use-tasers-ends-hundreds-like-daunte-wright/7221153002 (last visited Apr. 17, 2024).

Despite officers' lawful use of force to subdue Mr. Dallas and their adherence to MPD's policy, there appears to be a need for better training on the use of the Taser – maintaining control of the Taser – distance for use - and other defensive tactics (pain compliance techniques) that might bring a subject into compliance.

6. The Mobile Police Department can establish and weekly convene a "Performance Review Board" comprised of commanders, training administrators, medical specialists, legal representatives, etc. This board should analyze camera footage to assess use of force cases. The assessment should include the extent to which policies were followed or violated; opportunities to write or revise agency policies; recommendations for training, etc. This measure is preventive in nature and allows for significant input from all entities.

**D.    Beezer DuBose, Jr. - Case No. M223-10-01384**

**SUMMARY**

On October 12, 2023, Officer #1, alongside his patrol car partner, Officer #2, executed a vehicle stop of a car driven by Beezer DuBose, Jr. at the Hop-In/Chevron convenient store and gas station on Dauphin Island Parkway. Officer #1 was on duty and working with the Street Enforcement Team (SET) – his assigned unit at the time. As shown on Officer #1's BWC, upon pulling the suspect over, Officer #1 immediately knocks on the back driver's side window of the car driven by Mr. DuBose. Mr. Dubose opens the driver side door and says, "What you need sir?" Officer #1 responds, "What's up man, what do I need?" Mr. DuBose asks, "License?," to which Officer #1 responds, "Yup." Mr. DuBose then hands Officer #1 his driver's license. Officer #1 then says, "The reason I stopped you was the dark tint on your windows." Mr. DuBose then says, "Ah, I know, there's my license right there man," looking at his driver's license held in Officer #1's hand. Officer #1 than inquires of Mr. DuBose, "You got insurance on the car?," to which Mr. DuBose responds, "Yup, sir, right here, wop! There you go, you ain't gonna get me no more like that last time," as he hands his insurance information to Officer #1. Mr. DuBose continues by saying, "Everything is right there," to which Officer #1 responds by saying, "Okay." While he is inspecting Mr. DuBose's insurance information, Officer #1 politely asks Mr. DuBose, "How are you doing today?" Mr. DuBose responds, "I'm blessed man, I'm getting ready to put some gas in my car." Mr. DuBose then asks Officer #1, "Why you pull me over man?" in a non-threatening way. Officer #1 responds, "I already told you, dark tint." Mr. DuBose then responds by rolling his eyes and turning his face away from Officer #1 while saying, "Man, come on man, I ain't even did nothing." Mr. DuBose's tone towards Officer #1 was still respectful and non-threatening. Officer #1 then directed Mr. DuBose to exit the vehicle by stating, "Now what I need you to do, I need you to step out (of the car)." Once Mr. DuBose steps out of the car Officer #1 immediately turns Mr. DuBose's back towards himself and places him in handcuffs.

Mr. DuBose expresses surprise that handcuffs have been placed on him then verbally directs the passenger in his car to "call his girls" and provides the number to reach them. Officer #1 then leads Mr. DuBose towards his patrol car that is parked behind Mr. DuBose's vehicle so that he can perform a search of his person. While patting Mr. DuBose down for possible weapons or illegal contraband he says, "Hmm" several times in what could be perceived as a mocking tone by Mr. DuBose. Mr. DuBose then calls out to a bystander to call his old lady and let her know that he got pulled over by the police. Mocking Mr. DuBose's request to the bystander, Officer #1 then shouts out to the bystander, "Call his Momma too!" While handcuffed, Mr. DuBose appears to move slightly away from the location Officer #1 wants him to be in and Officer #1 verbally directs him to move back to where he was standing. Officer #1 also physically moves him back to where he wants him to stand next to his patrol car. Mr. DuBose then starts to curse at Officer #1 and use racially derogatory terms towards him. In response, Officer #1 physically pushes Mr. DuBose towards a nearby post that is supporting the gas station canopy covering the gas station pumps. During this instant, Mr. DuBose says, "I'm going to show you," several times to Officer #1, to which he responds "What you gonna show me?" As seen from Officer #2's BWC, as Officer #1 pushes Mr. DuBose towards the gas station post, Officer #1 grabs Mr. DuBose's hair (which is in a bunned dreadlock style) to assert control over his person. Once Officer #1 presses the still handcuffed Mr. DuBose against the gas station post, he then surrenders a tactically sound arms-

length distance from Mr. DuBose so that he can press his face close to Mr. DuBose's face in order to shout, "What you gonna show me?" or "What you fucking showing me?" several times in response to Mr. DuBose's angry "I'm gonna show you something!" taunt directed at Officer #1 during the heated verbal exchange.

As seen from both Officer #1 and Officer #2's BWCs , Officer #1 then continues to forcibly grab Mr. DuBose's hair and direct his body towards the back driver's side of the patrol car that is located close to the gas station post. Neither Officer #1's BWC video or Officer #2's BWC video captures video or audio indicating that Mr. DuBose is causing Officer #1 any physical pain during their argument or subsequent scuffle. Instead, the videos capture Officer #1 using several closed fist blows to strike Mr. DuBose about his head and face. This particular part of their scuffle was also caught on video by a bystander and later posted to social media. Only towards the very end of Officer #1's scuffle with Mr. DuBose does his BWC capture Officer #1 yell, "Let fucking go of me" to Mr. DuBose, but his BWC is obscured due to his close physical proximity to Mr. DuBose. Meanwhile Mr. DuBose calls out to bystanders several times to record the altercation during the time Officer #1 is beating him with closed fists.

Officer #1 later claimed to fellow officers and Internal Affairs investigators that Mr. DuBose forcibly grabbed his genital area and caused great discomfort and injury. On the scene, Officer #1 even suggested to one of the assisting officers that he planned to charge Mr. DuBose with Assault 2nd for his assault upon his genitals, which he followed through on. One of the later bystanding officers advised Officer #1 that if he was injured that he should go see "medical." However, Officer #1 did not go see a doctor until three days after the altercation with Mr. Dubose to document his injuries. This doctor's visit was also after the bystander video of the altercation surfaced on social media.

Moreover, a close inspection of Officer #2's BWC video capturing the altercation between Officer #1 and Mr. DuBose shows a point at which the two fighting parties' bodies completely separate after Officer #1 has already landed several closed fist punches to Mr. DuBose's face and head. At this point on Officer #2's BWC, Mr. DuBose's handcuffed hands can be clearly seen separated from Officer #1's body. Nonetheless, Officer #1 reengages the use of closed fist punches against Mr. DuBose's face and head.

Additionally, once Mr. DuBose is in the back of Officer #1's patrol car, and still handcuffed, Officer #2 gets into a verbal altercation with Mr. DuBose when he complaints about the police handling him roughly. Officer #2 says to Mr. DuBose, "You've been nothing but disrespectful to him (Officer #1) the whole time he's been dealing with you." Officer #2 then says to Mr. DuBose, "That's your problem, you won't shut the fuck up!"

Once the altercation with Mr. DuBose is complete and Officer #1 returns to his patrol car, his BWC still runs for eleven minutes as he places a telephone call, interacts with the laptop in his patrol car and later drives Mr. DuBose to the Metro Jail in his patrol car. Officer #1 complains to Officer #2 about the pain in his right thumb (the hand that he used to strike Mr. DuBose with his closed fist). Officer #1 also touches his right thumb because of the pain he feels in that location

as well as makes attempts to flex and stretch the thumb in order to ease his apparent pain and discomfort. However, during this same eleven minute span of time Officer #1 does not complain about any pain to his genital area or in any way attempt to address discomfort in his groin area.

Based on these circumstances and as per MPD General Order 52.1.3, the MPD Office of Internal Affairs conducted an administrative investigation into the matter. Ultimately Internal Affairs concluded "It is likely that a reasonable officer in the same predicament would have chosen the same level of force as Officer #1." It also determined that the level of force used was consistent with MPD General Order No. 1.3.1 relating to the use of force.

The Internal Affairs officer that conducted the investigation into Officer #1's use of force was interviewed by the Independent Investigative Team. Said officer disclosed to the Independent Investigative Team that he made no effort to look into Officer #1's disciplinary record, training record or the training materials Officer #1 would have received as it relates to the use of force, de-escalation or the SSGF tactical street fighting combat training he received.

The Independent Investigative Team also interviewed ███████████████████ █████████████████████████████") and discussed many topics. The █████ Trainer advised the Independent Investigative Team that Internal Affairs sometimes reaches out to the Training Academy for materials as part of their investigations. However, he said that Internal Affairs does not routinely reach out for the training records of the officers they are reviewing. He also advised that the Training Academy teaches that officers should not use any profanity, and that they should treat people with respect and dignity. He advised that profanity is an escalating factor that can lead to the use of unnecessary force, thereby creating a higher probability for officers to need to use escalated force.

The Independent Investigative Team then brought up the fact that Officer #1 used expletives in his encounter with Mr. DuBose and grabbed Mr. Debose's hair. The █████ Trainer said that neither of those tactics were taught at the MPD Training Academy and would lead to an "exponential" need for the use of additional force to subdue Mr. DuBose. The Independent Investigative Team also asked the Trainer about Officer #1's tactical decision to not have an arm-length distance between himself and Mr. DuBose when he had Mr. DuBose pressed against the gas station post. The █████ Trainer advised that Officer #1's tactical decision to move closer to Mr. DuBose so that he could more effectively argue with Mr. DuBose was not consistent with the training provided by the MPD Training Academy.

**ANALYSIS**

1.      It is the opinion of the Independent Investigative Team that Officer #1 failed to employ effective de-escalation techniques to persuade Mr. DuBose to comply with his commands, but rather, in contradiction to the training provided to him via the MPD Training Academy, he engaged in a series of actions that escalated the need to use heightened levels of force against Mr. DuBose. This unnecessary series of actions escalated Officer #1's use of force, resulting in avoidable injury

to himself and Mr. DuBose. Moreover, Officer #1's actions put both himself and Mr. DuBose at a much greater, or "exponential," risk of death or great bodily injury that could have resulted from the interaction.

Officer #1 violated MPD Policy 1.3.1. Use of Force by failing to follow clearly articulated MPD policy and training protocols by: 1) verbally taunting Mr. DuBose while in handcuffs; 2) continually grabbing Mr. Dubose's hair to control his movement; 3) unnecessarily returning Mr. DuBose's expletive-filled comments to him; 4) failing to maintain an appropriate arms-length distance from Mr. DuBose when pressing him against a gas station post so that he could better exchange verbal taunts with Mr. DuBose; 5) unnecessarily using his clenched fist against Mr. DuBose after giving up the tactically superior position when pressing Mr. DuBose to the gas station post; 6) reengaging his clenched fist against Mr. DuBose after the two momentarily disengaged and Mr. DuBose was on his knees in front of Officer #1.

Officer #1 executed almost no de-escalation techniques, but rather unnecessarily escalated the use of force, all in violation of MPD policy 1.3.1. Use of Force, "...*Officers are expected to achieve control, and to the extent possible, exhaust other reasonable means before resorting to the use of deadly force*" (June 5, 2020).

2.      It is the opinion of the Independent Investigative Team that Officer #1's rationale to use a heightened level for force, specifically, that Mr. DuBose grabbed his genital area causing extreme pain, is not credible for the following reasons:

a.) Officer #1 only complained that Mr. DuBose caused pain to his genital area after Mr. DuBose was screaming out for bystanders to record Officer #1 beating him with a clenched fist while handcuffed.

b.) While Officer #1 winced in pain and complained about the pain in his right thumb on his BWC after his altercation with Mr. DuBose in the eleven minutes it took him to transport Mr. DuBose to the Metro Jail, he did not articulate a single complaint about a pain in his genital area in the same time-span.

c.) Officer #1 refused to seek out medical treatment for his alleged injury to his genital area even after a fellow officer suggested that he do so if he was injured, but rather he only sought out medical treatment three days after the altercation and after a bystander video of the altercation with Mr. DuBose surfaced on social media and local mainstream media outlets.

d.) Assuming Officer #1's allegations are true that Mr. DuBose grabbed his genital area causing injury, Officer #2's BWC clearly shows the two men physically disengage, albeit momentarily, and Mr. DuBose's hands, still handcuffed, can be observed totally apart and away from Officer #1's body while Mr. DuBose's back is hunched over in a defensive position. Officer #1 nonetheless jumps on Mr. DuBose's back, forcing him to his knees where he resumes making closed fist strikes with his right hand to Mr. DuBose's face and head. Thus, even if Officer #1's initial rationale for striking Mr.

DuBose was legitimate, there was no legitimate rationale to reinitiate striking Mr. DuBose once he clearly had no grip on his genitals.

3.     It is the opinion of the Independent Investigative Team that both Officer #1 and Officer #2 violated MPD General Order No. 26.8.5, which states, "A member or employee shall not use disrespectful, profane, abusive, demeaning, belittling or insulting language and/or gestures to any person."  Officer #1 belittled Mr. DuBose when he shouted, "Call his Momma too!" to the bystander witnessing Mr. DuBose's arrest.  As noted above, Officer #1 also directed a series of expletives to Mr. DuBose before and during the altercation.  Lastly, Officer #2 said to Mr. DuBose, "That's your problem, you won't shut the fuck up!" while Mr. DuBose was in handcuffs and in custody sitting in the back seat of his patrol car.

4.     It is the opinion of the Independent Investigative Team that MPD Internal Affairs failed to perform a thorough investigation of this incident due to its failure to gather Officer #1's training record and relevant MPD Training Academy materials prior to deciding that a reasonable officer in the same predicament as Officer #1 would have chosen to use the same level of force as Officer

**RECOMMENDATIONS**

1.  MPD should adopt more comprehensive definitions for force, force variations, and use of force, to minimize confusion caused by vague generalizations; improve clarity and understandability; and increase applicability.

    1.1     Review and adopt comprehensive definitions from agencies under Consent Decrees whose policies have been reviewed and adopted by Department of Justice and a Monitoring Team. Currently 14 police agencies are under Consent Decree in the United States. Recommended agencies to review their use of force policies are: Baltimore City Maryland; Portland, Oregon; New Orleans, Louisiana; Chicago, Illinois (LDF Thurgood Marshall National Police Funding Data Base: Consent Decrees, Nat'l Police Funding Database, https://policefundingdatabase.org/explore-the-database/consent-decrees/ (last visited Apr. 17, 2024).

    As an example, the Baltimore Police Department lists several variations and or implications of force to include:

    • Use of Force: Levels 1, 2, 3
    • Use of Force: Reasonable, Necessary, and Proportional
    • Active Aggression
    • Prohibited Retaliatory Force
    • Chokehold/neck hold
    • Conducted Electrical Weapon (CEW)
    • Deadly Force/Lethal Force
    • Improvised Impact Weapon (IIW)
    • Less-Lethal Force
    • Reasonable
    • Necessary

• Proportional
• Active Resistance
• Passive Resistance
• Serious Physical Injury
• Temporary Pain
• Totality of Circumstances

1.2    In MPD's General Orders, "De-escalation" is referred to as police responses to terrain and adverse physical conditions (XII. De-escalation: General Manual, 46-8). The use of the term is inconsistent with most common uses of the word in policing – generally referencing police strategies to reduce agitation and physical threats from assailants or from general members of the community.  Additionally, the following is a statement regarding "de-escalation" found in MPD's General Orders: "*Only the amount of force necessary to effect the arrest may be used \*and employees should use de-escalation tactics when possible."* This statement is inconsistent with agency policies under Consent Decree such as:

Portland Oregon: 8.1 "De-escalation: A deliberate attempt to prevent or reduce the amount of force necessary to safely and effectively resolve confrontations… 1.1.2. De-escalation techniques provide members the opportunity to stabilize the scene or reduce the necessity for force so that more time, options and resources are available to resolve the situation. Members shall take proactive steps to eliminate the immediacy of the threat, establish control, and minimize the need for force" (December 2023).

New Orleans Louisiana: "When it is consistent with protecting the safety of the officer, the subject, or the public, officers shall use de-escalation techniques to avoid or reduce the need for the use of force. These techniques include gathering information about the incident, assessing the risks, assembling resources, attempting to slow momentum, and communicating and coordinating a response. In their interaction with subjects, officers should use advisements, warnings, verbal persuasion, and other tactics and alternatives to higher levels of force. Officers should recognize that they may withdraw to a position that is tactically more secure or allows them greater distance in order to consider or deploy a greater variety of force options" (October 2022).

Baltimore Police Department: "**De-Escalation.** Members shall use De-Escalation Techniques and tactics to reduce any threat or gain compliance to lawful commands without the Use of Force or with the lowest level of force possible (See Policy 1107, *De-Escalation).* **Avoiding Escalation.** Members shall not do or say anything that escalates an encounter unless necessary to achieve a lawful purpose" (Draft July 2023).

U.S. Department of Justice: DE-ESCALATION - "Officers will be trained in de-escalation tactics and techniques designed to gain voluntary compliance from a subject before using force, and such tactics and techniques should be employed if objectively feasible and they would not increase the danger to the officer or others. When feasible, reducing the need for force allows officers to secure their own safety as well as the safety of the public" (Office of Attorney General: Department Updated Use of Force Police, May 2022).

1.3     De-escalation policies and practices should be comprehensive and especially include strategies for dealing with traditionally marginalized citizens – typically experiencing high and disproportionate contact with police, i.e.

• Persons experiencing behavioral health crisis
• Persons appearing to have developmental disabilities
• Persons with Alzheimer and other Dementia Diseases
• Rape Victims who typically are women
• Children and Youth
• Responding to Quality-of-Life behaviors, i.e. people with housing challenges
• Persons who identify as LGBTQ+
• English as a Second Language (ESL citizens)

1.4     Review the policies and practices to include authorized deployment of special tactic teams to determine the appropriateness of their deployment in various arrest scenarios.

2     (LEVELS OF RESISTANCE TO "USE OF FORCE") In order to prioritize the sanctity of life it is critical that the agency establish a "continuum" (of such) that describes arrestees/subjects' levels of resistance - each requiring a responding intensity of force from police, sufficient enough to quell the disturbance to effectuate an arrest. This is one way to weigh the use of force actions more accurately from a police officer against the described resistance from an arrestee/subject – determining use of force proportionality, reasonableness and necessity.

2.1     New Orleans Police Department and Baltimore Police Department identify several levels of resistance from arrestees/subjects (October 2022) for consideration:

• Active Resistance
• Passive Resistance
• Aggravated Resistance
• Aggressive Resistance

2.2     A policy is needed, specifying that "members shall de-escalate force immediately as resistance [from arrestees/subjects] decreases" (Baltimore Police Department, Draft July 2023).

3     (DUTY TO INTERVENE) In order to prioritize the sanctity of life MPD, should adopt a clearer "duty to intervene" policy.  A "duty to intervene" involves the verbal or physical interaction from one member to prevent, alter or stop a course of action taken by another. The purpose of a "duty to intervene" is a legal and ethical obligation to interrupt or stop misconduct, and to develop a police culture of accountability. States including Maryland, Nevada, Minnesota, Colorado, Connecticut, Oregon, and Vermont have passed legislation, making a "duty to intervene" a legal requirement.

3.1     MPD's current policy is inadequate, unclear, and fails to capture the comprehensive nature and intent of the duty to intervene. The policy seems to imply that if an

officer observes misconduct, their duty to intervene is restricted to notifying a supervisor regarding their observations of misconduct. The policy is ambiguous and does not give an officer immediate authority to directly intervene when it is observed:

> *A member or employee, having occasion to use force, shall be restricted to that amount of force that is reasonable and lawful to establish custody. A member or employee shall have the duty to intervene and notify appropriate supervisory authority if they observe another agency employee or public safety associate engage in any unreasonable use of force.*

3.2   A process to assess BWC footage is recommended to ascertain the number and types of interventions made by members of the police force, and to identify officers' failures to intervene when it was necessary.

3.3   The Baltimore Police Department has an extensive policy (319), completely dedicated to the concepts and practices surrounding the "duty to intervene." Concepts and obligations include (but not limited to) intervening in matters concerning:

• Misconduct
• Preventive vs. Active Approach to Intervening
• Fraud and Waste
• Discriminatory Policing
• Sexual Misconduct
• Harassment
• Stops, searches, and arrests that are unconstitutional or violate agency policy.
• Reporting to Supervisors

3.4   MPD should explore and adopt a training that provides viable objectives on the proper and effectives way to intervene in officer misconduct – all driven toward a consistent agency philosophy of self-accountability. For instance, Baltimore City and New Orleans police departments have operationalized EPIC. "**Ethical Policing Is Courageous (EPIC)** is a peer intervention program that trains officers across all ranks to intervene in potentially problematic situations to prevent misconduct and mistakes—potentially saving careers and lives in the process."

> EPIC extends from Georgetown University Law Center for Interventions in Community Safety - ABLE (Active Bystandership for Law Enforcement). "ABLE proposes to prepare officers to successfully intervene to prevent harm and to create a law enforcement culture that supports peer intervention. ABLE is a national hub for training, technical assistance, and research, all with the aim of creating a police culture in which officers routinely intervene—and accept interventions—as necessary to:
>
> • Prevent misconduct,
> • Avoid police mistakes, and
> • Promote officer health and wellness."

48

(*Active Bystandership for Law Enforcement (ABLE) Project*, Georgetown Law, https://www.law.georgetown.edu/cics/able/ (last visited Apr. 17, 2024)

3.5     It is recommended that the City of Mobile, Alabama and or the state of Alabama pursue comprehensive local or state "law enforcement duty to intervene" legislation. Several states have established similar laws on intervening and reporting misconduct in a legal attempt to build a police culture of accountability:

> • Colo. Rev. Stat. §18-8-802 - Duty to report use of force by peace officers - duty to intervene
> • Md. Code, Pub. Safety § 3-524 – Maryland Use of Force Statute
> • Nevada NRS 193.355 - Use of force by peace officer: Duty of another peace officer to intervene to prevent or stop unjustified use of physical force; duty to report observation of unjustified use of physical force; retaliation prohibited; training required.
> • Minnesota 626.8475 Duty to Intercede and Report

4   MPD's training needs assessments, development, and instructor facilitation processes for entrance level, in-service, and specialized courses regarding use of force (among other topics). Trainings should be reviewed to ensure that each meets effective adult-learning approaches; are consistent with state and professional policing best practices; comply with constitutional policing strategies; reflects state and federal laws; and incorporates agency policies.

4.1     MPD is encouraged to create a Community Training Review Committee – allowing volunteer community members to participate in the development and observation of trainings directly related to community engagement.

4.2     In order to enhance public confidence and transparency in individual MPD officers receiving all of their necessary professional trainings, the Independent Investigative Team recommends that MPD maintain an internal training record for each sworn officer detailing the course name and date of the trainings they have completed.

### E.     Christopher Jones

**SUMMARY**

On October 2, 2023, Officers #1 and #2 reported to 602 Glenwood Street ("Glenwood") after neighbors called complaining of a subject sleeping on the roof. This was not the first complaint regarding a sleeping subject on this particular roof. On September 25, 2023, MPD officers and firefighters reported to the same scene with the same subject—Christopher Jones.

When Officer #1 and Officer #2 entered into the Glenwood backyard, Officer #1 used a broken tree limb to bang on the underside of the roof to get Mr. Jones's attention. When Mr. Jones stood up and approached the edge of the roof, Officer #1 told Mr. Jones to get off of the roof because he was scaring neighbors. Mr. Jones appeared as though we was going to descend from the roof, but then asked what Officer #1 meant by "scaring neighbors."

After this question, Officer #1 emphatically stated, "Get off the roof, fuck." Officer #1 then proceeded to unholster his Taser and brandish it towards Mr. Jones. Mr. Jones stated, "You gonna tase me?" questioning the officers quick escalation of the use of force. Officer #1 replied, "Yea, get off the roof. You're not supposed to be here." Then Officer #1 stated to Mr. Jones, "run, you better run."

Mr. Jones then went to the front of the house via the roof. Although he appeared as if he was going to jump off of the roof, he stopped his efforts when he saw the officers. Mr. Jones asked that Officer #1 not tase him, and Officer #1 stated that he would not. Mr. Jones was clearly reluctant to descend from the roof in the presence of the two officers, and when he voiced this concern, Officer #1 stated "And what are you going to do about it?"

After this comment, Mr. Jones jumped off of the roof (a six foot wooden fence still separated Mr. Jones from the officers) and walked towards the backyard. Officer #1 walked along the opposite side of the home to the backyard, while Officer #2 remained in the front of the house with the fence separating him from the backyard. While Officer #1 approached the Glenwood backyard, Officer #2 could see something in Mr. Jones's hands and exclaimed: "What is that? Put it down!" When Officer #1 reached the backyard, Mr. Jones revealed a shotgun from a black jacket and pointed it at Officer #1. Officer #1 then fired twelve shots at Mr. Jones, and Officer #2 joined with fourteen shots.

Officer #1 ceased fire when Mr. Jones dropped the weapon. He then handcuffed Mr. Jones and proceeded to render medical aid. Mr. Jones died as a result of fourteen gunshot wounds. MPD uncovered a 12-gauge Mossberg Model 500 pump-action shotgun with an attached pistol grip at the scene. This shotgun had been reported stolen by one of Mr. Jones's family member on September 19, 2023. Further, Mr. Jones's mother had filed a petition for involuntary commitment related to Mr. Jones with the Mobile County Probate Court on September 29, 2023.

After this incident, Internal Affairs conducted an internal investigation analyzing the officers' use of force and compliance with MPD policies. The investigator concluded that the officers' use of force was justified because Mr. Jones "armed himself with a shotgun, assumed a shooting stance, and pointed the muzzle at Officer #1 – even as Officer #2 ordered him to put it down." ("C. Jones Investigative Summary"), p. 9.

In 2011, MPD issued a Memorandum Order ("MO") addressing the recognition and handling of persons with mental illness. MO-2011-03. The MO directs officers to avoid moving suddenly, giving rapid orders or shouting, and expressing anger, impatience, or irritation. The MO recommends that officers approaching and interacting with persons with mental illness to, among other actions,

- Remain calm and avoid overreacting;
- Remove distractions, upsetting influences, and disruptive people from the scene;
- Indicate a willingness to understand and help;
- Speak simply and briefly, and move slowly;
- Recognize that the person may be overwhelmed by sensations, thoughts, frightening; beliefs, sounds ("voices"), or the environment;

- Be helpful and professional;
- Be friendly, patient, accepting, and encouraging, but remain firm and professional;
- Be aware that their uniform, gun, handcuffs and nightstick may frighten the person with mental illness, and reassure the person that no harm is intended; and
- Announce actions before initiating them.

The Independent Investigative Team also obtained the training materials maintained and taught by the MPD Training Academy as they relate to officers interacting with mentally ill persons. In the mental illness PowerPoint taught to officers (2023 In Service training titled "Mental Health, Crisis Intervention and De-escalation Techniques Virtual Reality Experience") there is a section on de-escalation and crisis intervention. Among other things, it advises officers (on slide 48) to do the following: "evaluate safety conditions; introduce yourself, and attempt to obtain the persons name; be patient, polite, calm, courteous, and avoid overreacting: speak and move slowly, and in a non-threatening manner; moderate the level of direct eye contact." Moreover, slide 56 of the PowerPoint states "Avoid satire, sarcasm, and jokes." It also encourages officers to use de-escalation tactics (slide 50), advising that they generally should not do the following: "use stances or tactics that can be interpreted as aggressive; allow others to interrupt, or engage the person; corner a person who is not believe to be armed, violent, or suicidal; argue, speak with a raised voice, or use threats to obtain compliance."

Slide 62 of the document continues, "never demean or make fun of a person who is behaving strangely. Such remarks, ultimately, cause the individual to become more agitated." The training continues on slide 65, "be aware that some people with delusions, incorporate everything into their delusional beliefs. For instance, the person may believe that everyone else is part of a conspiracy directed against him, or that everyone else can read his thoughts or knows about him, and is laughing at him. This can be particularly problematic when you are dealing with a person with paranoid schizophrenia. A person may perceive himself as being trapped or cornered, and may react violently in his own defense."

Slide 66 of the same document questions, "what resources are available?" Then it provides the number for AltaPoint's access to Care. It also describes what Alta Point offers in terms of its services, and specifically lists "acute crisis response team services." (There are two similar documents, one from 2021 and another from 2022 that contain the same information on different numbered pages).

MPD's Internal Affairs Investigator did not reference MO-2011-03 or mental illness in his report. Nor did he request the training records for the officers involved in the shooting of Mr. Jones or make a request for the training materials for the training courses the officers completed. He did not compare their conduct to those training materials before opining that their conduct was consistent with what a reasonable officer would have done if confronted with an identical situation.

However, his Internal Affairs report does note that Officer #1 used disrespectful, profane, abusive, demeaning, belittling, or insulting language, and or gestures to Mr. Jones that were inappropriate. These violations were cataloged as a minor infraction.

## ANALYSIS

1.     It is the opinion of the Independent Investigative Team that under the totality of the circumstances, a court would likely find that the officers' use of deadly force against Mr. Jones qualifies as a reasonable use of deadly force.  When analyzing claims of excessive force, courts must decide whether the officer's actions were objectively reasonable in light of the totality of the circumstances. *Graham v. Connor*, 490 U.S. 386, 397 (1989); *Tennessee v. Garner*, 471 U.S. 1, 9 (1985).  Further, the reasonableness of the use of force must be judged from the perspective of a reasonable officer on the scene, rather than with hindsight.  *Graham*, 490 U.S. at 396.  In its analysis, courts will consider several factors, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect is actively resisting or evading arrest.  *Id.*  However, the Eleventh Circuit has held that the presence of the second factor alone may justify the use of excessive force.  *Shaw v. City of Selma*, 241 F. Supp. 3d 1253, 1271 (S.D. Ala. 2017).

In this scenario, the officers made several, repeated commands to Mr. Jones to get off of the roof, but he did not comply with any of the requests.  *Knowles v. Hart*, 825 Fed. App'x 646, 650 (11th Cir. 2020) (considering decedent's failure to comply with officer commands when finding officer's use of deadly force reasonable).  Mr. Jones also posed an immediate threat to the safety of the officers at the scene when he produced a rifle, took a shooter's stance and attempted to level the barrel of the rifle at one of the officers.

Officer #1 stated in his interview with Internal Affairs that he had no other alternative but deadly force, as he had no form of cover to retreat from potential gun fire.  Officer #1 Interview, p. 2.  Officer #2 also believed that Officer #1's life was at risk when he observed Mr. Jones "swing his weapon upward" in the direction of Officer #1.  Internal Affairs Statement Summary, Interview of Officer #2, p. 2.  Therefore, the officers reasonably believed that there an immediate threat of death or serious injury to Officer #1, and the use of force was likely reasonable.

2.     It is the opinion of the Independent Investigative Team that that Officers #1 and #2 complied with MPD General Order No. 1.3.1 USE OF FORCE, in that, as per the above discussion, they "use[d] reasonable force to effect a legal arrest or detention, and also to overcome any resistance or threatened resistance of the person being legally arrested or detained."

3.     It is the opinion of the Independent Investigative Team that Officers #1 and #2 complied with MPD General Order 1.3.5 when they immediately attempted to render medical aid to Mr. Jones once they confirmed that the scene was secure.

4.     Although the use of force against Mr. Jones is likely constitutional, the Independent Investigative Team finds that the incident and resulting death could have been avoided by MPD. There are a number of avoidable factors that escalated the intensity of this citizen encounter, such

54048437 v1

as (1) officer use of profane and threatening language; (2) failing to interact with the mentally ill in an appropriate manner; (3) the officers' lack of community knowledge and involvement; (4) dispatch's failure to relay to responding officers that they may encounter a mental health situation based on a prior visit to the same location.

5.      Officer #1 escalated the severity and intensity of the incident with Mr. Jones by utilizing profane language and threatening behavior. Very quickly into his encounter with Mr. Jones, Officer #1 exclaimed "get off the roof, fuck." He then pulled out his Taser and tauntingly told him "run, you better run." This behavior obviously discouraged Mr. Jones from getting off the roof, as he was scared Officer #1 was going to Tase him.

        At no point during the encounter was Mr. Jones disrespectful or rude towards the officers. Officer #1's use of profane language and threatening behavior only escalated the situation by making Mr. Jones fearful for his health and safety. Not only were Officer #1's actions against MPD policy, it also possibly changed the trajectory of the encounter with Mr. Jones. General Orders 1.3.1 ("[E]mployees should use de-escalation tactics when possible.").

6 .     Officer #1 possibly violated MO-2011-03 due to his poor handling of a situation involving a mentally ill person as his actions were inapposite for how he should have conducted himself when encountering a mentally ill person.

7.      Finally, Officer #1's behavior set a poor precedent for new officers, especially Officer #2. This incident was Officer #2's third shift since completing his Field Training Officer program. However, Officer #1 did not set a good example, and tenured officers should bear the responsibility of teaching younger officers to conduct themselves ethically and professionally, and treat the community with respect and dignity.



        Several MPD ▮▮▮▮▮▮▮▮ officers confirmed that the use of profanity is not present on MPD's documented continuum of force. Further, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ onetheless, as discussed in more detail below in sections VI and VIII of this report, and contrary to MPD training and written policy, other MPD command staff, including Chief Prine, openly sanctioned MPD officer use of profanity in varying degrees. ▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮ If that sentiment was so freely shared with the Independent Investigative Team, one can only imagine the nature of conversations held among MPD command staff behind closed doors. Similarly, one can only postulate as to how deeply that contemptuous sentiment penetrated other MPD decisions, such as selecting when to use SWAT Detail or what time of day to execute a search warrant. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮ but as the Bible puts it, "It's the little foxes that ruin the vineyard." In other words, overlooking small bad habits or practices can result in big problems, particularly for persons who have the legal authority to use deadly force.

**RECOMMENDATIONS**

1.    In order to prevent unnecessary force escalation and prioritize the sanctity of life, the Independent Investigatory Team recommends that MPD ban the use of profane and threatening language for all officers effective immediately.  The use of profane and threatening language should result in a minor infraction for the first offense.  If another violation occurs, the offense should increase to a major infraction.  Disciplining officers can consider the presence of exigent and mitigating circumstances. However, there must be a complete ban to reiterate that this language and behavior is unacceptable.  All MPD leadership must demonstrate support for this ban.

2     MPD has implemented more trainings on mental health, including implementing mental health trainings for yearly in-service and sending select officers to Houston, Texas, to become certified mental health trainers.  The Independent Investigative Team recommends that MPD continue training its officers on mental health and implement its recommendations for approaching and handling the mental ill for every civilian encounter.  To ensure that MPD policies are being followed, the Independent Investigative Team also recommends that Internal Affairs compare the behavior of an officer during the incident to the training the officer received that applies to the particular scenario.  This comparative review should be a standard practice for every investigation. This will ensure that officers are appropriating using and implementing the training, and will also allow MPD to identify gaps in officer training.

3.    Ala. Code Section 36-21-51.1, effective January 1, 2024, requires each law enforcement officer certified by the Alabama Peace Officers' Standards and Training Commission (APOSTC) to complete one (1) hour of training on interacting with individuals with sensory needs or invisible disabilities every other year…There are no exemptions from this training for any duly appointed law enforcement officer": (Alabama Peace Officers Standards & Training Commission (APOSTC) Home Page:

https://www.apostc.alabama.gov/#:~:text=The%20Alabama%20Peace%20Officers'%20Standards%20and%20Training%20Commission%20has%20adopted,over%20a%2014%2Dweek%20period(last visited Apr. 17, 2024).

MPD officers are required to complete a 1-hour, virtual training conducted by the Kulture Training 501C3 non-profit organization (Sensory Inclusive Training for Alabama Law Enforcement Officers: https://www.kulturecity.org/apostc/(last visited Apr. 17, 2024).

MPD should invest in and conduct greater comprehensive training beyond the state minimal requirement on identifying signs and symptoms of persons found in behavioral health crisis; or who demonstrate developmental disabilities.

3.1 The MPD should examine and adopt extensive policies on police interactions with citizens who demonstrate mental health crises, or indices reflecting developmental disabilities – researching and writing a comprehensive series of policies covering the following (using Portland Oregon and Baltimore Police Departments as examples):

Portland Oregon Police Department

• Explanation of Mental Health and Mental Health Crisis
• Distinction between Mental Health, intoxication, Physical Illness Symptoms
• Mental Health Response Training
• Police Action and Involvement

• Types of Communication (verbal and non-verbal)
• Resources and Strategies for Mental Health Crisis Response - Requesting specialized units such as Enhanced Crisis Intervention Team (ECIT) members or the Crisis Negotiation Team (CNT);

- Consulting with a mental health provider;
- Surveillance
- Area containment;
- Requesting more resources/summoning reinforcements;
- Delaying arrest (get a warrant, or try different time/place);
- Using time, distance, and communication to attempt to de-escalate the person; and
- Disengagement with a plan to resolve later.

• Disengagement
• If a person presents an immediate danger to themselves, before disengaging members shall assess whether they could reasonably remain at the scene and use other tactics to diminish the risk of harm to the person without increasing the risk of harm to the member or third parties.

Baltimore Police Department

• Behavioral Health Disability
• Crisis Response Team
• Behavioral Health Dispatch
• Non-Police Response Dispatch
• Incident Report and Behavioral Health Form
• Collaborative Planning and Implementation Committee (CPIC)
• Develop protocols for identifying and referring for services individuals whose behavioral health needs result in a high 911 call volume and/or law enforcement contact.
• Ensure that 911 call takers, dispatchers, and dispatch supervisors have received Crisis Response Training.
• De-escalation Techniques
• Totality of Circumstances

3.2 MPD is advised to develop a Crisis Intervention Team – specifically made up of members receiving advanced training in crisis intervention, and who collaborate and respond with certified mental health professionals from the city of Mobile, state health agencies, and private companies. Based on use of force cases involving subjects presumed to have mental health challenges, an organized Crisis Intervention Team and a Mobile Crisis Intervention Team of health specialists, will significantly reduce the likelihood of fatality and significant injury.

3.3 MPD is advised to seek out The National 988 Mental Health Crisis line.  Alabama dispatchers can train with MPD dispatchers to better coordinate calls for service involving persons demonstrating symptoms of mental health.

4.     If the involved officers had been more involved with the community, they might have known of Mr. Jones's mental illness and patterns.  Officer #1 noted that "he had no idea who the

subject was," even though Glenwood was located within his area.  Internal Affairs Interview, p. 1-2.  However, there had been two previous calls regarding this exact same incident, at the exact same location, with the exact same subject.  Further, MPD and MFD responded to the scene and approached Mr. Jones under nearly identical circumstances exactly one week prior to the fatal incident.

Moreover, Mr. Jones's mother filed a petition for involuntary commitment on September 29, 2023, with the Mobile County Probate Court.  In this petition, Mr. Jones's mother disclosed Mr. Jones's schizophrenia diagnosis, failure to take his medications, and recent history of aggressive behavior.  Petition for Involuntary Commitment, p. 1.  Mr. Jones's mother also informed a MPD Homicide Detective that Mr. Jones was "known to climb trees in the neighborhood" and "to sleep on roofs of houses and preferred being outside."  MPD Criminal Investigation Section, Homicide Unit Case Narrative, p. 6.  Mr. Jones's mother also stated that he was a former patient at AltaPointe, a local behavioral health crisis center.  *Id.*

Had the officers been more involved in the local community, were informed of the petition for involuntary commitment, or had knowledge of the previous calls, the officers could have known of Mr. Jones's behaviors, patterns, and mental illness.  Had the officers known these facts, they might have engaged AltaPointe, which MPD collaborates with on mental health crises, or approached the situation with Mr. Jones's mental illness in mind.  *See MPD and AltaPointe to Strengthen Police-Mental Health Collaboration*, Mobile Police Department, https://www.mobilepd.org/news/mpd-and-altapointe-to-strengthen-police-mental-health-collaboration/ (May 18, 2022).

Community stakeholders, such as City Council Members , and NAACP Chapter 5044 , all expressed a desire for MPD to be more involved in the community.  For example, community stakeholders wanted to see more incidents where MPD officers play football with local community youth.  *See, e.g.*, *Video Showing MPD Officer Playing Football with Youth on Fat Tuesday Goes Viral*, NBC 15, https://www.youtube.com/watch?v=wUVLlPv6Erw (Feb. 22, 2023).

Therefore, the Independent Investigatory Team recommends that MPD improve its inter-agency collaboration so that officers can be informed of local individuals who are suffering from current or potential mental health crises.  This will allow MPD to identify individuals who are suffering from mental health crises and craft effective tactical approaches for these individuals.  Additionally, MPD must become more engaged with the local community on a daily basis in order to learn more about the local community and citizens.  Community engagement is essential to informed and effective policing.

 5.  The Independent Investigative Team recommends that MPD dispatch retain/index information relating to the circumstances under which MPD officers are sent to a particular location and relay that intelligence to officers via dispatch if MPD officers are sent to the same location again.  Adoption of this protocol with increase officer safety and the safety of community members, particularly in instances where MPD officers will encounter a mentally ill person.

### F.    Kordell Jones

**SUMMARY**

On Friday, March 3, 2023, an MPD investigator obtained a search warrant for the residence located at 856 Charles Street. A resident of the home (not Kordell Jones) had been

identified as one of two individuals who used a handgun to rob another man of an AR-style rifle and a handgun at another residence in January of 2023. The search warrant was signed by District Judge Spiro Cheriogotis.

Pursuant to MPD policy, a Threat Assessment For Warrant Service (the "Threat Assessment" measuring the risk of violence the executing officers could potentially face) was completed by investigative officers and the overall Threat Assessment Score total necessitated mandatory SWAT activation. A parallel risk assessment evaluating the risk of injury or death to citizens and/or innocent bystanders if the SWAT Detail was activated to participate in the execution of a search warrant was not required. There is one question on the Threat Assessment form that reads, "Are there children, elderly persons, or handicapped persons? [Inside the location to be searched]". However, "Informational purposes only" appears in parentheticals below this question and the columns next to the question where a response can be provided are permanently shaded out on the form. Nonetheless, the Threat Assessment and search warrant were forwarded to the SWAT Detail, and plans were made to execute the warrant on March 7. On Tuesday morning, March 7, the SWAT Detail met for a briefing before executing the search warrant. Officer #1 was assigned to cover the back left corner of the house and Officer #2 of the Canine Detail was ultimately assigned to cover the back right side of the house. In total, 15 officers participated in executing the search warrant at 856 Charles Street.

At 6:12 AM on March 7, 2023, with MPD's SWAT Detail in place, officers assigned to breach the front and side doors of 856 Charles Street loudly knocked on those respective doors and yelled, "Police! Search warrant!" The side door was then immediate breached with a ram, opening the door with one blow. The officer assigned to the front door used a charged explosive breach on the front door causing a loud boom. With both doors successfully breached, officers again yelled, "Search warrant!"

Over the next several seconds, officers attempted to identify who was inside the residence and communicate with them from their outside positions. Inside the residence, Mr. Jones' 55-year old mother screamed after being awakened by the loud sound of the explosive breach. Her six-year-old granddaughter was sleeping in the same bed with her. An officer yelled through the side door, "Mobile Police Department! You better start coming to the front." At roughly the same time, yet another officer sounded the siren twice and pulled the BearCat (a tank type of vehicle) into the front yard – facing the house. The blue emergency lights of the vehicle were activated and flashed back and forth on the front grill. The officer driving the BearCat announced on the vehicle's PA system, "Occupants of 856. This is the Mobile Police SWAT…." Then, shots were fired.

Approximately 22 seconds after officers first knocked and announced their presence, and after officers continued to announce as they attempted to communicate with the occupants inside the residence, Officer #1 heard the back window closest to him open forcefully. A split second later, 25-year-old Kordell Jones, who had armed himself and bolted past his mother and his 30-year-old brother in the hall, lunged out of the window of his mother's bedroom. Mr. Jones was completely naked and holding an AR-style pistol by the buffer tube (where the tube meets the receiver) in his left hand. The firearm appeared to emerge from the window first, followed by Mr. Jones' left arm, left leg, torso, right arm, and then right leg. Officer #1 shouted, "Hey! [inaudible]!" – as Mr. Jones continued out of the window. From a review of Officer #1's BWC and the speed at which events occurred there is no indication that Mr. Jones was aware of any officers' presence on

the backside of the home. Officer #1 discharged his handgun approximately 3 to 4 times targeting Mr. Jones, who was struck at least three times in the left-back side of his torso. He stumbled and lost control of the firearm in his hand as he fell to the ground.

As Mr. Jones lay prone on the ground, Officer #1shouted, "Get the fuck down!" repeatedly and then ordered, "Put your hands behind your back motherfucker." Officer #1quickly straddled Mr. Jones, placed his wrists in handcuffs, and shouted repeatedly for the medical aid officer to assist Mr. Jones. Officer #1 then encouraged Mr. Jones to keep breathing as he rolled him onto his left side and applied pressure to his apparent wounds until the medical aid officer arrived. As he made his way to the back of the home, the medical aid officer placed a request over police radio for EMS to come to the scene immediately.

Officers then moved Mr. Jones from the location where he was laying several feet away from the house to a location closer to the back wall of the house. As the house was not yet secure, this was done to limit potential hostile gunfire from within the house from other windows. A review of several officers' BWCs reveals that a decision was then made to move Mr. Jones from the backyard of the house to the intersection closest to the house so that EMS could reach him more readily. Along the way they passed two of Mr. Jones's siblings, who had complied with officers' commands and were now secured on the left side of the residence.

Officers stayed with Mr. Jones, attempted rescue breathing, and performed chest compressions for the next 3 minutes until Mobile Fire and Rescue Department medics arrived and took over. Mr. Jones was pronounced deceased on the scene at approximately 6:28 AM by medical personnel.

The search of 856 Charles Street continued. The AR-style rifle and handgun from the robbery investigation were not found. However, investigators discovered and seized a fully loaded 9mm pistol (one round in the chamber and 15 rounds in the magazine), over 100 rounds of ammunition of various calibers, four WIFI digital surveillance cameras, and several plastic baggies of what was believed to be marijuana.

While the search of 856 Charles Street was being conducted, MPD officers moved all of Kordell Jones' family members (6 persons including the six-year-old girl) away from their home to the intersection closest to their home. At this time all six of Kordell Jones' family members were handcuffed, with the exceptions of Mr. Jones' mother and her granddaughter. MPD officers transported all of Kordell Jones's family members who were home at the time of the raid to MPD Headquarters for questioning. While at MPD Headquarters, MPD officers kept them handcuffed and separated from one another. One by one MPD investigators interviewed all the occupants of 856 Charles Street, including the six-year-old girl, out of the presence of her mother or grandmother. At no time were any of Kordell Jones's family members placed under arrest and read their Miranda rights or advised that they did not have to submit to an interview by MPD investigators. With the exception of Kordell Jones's family member who was suspected of being involved in the robbery that was the genesis of the search warrant obtained for 856 Charles Street, MPD investigators questions to Kordell Jones' family members related exclusively to MPDs execution of the search warrant earlier in the day.

The three female occupants of 856 Charles Street, including the six-year-old girl, were released at 10:00 AM. Two of the male occupants of 856 Charles Street were released from MPD Headquarters at 12:30 PM. The male occupant of 856 Charles Street that MPD investigators suspected of being involved in the prior robbery was not released, but rather later booked into the Metro Jail.

The Property and Evidence forms reviewed by the Independent Investigative Team show that the last MPD officer to depart 856 Charles Street left at 11:15 AM.

Officer #1 was later interviewed by MPD Internal Affairs investigators about his use of deadly force against Mr. Jones. During his interview with MPD Internal Affairs Officer #1 stated that shortly after the front door of 856 Charles Street was breached he heard a woman scream and other officers giving directions to the people inside. He said the next thing he saw was the back window being pushed up quickly and the barrel of an AR style gun coming out of the window.

He said that he then observed a naked male exit the window carrying the AR style firearm that was pointed in the general direction of the backyard. He remembers that he had a direct line of site to the canine officer from where he was standing in the backyard. He articulated that he thought he was in immediate danger because of the close proximity to the black male who had just jumped out of the window. He approximated that he was about 5 feet away from him. He was also concerned about the potential of the naked male firing his weapon at the canine officer. He said that he feared for his life, or great bodily injury, from the AR style weapon that Mr. Jones was carrying.

Officer #1 also said that given the short style weapon that Mr. Jones was carrying, that Mr. Jones could quickly turn that weapon on him, or the canine officer. Officer #1 also advised that based upon his training and experience with an AR pistol, and given the close proximity of Mr. Jones to himself, it was his opinion that the AR rounds could've pierced his body armor to cause serious bodily injury to himself. Officer #1 did not believe that a Taser could have been used in the circumstance, as it would have been unsafe for him and the canine officer. He recalls firing his firearm three times at Mr. Jones.

He stated that he tried to give Mr. Jones medical support once he was able to confirm that he no longer posed a physical threat to him. He also said that the decision was made to move Mr. Jones from the back of the house down to the intersection so that medical professionals could have better access to him. Officer #1 could not specifically recall who gave the order to move the Mr. Jones to the intersection, but thinks that it was probably the medical officer.

**ANALYSIS**

1.     It is the opinion of the Independent Investigative Team that under the totality of the circumstances, a court would likely find that the officer's use of deadly force against Mr. Jones qualifies as a reasonable use of deadly force. When analyzing claims of excessive force, courts must decide whether the officer's actions were objectively reasonable in light of the totality of the circumstances. *Graham v. Connor*, 490 U.S. 386, 397 (1989); *Tennessee v. Garner*, 471 U.S. 1, 9 (1985). Further, the reasonableness of the use of force must be judged from the perspective of a

reasonable officer on the scene, rather than with hindsight. *Graham*, 490 U.S. at 396. In its analysis, courts will consider several factors, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect is actively resisting or evading arrest. *Id.* However, the Eleventh Circuit has held that the presence of the second factor alone may justify the use of excessive force. *Shaw v. City of Selma*, 241 F. Supp. 3d 1253, 1271 (S.D. Ala. 2017).

In regard to the second factor (whether the suspect poses an immediate threat to the safety of the officers) the analysis focuses on the level and immediacy of the threat. *Perez v. Suszczynski*, 809 F.3d 1213, 1220 (11th Cir. 2016). The Eleventh Circuit has stated: "The law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect." *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010). Therefore, although the presence or absence of a weapon is a factor in the analysis of an immediate threat, the court must consider where the weapon was, the type of weapon, and what was happening with the weapon. *Perez*, 809 F.3d at 1220.

The factors weighing in favor of reasonable use of deadly force include: (1) Mr. Jones arguably posed an immediate threat to the safety of the officers at the scene when he jumped out of the back window of the home with an AR style automatic weapon, (2) Mr. Jones appeared to be fleeing the scene, and (3) police suspected guns were in the home.

Mr. Jones arguably posed an immediate threat to the safety of the officers. The police were aware when arriving at the scene that there was a probability that guns were present at the home because the search warrant was issued to locate a gun used in an armed robbery. *See Howe v. City of Enterprise*, No. 1:15-CV-1130JA-SRW, 2018 WL 8545947, at *23 (M.D. Ala. Sept. 17, 2018) (highlighting that police knew the suspect had a gun in the home when finding the use of deadly force reasonable). Additionally, at the time he was shot, Mr. Jones had the gun in his possession, holding the gun in his hands. *Perez*, 809 F.3d at 1220 (emphasizing the importance of the gun being on the suspect's person at the time the officer used deadly force). Although Mr. Jones did not purposefully point the gun in the officers' direction or take a threatening stance, the gun was available and ready for use. *Jean-Baptiste*, 627 F.3d at 821; *see also Clark v. City of Atlanta*, No. 1:10-CV-2163-MHS, 2011 WL 13136620, at *5 (N.D. Ga. Oct. 18, 2011). Mr. Jones was also located within a relatively close distance from the officers. *See Pipkins v. City of Hoover*, 647 F. Supp. 3d 1211, 1222–23 (N.D. Ala. 2022) (highlighting that the suspect was armed and within ten feet from an injured pedestrian). The shooting officer also articulated that Mr. Jones was a potential deadly threat to the canine officer positioned to the back right of the house.

Moreover, Mr. Jones appeared to be actively fleeing the scene when he was shot, which weighs in favor of reasonable use of deadly force. *Garner*, 471 U.S. at 11–12 ("Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force."); *Howe*, 2018 WL 8545947, at *26 (finding the use of deadly force reasonable when a man opened the door with a gun, without pointing the gun at the officers, and retreated once he saw police); *Young v. Borders*, No. 5:13-CV-113-OC-22PRL, 2014 WL 11444072, at *4 (M. D. Fla. Sept. 18, 2014) (same).

Therefore, a court is likely to find that a reasonable officer on the scene would have perceived an immediate threat to the officers' safety when Mr. Jones emerged from the back window of the premises with an AR style automatic gun, appearing to retreat from the scene.

2.  It is the opinion of the Independent Investigative Team that Officer #1 complied with MPD General Order No. 1.3.1 USE OF FORCE, in that, as per the above discussion, he "use[d] reasonable force to effect a legal arrest or detention, and also to overcome any resistance or threatened resistance of the person being legally arrested or detained."

3.  It is the opinion of the Independent Investigative Team that Officer #1 and others officers present on the scene complied with MPD General Order 1.3.5 when they immediately attempted to render medical aid to Mr. Jones once they confirmed that the scene was secure.  Moving Mr. Jones to the intersection closest to his home so that EMS could rapidly access professional medical care was part of that effort.

4.  It is the opinion of the Independent Investigative Team that the sanctity of life was not prioritized in MPD's decision to execute the search warrant for 856 Charles Street pre-dawn because its Threat Assessment form to determine if a SWAT Detail should be activated fails to genuinely evaluate risks to citizens if a SWAT Detail is activated.  Moreover, no genuine consideration was given to whether alternative strategies posing a lesser threat of injury or death to officers, suspects or bystanders could have been employed to achieve the same desired results. Thus, it is the further opinion of the Independent Investigative Team that while the use of deadly force against Mr. Jones was legally justifiable, it may have been nonetheless avoidable.

5.  It is the opinion of the Independent Investigative Team that MPD officers may have improperly transported Kordell Jones' family members who were present during the execution of the search warrant to MPD headquarters for questioning.  It is also the opinion of the Independent Investigative Team that MPD officers may have improperly detained some of Kordell Jones' family members at MPD Headquarters beyond the time it took MPD Officers to complete their search of 856 Charles Street.

> 5.1    The police detention of some of the home occupants after the shooting at MPD Headquarters was likely impermissible once the search of the home was complete.  MPD Property and Evidence forms indicate that the search of 856 Charles St. concluded at 11:15 AM, however, some of Mr. Jones' family members were not released from MPD detention until 12:30 PM the same day.  Police are constitutionally permitted to detain occupants of a premises subject to a search warrant throughout the duration of the search.  *Michigan v. Summers*, 452 U.S. 692, 705 ("Thus, for Fourth Amendment purposes, we hold that a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted.") (emphasis added); *Croom v. Balkwill*, 645 F.3d 1240, 1250 (11th Cir. 2011) ("[L]aw enforcement officers are entitled to detain occupants of a premises for the whole length of most warranted searches.").

Several courts in the Eleventh Circuit have followed this principle announced by the Supreme Court.  For example, in *Hooks v. Brewer*, the wife of a suspect shot by police

claimed police violated her Fourth Amendment rights when officers detained her in zip-ties after an officer-involved shooting occurred during the execution of a search warrant. 818 F. App'x 923, 930 (11th Cir. 2020). The incident began at night when the wife noticed several men dressed in dark clothing running towards her home. *Id.* at 924. The wife ran downstairs to warn her husband, and her husband "emerged from his slumber naked, holding a shotgun." *Id.* The couple thought they were being robbed; however, the men were police officers arriving to execute a search warrant for drugs on the premises. *Id.* at 924–25. When police breached the premises, the husband was fatally shot by police. *Id.* at 926.

Upon hearing the gunshots, the wife ran to her bedroom and locked the door. *Id.* Once she realized the police were present, she opened the bedroom door. *Id.* The police handcuffed the wife with zip-ties and detained her in the backyard. *Id.* The police did not complete the search warrant because of the shooting, and the local Bureau of Investigation took over. *Id.* The wife was detained until the Bureau completed the investigation, which included searching the wife's person and interviewing her. *Id.* No drugs were found on the premises. *Id.* at 926.

The wife argued that the police unlawfully detained her during the Bureau's investigation, but the court found that her claim failed because "[o]fficers may temporarily detain occupants of a house while executing a search warrant." *Id.* at 930. The court also noted that the fact that the Bureau took over the investigation after the shooting had no bearing on the constitutionality of the wife's detention. *Id.*

In the present case, the video footage reveals that the home's remaining occupants were detained by police, restrained, and escorted down the block from the home. A court is likely to find that this police detention was constitutional because the detention was a minimal intrusion on the occupants' Fourth Amendment rights, especially in comparison to the officers' interests of preventing flight, minimizing risks to officers, and facilitating an orderly search. *Croom*, 645 F.3d at 1247 (citing *Summers*, 453 U.S. at 702–03 and *Muehler v. Mena*, 544 U.S. 93, 100–02 (2005)); see also *Sampson v. City of Brunswick*, 549 F. App'x 858, 860 (11th Cir. 2013) (finding police detention of home occupants for six hours during the execution of no-knock search warrant constitutional). The officers' interest in this case were likely heightened considering Mr. Jones attempt to flee the residence with an AR style automatic gun. See *United States v. Mitchell*, No. 1:17-CR-122-LMM-LTW, 2019 WL 6462838, at *5, *30 (N. D. Ga. June 25, 2019) (noting that the officers were worried about more occupants fleeing the residence after one occupant led police on a five minute chase).

However, the constitutionality of the detention likely ended after the search warrant and investigation at the scene were completed.

5.2      The transportation and questioning of the home's occupants at the police station was likely not constitutionally allowed. Although police are permitted to detain occupants of a premises named in a search warrant, police must have probable cause to believe the

occupants committed, are committing, or are about to commit a criminal offense to involuntarily transport the occupants to the police station for questioning. *Mitchell*, 2019 WL 6462838, at *12.

In *United States v. Mitchell*, the police transferred four occupants of a home being searched for evidence in connection to an armed robbery to the police station. *Id*. at *2, *4–5. The police did not converse with the four men prior to the transport, and the officers were unaware of the identity of the robbery suspects at the time of the transport. *Id*. at *5. One of the men who police transported to the police station was held at the police station for six hours and interrogated about his alleged involvement in the armed robbery. *Id*. After the interview, the detainee was transferred to jail. *Id.* at *8.

The detainee contended he was unlawfully arrested without a warrant or probable cause when police restrained him during the search warrant, transported him to the police station, held him at the police station for six hours, and interrogated him. *Id*. at *9. In response, the government argued that the police were permitted to "interview and investigate the individuals inhabiting the house targeted by the search warrant because such an investigation is a natural consequence of executing a search warrant." *Id.* Further, the government justified the transport to the police station because "the situation became too chaotic for law enforcement to properly interview the various suspects at the scene of the property." *Id.* The court did not accept the government's arguments.

First, the court stated that officer safety could be accomplished by simply detaining the men at the scene. *Id*. Thus, transporting the men to the police station did not advance the interest of officer safety. *Id.* The court noted that the man complied with officer commands, the officers placed handcuffs on the man, and there were over twenty armed police officers present at the scene to ensure safety and order. *Id*. Therefore, transporting the men to the police station did not advance officer safety. *Id*. Rather than ensuring safety, the court concluded that the prolonged detention at the police station was "exploited" by the police to gain more information from the occupants. *Id*.

Next, the court explained that although the Supreme Court's decision in Summers authorized the detention of the home occupants until the completion of the search, the Summers case does not apply to situations in which the occupants are "transported from the location of the search to the police station, held handcuffed to a desk for six or more hours, and then interrogated well beyond the conclusion of the search for more than two hours." *Id*. at *11.

Although police had the right to detain the man throughout the duration of the search, the court held that the transport to the police station involved the "inconvenience or the indignity associated with a compelled visit to the police station." *Id*. (citing *Summers*, 452 U.S. at 701–02); see also *Bailey v. United States*, 568 U.S. 186, 200 (2013) (explaining that police detention away from the home causes the "additional indignity of a compelled transfer back to the premises, giving all the appearances of an arrest"). Therefore, the detention of the man "ripened into a full arrest which could only be justified by probable

cause.  *Mitchell*, 2019 WL 6462838, at *11 (citing to a string of Supreme Court cases holding that intrusive police detentions that are equivalent to an arrest must be supported by probable cause); see also *United States v. Virden*, 417 F. Supp. 2d 1360, 1366 (M.D. Ga. 2006) ("The law is clear that the officers could not, based solely on reasonable suspicion, forcibly remove [the detainee] from a place in which he was entitled to be, transport him to a police station, and detain him there, even briefly.").

Finally, the court held that the transport to the police station was not supported by probable cause.  *Mitchell*,  2019 WL 6462838, at*12.  The court emphasized: "A person's mere propinquity to others suspected of criminal activity does not, without more, give rise to probable cause to arrest that person."  *Id.*  Although the occupants were present in a home connected to an armed robbery, the court highlighted that the police did not know the identity of the suspects in the case at the time of the transport to the police station and interrogation.  *Id.*  The court also stated that the fact that one of the home occupants attempted to flee when police initially detained the occupants at the premises did not provide probable cause to arrest the other occupants.  *Id.*  Therefore, the court concluded that the man's "mere presence at the residence where potential evidence of a crime was present is not enough to establish probable cause for his arrest."  *Id.*

With regards to the Jones incident, the search warrant was based on information that a weapon used in an armed robbery by one of the occupants was located inside the premises.  There  is no indication that any of the other occupants of the home were suspects in the robbery.  Nor is there any indication that the occupants committed, were committing, or were about to commit a crime (especially because it appears all the occupants were sleeping at the time the police conducted the search warrant).  This contention is bolstered by the fact that MPD investigators only posed questions to the occupants of the home about the execution of the  search warrant earlier in the day (with the exception of the robbery suspect).  See *Hayes v. Florida*, 470 U.S. 811, 816 (1985) ("[T]he line is crossed when the police, without probable cause or a warrant, forcibly remove a person from his home or other place in which he is entitled to be and transport him to the police station, where he is detained, although briefly, for investigative purposes.  We adhere to the view that such seizures, at least where not under judicial supervision, are sufficiently like arrests to invoke the traditional rule that arrests may constitutionally be made only on probable cause.").

Additionally, the fact that Mr. Jones attempted to flee the scene does not supply the officers with probable cause to arrest the additional occupants.  *Mitchell*, 2019 WL 6462838, at *11.  There is also no indication that the remaining home occupants failed to comply with officer commands or threatened the safety of the officers.  The home occupants were restrained, 15 armed officers were on the scene to ensure safety and order.  In fact, the home occupants could argue that police merely "exploited" the situation to gain intel or obtain statements from them that may have been useful in any later civil action related to the death of their family member.  *Mitchell*, 2019 WL 6462838, at *9.  Thus, there was likely no reasonable concern for officer safety that would justify transporting the home occupants involuntarily to the police station.  Therefore, because there was not probable

cause to involuntarily transport the home occupants (with one exception) to the police station, the officers' actions were likely unconstitutional.

## RECOMMENDATIONS

1.  MPD should prioritize the sanctity of life by formally and genuinely incorporating factors into their evaluation of whether a SWAT Detail should be activated as part of executing a search warrant by including factors that evaluate and/or gauge citizen risk if a SWAT Detail is activated.

2.  MPD should prioritize the sanctity of life by requiring a formal analysis of whether less intrusive, lower risk alternatives exist to activating the SWAT Detail or executing pre-dawn search warrants, that can equally achieve their law enforcement goal, prior to using either asset.

3.  MPD should develop formal written protocols to provide guidance to officers regarding the detention and transport of persons and/or innocents on the scene to/at MPD Headquarters.

## VI.  MPD COMMAND/LEADERSHIP CULTURE

### A.  Paul Prine, Chief of Mobile Police Department

Chief of Police Paul Prine started his career in law enforcement in 1995 in Chickasaw, Alabama.  Chief Prine has worked in various patrol positions and several different departments within MPD, including the Crime Task Force, Assault and Sex Crimes Unit, Narcotics Unit, and Criminal Investigations.  In 2001, Chief Prine was shot in the line of duty three times.

#### a.  Policies and Training

Chief Prine advised that he established standards of excellence when he became police chief, and the pillars of excellence include attitude, appearance, competence, and service.  He relayed that "attitude is everything" and that officers must have a "teachable spirit."  However, Chief Prine admitted that there is a language and demeanor issue within the force.

When asked about the police department's standards regarding the use of profanity, Chief Prine highlighted that circumstances surrounding the use of profanity are important to his analysis of its appropriate use.  Chief Prine categorizes the use of profanity into three categories: (1) malicious, (2) intentional, and (3) incidental. If the use of profanity was incidental, such as profanity used in the heat of a fight or when the officer is in fight or flight mode, he would not reprimand the officer. If the use of profanity was malicious, the officer would be asked to leave, and if the use of profanity was intentional, the officer could, or could not, face punishment.  In sum, Chief Prine analyzes the use of profanity on a sliding scale.  Chief Prine said that before he became Chief, there was no standard on the use of profanity within the police force. (The Independent Investigative Team finds this remark to be disingenuous.  The Independent Investigative Team also notes that Chief Prine's articulation of how he handles an officer's use of profanity does not appear anywhere in MPD's General Orders, Memorandum Orders or any other MPD regulation.  Rather, MPD officers, as well as Chief Prine, should be guided by MPD General Order #26.8.5, which reads, "A member

65

(officer) or employee shall not use disrespectful, profane, abusive, demeaning, belittling, or insulting language and/or gestures to any person." Adopted February 1, 2005.)

Chief Prine admitted that the officers' use of profanity in the Jawan Dallas incident was unacceptable. He noted that the department is young and there appears to be a language issue. However, he also noted that he believes this problem is exacerbated by the media. The Chief reiterated that the use of profanity while under duress is okay, but it is not okay when giving commands to citizens and when not under duress. However, he highlighted that all mitigating circumstances must be considered. Chief Prine relayed that he expects that the Independent Investigative Team will recommend policies on demeanor and language.

Chief Prine also highlighted the importance of ensuring training officers do not use profanity during training in order to avoid learned behaviors. He stated that the use of profanity is not on the use of force continuum, and it is not taught in any trainings. The Independent Investigative Team asked Chief Prine about other areas of training, such as de-escalation and the duty to intervene. Chief Prine did not provide a clear answer regarding what de-escalation training was given to officers. When asked when the duty to intervene begins, he said that the duty to intervene policy does not address the timing of the duty. He reiterated that officers have a duty to intervene, and that he has a standing order for every officer to "do the right thing."

The Independent Investigative Team also inquired about MPD policies addressing officers encountering persons with behavioral health problems. Chief Prine informed the Independent Investigative Team about MPD's partnership with AltaPointe. If an officer suspects that a citizen is having a mental health crisis, the officer has the option, within certain hours, to call AltaPointe for assistance. However, Chief Prine admitted that when police receive a call they likely do not know if the person suffers from mental illness unless that information is provided to dispatch or the officer knows the resident's history. Chief Prine also confirmed that an officer was sent to Texas for training on encountering the mentally ill, and that officer's training is going to be taught to the force.

b.   *Pre-Dawn Raids*

Finally, the Independent Investigative Team inquired about the use of pre-dawn raids. Chief Prine stated that his personal views on pre-dawn raids do not matter because state law dictates the use of this raid. However, he noted that just because the officers are allowed to do something does not mean they should. He stated that as long as the state law requirements for use of a pre-dawn raid are met, then the raid is permissible. However, he changed the pre-dawn raid policy in conjunction with the Mayor to show cooperation with the City Council.

Chief Prine said the risk assessment is an important aspect, especially to determine whether children or other risks are involved. He said that the reason to conduct a pre-dawn warrant is to have an element of surprise. In regards to the deadly shootings, he says the media and public have dictated the narrative and he stated that these are not just innocent people who had been shot because when anyone points a gun at an officer, it is a potentially dangerous situation. He emphasized the importance of having all angles when discussing these incidents.

### c.    *MPD Morale*

Chief Prine thought police morale was at an all-time low when he became Police Chief, and it has taken him two years to increase morale. He opined that he personally, as the Chief, has low morale due to the politics, but that overall, MPD currently has a very high morale. Chief Prine articulated that there must be an element of fear within the department, particularly in regards to discipline. He compared the fear he tried to instill in his officers to the fear he tries to instill in his children. He stated that officers must understand that there can be consequences for their actions. However, Chief Prine also stated his opinion that the Independent Investigative Team's review of MPD's morale or climate was outside the scope of its review.

### d.    *Community Perception*

Chief Prine believes that the community as a whole is very supportive of MPD. He noted that 2023 was ugly in terms of perception, and this perception was exacerbated by certain City Council members and the media. In regard to a media survey on MPD, his takeaways were that the public wanted more training, specifically on de-escalation, and the public had concerns about traffic stops and enforcement. He said that when a citizen complains about MPD, he believes the citizen has a right for the police chief to review the complaint at least once during the complaint process. He also stated that he was not going to let his decisions or priorities as chief be dictated by a small but vocal segment of the community that was critical of MPD's tactics. Moreover, Chief Prine articulated that he didn't feel the need to engage with that segment of the community because they would never be happy or satisfied.

### e.    *Internal Conflicts*

Chief Prine shared that there were internal conflicts between him and other city officials, particularly Chief of Staff James Barber and Public Safety Director Rob Lasky. He informed the Independent Investigative Team that he filed a complaint against My. Lasky for his involvement in Operation Echo. He also informed us not to credit information gathered from our interview with a ▮▮▮▮▮▮▮▮▮▮▮  In sum, he said there were a number of personality conflicts.

Chief Prine informed us that he believes he is being targeted by other city officials. Chief Prine informed us that he knew we inquired about an alleged comment he made at an open rollcall two years ago, in which he allegedly said "fuck the public." He stated his opinion that this inquiry was outside the scope of the Independent Investigative Team's investigation.

### B.    **MPD Executive Leader #1**





C.     **MPD Executive Leader #2**



**D.     MPD Executive Leader #3**



**E.     MPD Executive Leader #4**



**F.    MPD Executive Leader #5**

*a.    Policies and Training*



b.  *Officer-Involved Shooting*

c.  *Community Relations and MPD Morale*



### G. MPD Leader #1

*a.* *Use of Profanity*

*b.* *Chief Prine's Tenure*

*c.* *Chief Prine's Derogatory Comment About the Community*

**H.** 

*a.*   *16-Year-Old's Cell Phone*



75

█████████████████████████████████████

I.        ████        **MPD Training Academy**

The Independent Investigative Team interviewed a ████ MPD Trainer. He/She stated that APOST (the Alabama Peace Officers Standards and Training Commission) is the governing body that certifies MPD's training. He/She stated that officers have to achieve a 70% proficiency for use of firearms in order for them to be approved to carry a firearm. SSGF stands for defensive tactics and officers have to receive 48 hours of defensive tactics per year.

a.    *Taser Training*

The ████ MPD Trainer advised that Taser trainings are provided by a company called Axon. The course Axon provides is eight hours long. He/She advised that Axon recommends a max striking distance of 21' away from a subject. If the subject is more than 21' away from the subject then the taser prongs can break and disconnect. He/She said the ideal distance is 10' to 12' away from a subject. When the ████ MPD Trainer was asked how many times an officer should Tase a subject, he/she said 2 to 3 times maximum. He/said that officer sometimes Tase a subject more because they are too excited in the moment. He/She said that if they do this they are sent back for Taser retraining.

The ████ MPD Trainer said that the use of a Taser is number 4 on MPD's force continuum. He/She also said that MPD Internal Affairs can send an officer to remedial Taser training. He/She informed the Independent Investigative Team that the de-escalation component of Taser training is done in live scenarios and it's not written down in text.

b.    *Officer Use of Profanity*

The use of profanity is not on MPD's use of force continuum that is taught at the Training Academy according to the ████ MPD Trainer. In fact, he/she advised that the Training Academy teaches that officers should not use any profanity, and that they should treat people with respect and dignity. He/She advised that profanity is an escalation that can lead to the use of unnecessary force, thereby creating a higher probability for officers to need to use escalated force. The MPD ████ MPD Trainer indicated that the "Traffic Stop" training has some de-escalation aspects to it (the Independent Investigative Team did not observe this in their review of MPD training materials that were provided). He/She said that Mobile County Deputy District Attorneys train MPD officers about the legal aspects of their "use of force."

c.    *Beezer DuBose, Jr./Officer #1*

The ████ MPD Trainer advised the Independent Investigative Team that grabbing a suspect's hair was never taught as an appropriate means of gaining control of a suspect. Investigators then brought up the fact that the officer in the case with Mr. DuBose used expletives in his encounter with Mr. DuBose, as well as grabbed Mr. Debose's hair. The ████ MPD Trainer said that neither

of those tactics were taught at the MPD Training Academy and would lead to an "exponential need" for the use of additional force to subdue Mr. DuBose.

### d. Reasonable Use of Force/Juvenile #2

The ▮▮ MPD Trainer said that an officer's use of force is supposed to be proportional, so if a law officer encounters a small person, they should not use their strongest combat tactics to gain the submission of the suspect. Investigators then asked whether or not the officer that arrested Juvenile #2 should have used the level of force he used against her given that the officer was a very big man and Juvenile #2 was a small female. The ▮▮ MPD Trainer advised that the officer should have used other tactics, such as holding her against the car.

### e. Mentally Ill Suspects

Virtual reality helmets are worn by MPD trainees to learn about how to handle and interact with mentally ill persons according to the ▮▮ MPD Trainer. He/She also said that "Conflict Resolution and De-escalation" is taught as a standalone course. However, this course was not on the list of classes that were provided to investigators as the courses that were taught by the MPD Training Academy.

The ▮▮ MPD Trainer also said that MPD officers received training on the "duty to intervene" but no such a training was listed as being provided by the Training Academy from 2021-2023.

The ▮▮ MPD Trainer said that Internal Affairs sometimes reaches out to the Training Academy for materials as part of their investigations. However, he/she said that Internal Affairs does not routinely reach out for the training records of the officers they are reviewing.

## VII.   VIEW OF FORMER MPD COMMAND/LEADERSHIP



### a. Chief Prine's Early Tenure As Chief and MPD Culture





*b.*     *Rift Between Chief Prine and Intelligence Unit*



c.    *Gang Intelligence*

d.    *Early Morning Raids*

e.    *Strategic initiatives*

### f. *Improving the Community*



## VIII. CHIEF PRINE'S DEROGATORY COMMENTS ABOUT THE COMMUNITY

### a. *Officer #1*

Officer #1 said that he's/she's been an MPD police officer for several years. Officer #1 was in a leadership position in the 1st Precinct during Chief Prine's early tenue as chief. Officer #1 confirmed that Chief Prine said "I'm not concerned with what the media and the public thinks about the police. Fuck the public." Officer #1 also said that ████████████████████ ███████████████████████████████ Officer #1 said that ███████

He/She said that Chief Prine was attempting to encourage camaraderie and make himself accessible to the line officers. However, for younger guys, Officer # 1 thought it was bad in that it made them think that it was okay to disrespect the public.

Officer #1 said that Chief Prine's comment was the running joke at rollcall for at least 60 days. Officer #1 said officers would lightheartedly say, "According to the chief, fuck the public!" Officer #1 thought that the comment was completely inappropriate. Officer #1 said that some of the line officers were shocked by the comment, but some were not. Officer # 1 said that he/she didn't want those under his/her supervision mistreating people and thought that Chief Prine's comments adversely impacted the way some officers may police in in the future.

When the Independent Investigative Team asked Officer #1 what recommendations he/she would make to improve MPD, he/she said that there is a need for consistency, as the mission of law enforcement has been lost. Officer #1 said of Chief Prine, "He's a police officer's chief, but not a chief of the community."



### c. *Officer #2*

Officer #2 said that Chief Price did in fact say the offensive comment about the community. Officer #2 said that he/she took it to mean that the chief was trying to focus officers on doing their jobs rather than spend time worrying about what the public thought of them as police officers. At

the time Chief Prine made the negative comments about the community, Officer #2 said that he/she was a patrol officer. Officer #2 also said that he/she didn't think it impacted the way officers did their jobs. He/She said Chief Prine never said anything like that again.



e.   *Officer #3*

Officer #3 said that he/she was in the 1st Precinct beginning in early 2020. He/She confirmed that the Chief Prine made a derogatory statement about the public. According to Officer #3, Chief Prine said, "You need the public, but fuck the public." According to Officer #3, Chief Prine also bragged about being able to look someone in the face and make them believe they were a friend when he actually didn't care anything about them.

Officer #3 said that these comments were made at an open rollcall in the 1st Precinct, early in Chief Prine's tenure as chief. Officer #3 said that 15 to 20 other people were present when it happened and that everyone was shocked.



## IX.   VIEWS OF MOBILE LEADERSHIP

The Independent Investigative Team met with several of Mobile's elected leaders as part of its investigation in order to obtain their thoughts about MPD and MPD/community relations.

### A.   Mayor Sandy Stimpson

Mayor Sandy Stimpson expressed his desire to get to the bottom of the problem, if there was any, involving the recent use of force incidents by the police department. It was his view that "the truth is the truth," and he wanted the Independent Investigative Team to do a thorough job and provide the city with whatever findings it arrived at.

Mayor Simpson commented on the fact that if you look at crime statistics, they're trending down, so you would think that MPD is getting the job done. However, he said that you cannot rely on statistics alone. He said that you cannot police your way out of crime and violence, but rather it takes the community coming together. He said that you have to listen to the community and you need the community for the police department to be effective.

54048437 v1

**B.**     **Councilor # 1**



82



**C.    Councilor # 2**



**D.    Councilor # 3**



**E.** **Councilor # 4**

54048437 v1



## X.    VIEWS OF COMMUNITY STAKEHOLDERS

### A.    NAACP Chapter 5044

The Independent Investigative Team had the opportunity to sit down with NAACP Chapter 5054.  NAACP Chapter 5054 representative # 1 said that they had a unique opportunity in July 2020 during the George Floyd protests to meet with local law enforcement leaders and express their views. He/She connected with Richard Moore, then the U.S. Attorney in Mobile, and they had a Zoom call with all the leaders of the Black community and local law enforcement leaders

about what they thought were unequal laws and treatment of people of color in the Mobile area. This collection of African-American leaders asked that a community advisory board for law enforcement be established, and their request was granted. However, it was disbanded in 2021, and he/she doesn't know why. He/She said that everyone he/she talks to has a different opinion as to why it was disbanded.

NAACP Chapter 5054 representative # 1 said that he/she also spoke with Chief Prine on several occasions during this time, and that they have a professional relationship. However, he/she said that he/she had to verify that he/she had the correct telephone number for Chief Prine because he didn't return his/her calls on a consistent basis.

NAACP Chapter 5054 representative # 1 described MPD officers' behavior as being similar to "cowboys." He/She said that they typically showed no respect or dignity to citizens, or those they had to use deadly force against in the line of duty at their later press conferences with the media. He/She said that he/she had raised the issue of MPD officers using foul language with Chief Prine.

NAACP Chapter 5054 representative # 1 said that many persons in the African-American community were greatly offended by the Comic Cowboys Mardi Gras float that said, "The MPD releases BWC video with shocking results." He/She said that the silence afterwards from all city officials and the police was very disappointing. He/She and others hoped that they would weigh in publicly to say that the Comic Cowboys Mardi Gras float was offensive and inappropriate.

NAACP Chapter 5054 representative # 1 stated his/her perception that most traffic stops in the Mobile area were of African-Americans. The most common complaints he received from his/her constituency about MPD were allegations of excessive force, bad language and a lack of basic respect.

When the Independent investigative team asked NAACP Chapter 5054 representative # 1 what role or responsibilities he/she would like to see a citizen advisory board have, he/she said to: 1) discuss the concerns of the citizens; 2) review board should be a mixture of the community; 3) they should have some type of investigatory powers, and; 4) they should be able to speak to MPD supervisors directly.

MPD Internal Affairs is also part of the problem according to NAACP Chapter 5054 representative # 1. He/She said police policing the police is a problem, and that they lack objectivity. He/She suggested that the D.A.'s Office needs to have something to do with reviewing MPD officer misconduct.

### B.    Pastor # 1

Pastor # 1 is a prominent African-American pastor in the Mobile area that has participated in police community engagement initiatives over the past several years. He/She advised that he/she has no understanding of police policy and why they perform their tasks the way that they do. When he/she was asked about the status of police/community relations, he/she said that it is very strained.

He/She informed the Independent Investigative Team that he/she has been involved with and assisting the family of Kordell Jones in the wake of his death. He/She said that he/she is most

bothered by police comments to the media immediately after the fatal use of force against Mr. Jones, in which they demonized him by describing him as a person who came from a bad background. He/She said that MPD often describes the parents of persons MPD uses deadly force against as bad parents. For example, "If this person's parent would've done XYZ, their child would not have had a bad encounter with law enforcement."

He/She said that greater work has to be done by police in respecting the "sanctity of life." He/She also expressed concern that if you speak up on something that the police have done wrong then you are perceived as "anti-police." He/She advised that he/she is not anti-police. Nonetheless, he/she said that police should show empathy for those they have to use deadly force against in the line of duty.

He/She also said that MPD should sit down with the community in "times of peace" in order to open the doors of communication with the community. For example, he/she said that MPD should explain their tactics and how they use intel to guide their actions. He/She also questioned whether or not it was "that serious" to search the home of Kordell Jones when they knew that the person that they were looking for was not there at the time of the search.

Pastor # 1 also said that there is now a negative community stigma that attaches if you are too closely affiliated with MPD. He/She stated that he/she was very concerned about the reactions in the community if something else happened that was negative involving the police if no prior outreach to the community is performed.

He/She said that Chief Prine previously tried to set up normal meetings with the clergy in Mobile and that things were going well until the recent use of force incidents happened. He/She said that if MPD restarts community outreach efforts, MPD officials have to come to the community rather than the community going to them.

Pastor # 1 said that the top two complaints he heard from the community about MPD were the following: 1. MPD's tone of interaction with community members (disrespect and bad language), and; 2. There is a perception that African-American community members are approached differently than their White counterparts, and that they are presumed to be guilty when approached by police.

    **C.**    **Police Benevolent Association representative # 1**



54048437 v1



## XI.    VIEWS FROM THE COMMUNITY

### A.    Community Listening Forum

On the evening of March 21, 2024, the Independent Investigative Team convened a Community Listening Forum in order to field the opinions and views of everyday community members about MPD's use of force over the past year. Of particular note, the family and friends of Kordell Jones and Jawan Dallas were present. Several City Council Members and Mobile's Public Safety Director were also in attendance. Citizens generally expressed a palpable fear of encountering MPD officers for fear that they would be unjustly killed or abused in some way.

Although the Independent Investigative Team had arranged for a person to travel around the room with a microphone in order to give meeting attendees the opportunity to share their thoughts, the Independent Investigative Team had to pause on several occasions when a community member without the microphone spoke or yelled loudly expressing their genuine grief, rage or fear related to MPD officers' use of force over the past year. While the event was progressing the phrase "SLAVE PATROL" was periodically yelled from different portions of the gathering. Most notable was the grief and anger the Jawan Dallas family felt that their loved one was made into a satirical joke by the Comic Cowboys' Mardi Gras float. The Independent Investigative Team welcome these and other comments as part of its investigation. Meeting attendees expressed wide range of views about the City of Mobile, several of which were general grievances unrelated to MPD's recent use of force. Below are several of the relevant comments (without attribution) the Independent Investigative Team gathered by hosting the Community Listening Forum:

54048437 v1

- "No-knock warrant is a murder warrant."
  - Explains the situation where he has his gun next to him and if he wakes up to someone banging down his gun he will pull his gun as he is ex-military.
  - Says there is a better way to conduct that warrant.

- Her background involves working with veterans, and in her experience a lot of veterans have PTSD (Post Traumatic Stress Disorder).
  - Her analogy:
    - When someone comes into your house, you take a flashlight to look who is there and if they think it is a gun, they would shoot her.
  - There could be medical problems and it is difficult to get fully awake during a pre-dawn warrant.
  - There are other ways for the warrant to be accomplished.
  - She was a steward and knows leadership and this is not the way to do it.
  - A lot of people also have dogs who will alert when the police show up, and just do what they do and the police shoot the dog.
  - Impossible to go to someone's home and knock the door down without problems.
  - The police do not know if the people are ex-military or have health issues.
  - If citizens know someone has committed a crime, they need to report it.
  - People don't like police because they do not do things right.
    - For example, people are searched and they have nothing to do with the crime
  - Kicking a door down and coming in unannounced is a "bad, bad idea."
- Need to get rid of "no knock warrants."
  - Shared that citizens feel as like no one cares about them.
  - Says Mobile is in slavery and the confederacy is real.

- DA and MPD are too close for DA to review deadly use of force incidents objectively.

- Dallas family waiting and fighting to see the BWC footage.
  - Dallas family brought up the Comic Cowboys Mardi gras parade
    - Says they are KKK and it was a "mockery."
    - And no one said or did anything about it.
  - There is also an outcry for the video to be shown and an outcry for transparency.
  - Concerned about us doing the report because Mobile government is going to do something "crooked" once the report comes down.
  - Mentions that money is going to be a factor.
  - They said that they want justice for all African-Americans who are murdered by the police.
  - Says they need to move the police department. Possibly to being under another person?

- The Independent Investigator's report is pointless if the city has to implement it, because it won't.

- A person commented on the case relating to the 16-year-old's death

- MPD had probable cause earlier in the week for the warrant...
- They question the evidence underlying the warrant…
- They point out that the suspect was not even home when the search warrant was executed.

o People are being targeted.
o The Constitution is not being enforced in Mobile.
o Complaints are being swept under the rug.
o Courtroom is a joke.
o She says that this is not just an MPD issue, it is also a city issue
  - "Mobile Mafia" – corruption through the generations
  - Prine went nuts after the ordinance and bused officers to the meeting and then celebrated when it failed

o No-knock warrants
  - Only use them for the worst offenders, the brother who was arrested (Kordell Jones' brother) was out in a couple of days, so he was not the worst offenders.
  - Thinks the MPD priorities are not right.
  - Not addressing citizen complaints, but then taking the SWAT team to the Black family house.
  - Petitioned to clean up streets but then the SWAT incident with 16-year-old happens.

o 16-year-old – say their names
  - "We are in Alabama but doing the Texas 2 step"
  - He says that people were not prepared for this (just a listening session), they thought they were getting answers.
  - He says this is reminiscent of Michael Moore where they set up a board to investigate and then nothing happened.
  - Says that he wants to know the status of these boards (Citizen Advisory Boards) and power of these boards
  - Wants more citizen advisory boards to be a part of the recommendations.

o The youth need to be involved in the process.:
  - Everyone in the room is older, but need to talk to the youth.
  - Recommendation is to hear from youth in a safe place.
  - Police and public officials cannot be there.
  - Says they cannot have a complete report without hearing from young people.

o Citizen Complaint re Sharing BWC video with Public:
  - Brought up BWC video and wanting transparency in BWC being shared to the public.
  - Recommendation - 72 hours to share BWC.
  - First to family and then to the media for the public can see.
  - Summation – wants policy to show the BWC within a specified period of time.

o Recommendation – says that the police just have to know the community.

o Citizen concerned about "no-knock warrants."
- Says no one should go into anyone's house without knocking.
- Comment related to Comic Cowboys – says city should have fined them and taken down their Mardi Gras float.
- Says you do not have to have a permit to have a gun, so there is a danger to everyone.
- Must get rid of no-knock.
- He wants DOJ to come to Mobile and investigate the city.

o Mobile is not holding MPD accountable.
- Sad that they are losing 4 Black guys and nothing is happening to MPD.
- Need to give everyone an opportunity to get out of the house.

o Recommendation – come up with plan where officers address citizens properly and give respect.

o Family of Kordell Jones
▪ Recommendation that Chief of Police should not make a victim blaming statement until the investigation is complete.
▪ Chief Prine finds them guilty before they are even tried.
▪ Says that facts are being misconstrued by the media.
▪ No-knock warrant should be banned.
▪ No one knew that it was police and they had no idea what was on the other side of the door coming inside.
▪ Also says the use of explosives on the door was unsafe and inappropriate.
▪ The family found out about grand jury results along with the public.
▪ They still have not received a proper death notification
▪ The way that they do things in Mobile is not proper and not right.

o Recommends additional listening sessions.
o Suggest having training sessions and partnerships with local organizations to advocate for the needs of the community.

o This is not a policing problem. It is a sociological and economic breakdown in the Black community. Until parents are held accountable for the environments in which their children are raised, violent crime will persist. Consistent with their mission of Public Safety, law enforcement will persist in a manner that minimizes risk to the officers.

Minimizing risk to law enforcement officers must come first. There are limited numbers of well-trained, dedicated public servants in law enforcement and thanks to short-sighted policies to cut funding and tie their hands, the number is shrinking. They are being asked to police ever growing numbers of young people whose parents and role models have failed them. The sociological crisis is getting worse. The risk to the safety of law enforcement is growing. So the number of engagements between the police and the policed are going to continue, and the number of engagements ending in violence will as well.

92

A. Community Advisory Board

Immediately prior to the Community Listening Forum the Independent Investigative Team met with the Community Advisory Board (CAB) to obtain their thoughts and views as to the recent use of force incidents by MPD. The CAB predominantly comprised of Mobile area African-American religious and community leaders . The CAB periodically meets with the Mobile Public Safety Director in order to provide concerns from the community and input on police/community relations.

On the evening of March 21, 2024, CAB met with the Independent Investigative Team and shared various concerns regarding MPD. One CAB member shared concerns about the officer recruitment process. The member said that the public is unaware of the general qualifications, what type of background checks are performed, whether any psychological evaluations are performed prior to hiring, and whether the police department can see any past discipline history if the officer is transferring from another police department. In sum, the CAB would like to receive more transparency regarding the officer recruitment and hiring process.

Next, the CAB shared concerns regarding officer training. The members highlighted that MPD can provide as much training as possible, but officers must choose to implement and enforce the training. To this end, the CAB wants more stringent rules regarding body camera (BWC) footage. For example, the CAB recommended that officers not be given an option to turn BWC footage on and off, and if an officer fails to active their BWC during a citizen encounter, then the officer should receive serious and progressive discipline. The CAB stated that BWC footage is necessary to establish transparency and create evidence that can be used when evaluating police conduct.

The CAB also recounted issues with police practices. The CAB thinks that MPD polices "with a net, not a pole." The CAB wants MPD to use targeted intelligence to accomplish its missions instead of generally targeting a group or community. The CAB used the "jump out boys" (the former Jaguar Unit) program to demonstrate this frustration, and they shared that they feel as though these same type of tactics are being reintroduced and used by MPD.

A large issue of concern was accountability—who is policing the police. The CAB was concerned about who is responsible for ensuring that officers are in a good mindset before going to work and into the community. The CAB wants to ensure resources are in place to help officers who may be going through a difficult time. Also, the CAB recommends that other officers receive training on identifying when officers may not be in a good mindset before going into the community, and how to address that. Further, officers should be trained on the duty to intervene if the officers see something in the field that is inappropriate or worrisome. Thus, there should be polices, practices, and procedures for the duty to intervene.

Finally, the CAB addressed the MPD mindset. A CAB member noted that every person in the community is able to make a change. Therefore, MPD and its officers must be open to hearing ideas and suggestions from those outside MPD. Further, MPD must be open to having the community and the CAB help implement change and ensure accountability because MPD officers serve the community. Moreover, the CAB shared concerns regarding the MPD's relationship with

community youth. The CAB recounted that there is a need to combat youth gang and gun violence. To help accomplish this mission, there should be more MPD engagement targeted towards community youth initiatives such as the Boys and Girls Club, Bridging the Gap, and other strategic youth initiatives.

However, the CAB also recognized that there must be mutual respect between MPD and the community. The CAB acknowledged that there is a history of abuse in policing, and therefore, trust cannot be built overnight. The CAB shared that several members of the community feel as though they are categorized and treated as "criminals" or "thugs," which contributes to the feeling of distrust. To heal the feelings of distrust, there must be a shift and emphasis on community policing. MPD must be transparent about complaints and incidents to strengthen trust. The youth must also be given opportunities to engage with police in positive and educational ways, such as inviting schools to the gun range and strengthening youth strategic initiatives.

## XII. ADDITIONAL INDEPENDENT INVESTIGATIVE TEAM OBSERVATIONS AND RECOMMENDATIONS

1. It was articulated to the Independent Investigative Team by several MPD officers there is an unwritten policy requiring that officers involved in or on the scene of an officer-involved shooting, or use of force incident, be separated from each other and refrain from making statements to others in order to preserve the integrity and independence of the statement/testimony they provide. However, a review of the BWCs from several of the use of force incidents the Independent Investigative Team was tasked with reviewing showed officers conferring with each other after use of force incidents discussing the use of force event. The Independent Investigative Team recommends formalizing the separation of officers on the scene immediately after the incident when conducting investigations of Level 3 Use of Force, in-custody deaths, any fatal motor vehicle crash in which the actions of a MPD member were a contributing cause.

    In order to further this purpose, preserve officer integrity, create greater transparency and build greater public trust in the review of officer-involved shootings and other use of force incidents, the Independent Investigative Team recommends that MPD create a Serious Incident Response Team (SIRT). SIRT is a multidisciplinary unit tasked with conducting investigations of Level 3 Use of Force, in-custody deaths, any fatal motor vehicle crash in which the actions of a MPD member were a contributing cause, any Use of Force incident in which the involved member is ranked captain or above, and investigations specially assigned to SIRT by the Police Chief or designee.

2. MPD currently has multiple and parallel tracks to administratively review officer involved shootings, all of which appear to be discretionary in execution at the Chief of Police's election. The Independent Investigative Team recommends that MPD develop definitive policies for the administrative review of officer-involved shootings or delegate such a review to an external law enforcement agency such as the Alabama State Bureau of Investigation.

3.  Consistent with BWC and transparency it is recommended that MPD obtain and make use of Samsara on MPD patrol vehicles. Samsara is a video-based system. The system uses GPS, device sensors, HD video, and Artificial Intelligence. The device is constantly recording and saves video in real time. There is an estimated 3-4 weeks of recorded video that is accessible for event retrieval. The device's GPS also allows for fleet tracking capabilities, including live positioning as well as historical routes.

4.  The City of Mobile Alabama would benefit from conducting a 3-year study to ascertain police practices on constitutional arrests, searches, seizures, and traffic stops; use of force practices including the deployment of Tasers.

    4.1. The study should examine the proactivity following each data set to include:

    • prosecutorial successes
    • percentage of tickets/citations issued from car stops
    • contraband seized from car, and body searches

    4.2. The study should also include an analysis of the deployment of resources, patrolling strategies, searches, seizures, arrests, use-of-force, and proactivity in        relationship to the racial, gender, and socio-economic demographics of the city.

5.  The Independent Investigative Team recommends that OPR/Internal Affairs develop a standard protocol or policy for the items that should be reviewed in the course of their investigation, including the disciplinary file, training record, and training materials that were presented to the officer being investigated. OPR/Internal Affairs investigators should also receive specialized training that equips them to perform that specialized role within the MPD. Lastly, OPR/Internal Affairs investigators should refrain from asking interview questions that are leading in nature to the subject they are interviewing.

6.  It is advisable for the police department to create and maintain an Equity Office to operationalize and institutionalize diversity, equity, and inclusion strategies to assist in significant culture and climate changes department wide.

7.  (GENERAL ORDER CONSTRUCTION AND TRANSPARENCY) MPD uses numerous documents that establish parameters in which member performance and authority; agency organization and operations; and measures of accountability are communicated to members and to the public they serve.

    7.1. The agency has a series of directives that likely confuse and or misdirect members and the public – as it is unclear which document takes precedent; whether the documents act in concert with or contradict one another; or present

inconsistent expectations. They are *Memorandum Orders*, *General Orders*, *Special Orders*, *Policies and Procedures*.

7.2. The Memorandum of Orders includes a confusing and incoherent opening statement that fails to simplify its purpose and its authority in relationship to the other agency documents:

> "Memorandum Orders are issued to inform and direct. They shall not be used to disseminate information or instructions that do not warrant a formal order or direct the actions of subordinates in specific situations not authorized by General or Special Orders. Such direction cannot deviate from or conflict with established policies as documented by higher authority. Memorandum Orders shall explain or emphasize portions of previously issued orders or inform employees of the actions of other agencies. All Memorandum Orders shall be retained on a permanent basis unless otherwise rescinded. Periodically circumstances may deem it unfeasible to conform to Memorandum Orders, and certain situations may be presented that are not covered. In such events, employees shall contact their supervisor or proceed upon their judgment with consideration of policies and procedures."

7.3. The agency should consider collapsing all documents with the exception of two: Policies and Procedures; and Chief of Police Orders (CPO). CPOs would establish directives in the interim until policies and procedures can be written to address the specific issue in the long term. More specifically, CPOs are issued immediately following collective bargaining outcomes, if any; newly passed legislation or regulations impacting policing; and Chief of Police initiatives to heighten patrolling practices.

8. Restructure the General Orders (Policies, Procedures) for easier access and readability by agency members and the community.

8.1.    In circumstances where agencies are under a federal Consent Decree, i.e., Baltimore City, Portland, New Orleans, etc., agency policies and procedures are placed on the agency's website for easy public access. This lends to an agency that is fully committed to transparency to their members, elected officials, and the communities that they serve. Transparency is one quality that reflects the agency's attempt to gain public trust.

8.2.    Policy Chapters and Sections should be separated out; have their own links on the website; have a consistent numbering system; and have separate page numbers. This also allows for easy revisions to be made.

8.3.    Each policy should have an origination page to include the author/analyst of the policy, the date of adoption; approval signature line for the Chief of Police; and the projected review date. Generally, all policies should be under review every 2-3 years. A list of review and revision dates on each policy indicates that the agency is engaged in self-examination and ensuring the adoption of best practices and update information.

8.4.    Establish an agency policy that outlines an electronic signature process by which members authenticate receipt and understanding of policies – both original and revisions.

8.5.    Currently, the Mobile Police Department policies are significantly outdated - ranging from 2008 to 2014. The Most recent is the organizational chart dated 2022.   Minimally, outdated policies indicates that the agency:

- lacks transparency in operational processes
- lacks transparency with the community
- is inconsistent and arbitrary with its decision making
- too often violates its own policies, current laws, and industry regulations
- is at greater risk for liability
- ignores best operational practices in the industry
- fails to hold itself accountable for ineffective and inconsistent practices
- experiences confused employees resulting in poor performance, employee dissatisfaction, and disengagement

8.6     The Mobile Police Department should establish a policy research, review, writing, and revision unit, along with a 2–3-year cycle for reviewing policies.

9.  Create structured opportunities (i.e., written public comments; focus groups; ad hoc committees) through the Planning and Research Unit for public input into the writing and revisions of policies that directly impact community members and their engagement with law enforcement, to include "Use of Force" and other related policies.

9.1. Develop an online platform for community members to review and provide input on agency policies.

9.2. Identify and publish a timeframe by which community members can provide input on agency policies.

9.3. Establish a Community Policy Review Committee (CPRC) that meets bi-annually with the Planning and Research Unit to assess the use of community input in policy writing; and to assess the progress made on policies that impact African -American and other marginalized communities that more often encounter law enforcement. The CPRC should be composed of members of marginalized communities that are more likely to encounter law enforcement.

97

10. The Independent Investigative Team takes note that Chief Prine was placed on administrative leave subsequent to the Independent Investigative Team providing its preliminary findings to Mayor Sandy Stimpson and other officials of his administration. Since that time Chief Prine has engaged in a sustained campaign to discredit the integrity of this report. He has also made what appear to be a series of unsubstantiated claims that Mayor Stimpson, his Chief of Staff, the Public Safety Director and others within MPD who have been critical of his tenure as chief, have engaged in illegal and unethical conduct. It is the Opinion of the Independent Investigative Team that Chief Prine's recent actions are emblematic of his autocratic tendencies and are consistent with his prior actions of:

- trying to intimidate Mobile City Council members in the lead up to the vote as to the ordinance to ban "no knock warrants" and pre-dawn raids
- demeaning and dismissing certain segments of the community that are critical of MPD's treatment of them
- during press conferences, denigrating the character of persons subject to police use of force
- engaging in an unconstitutional quest to find, and make public, derogatory information about people subject to police use of force
- the probable unconstitutional transport and detention of a decedent's family members
- demeaning MPD ████████ staff when he initially became chief
- ████████████████████████████████████████████████████████

Unfortunately, a portion of MPD has adopted Chief Prine's autocratic demeanor in the way it executes its public responsibilities. Chief Prine's autocratic tendencies in isolation, or perhaps in another vocation, may be acceptable. However, as stated in the preamble of this report, "Police are the only entity in the United States of America that have the legal authority to restrict freedom and or seize an induvial based on law, discretion and training," and indeed, legally utilize fatal use of force, under color of law. If this authority is wielded from an autocratic mindset, constitutional violations will abound and the dignity due to every citizen, as well as the sanctity of life, will be subordinated.

Therefore, the Independent Investigative Team recommends that MPD Command staff and Executive Leadership Team consistently undertake leadership training with the understanding that officers – especially young officers will follow their example – from dress to mannerism – to the language and philosophy of the leadership and Command Staff.

The International Association of Chiefs of Police (IACP) notes:

> For chiefs who are committed to preparing for a critical incident involving use of force issues, highly specialized training is essential. For example, table top

exercises in partnership with other key players such as the city manager, command staff, public information officers, Department of Justice officials, and trusted partners within the media, police union, and public interest groups can be useful. Such exercises can simulate the type of pressures generated during a real crisis. Crafting a post-incident protocol in partnership with this group that fits the norms of unique communities and departmental policies and procedures would be invaluable as a guide during a real incident. Communication strategies that inform the public while maintaining the confidence of front-line officers who require the chief's support require planning in advance, and should not be addressed for the first time during an emotionally charged event. . *Emerging Use of Force Issues*, Int'l Ass'n of Chiefs of Police/COPS Office Use of Force Symposium, https://portal.cops.usdoj.gov/resourcecenter/RIC/Publications/cops-p232-pub.pdf (last visited Apr. 17, 2024).

The IACP also indicates that the agency's internal affairs or other appropriate investigative authority should review all use of force reports. Further investigations should be conducted in cases where there are inconsistencies in reports by officers, supervisors, or witnesses; in instances of irregularities in reports; or in other cases deemed necessary. All uses of force that result in injury, serious bodily injury, or death to a subject or officer should be reviewed by the agency chief executive or their designee in order to identify any deficiencies in agency policy, procedures, rules.

IACP provides that:

Because of the adverse consequences that a failure to control agency use of force might entail, positive steps must be taken by each law enforcement agency to ensure that use of force is strictly monitored. In addition to the reporting requirements that are the focus of this document, a comprehensive approach may be divided into five categories:

• **Policies.** The agency must establish policies that effectively govern use of force and reporting use of force incidents.

• **Training.** The agency must train its officers to ensure that they all understand the policies' provisions and adhere to them.

• **Monitoring.** The agency must monitor use-of-force policy compliance by effective first-line supervision and by establishing and maintaining a system of reporting of all use of force incidents.

• **Sanctions.** The agency must be prepared to take prompt, effective action against officers who employ excessive force in violation of the agency's policies.

• **Public Disclosure.** The agency should issue reports on use of force in a summary manner that are available to the public. It has been demonstrated that transparency enhances public trust and demonstrates that an agency adheres to constitutional policing.